**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

DARNELL WASHINGTON,

      Defendant.

Case No. 13-CR-0173 (JBW)

## MEMORANDUM OF *AMICUS CURIAE* THE WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS

Brandon W. Duke
Winston & Strawn LLP
1111 Louisiana Street, 25th Floor
Houston, Texas 77002
Tel: (713) 651-2636
Fax: (713) 651-2700
bduke@winston.com

Jeffrey J. Amato
Benjamin Sokoly
Jonathan R. McCoy
Sean R. Anderson
Winston & Strawn LLP
200 Park Avenue
New York, New York 10002
Tel: (212) 294-6700
Fax: (212) 294-4700
jamato@winston.com
bsokoly@winston.com
jmccoy@winston.com
sranderson@winston.com

*Counsel for* Amicus Curiae *The Washington Lawyers' Committee for Civil Rights and Urban Affairs*

March 10, 2016

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................. 1

INTERESTS OF THE AMICUS .......................................................................... 3

BACKGROUND .................................................................................................. 4

    A.    The BOP and Protective Custody in Special Housing Units .................................. 4

    B.    Procedural Background Relevant to Mr. Washington ......................... 10

ARGUMENT ...................................................................................................... 11

I.    The BOP Overuses Solitary Confinement, including Placing Vulnerable Inmates into the Harmful and Degrading Conditions of Protective Custody ............................... 11

    A.    The BOP Would Likely Place an Inmate with a History of Victimization, Sexual Offenses against Minors, and Mental Illness into Protective Custody ................................................................................ 13

    B.    The BOP's Protective Custody Is Just as Damaging and Degrading as Punitive Solitary Confinement ............................................................... 20

    C.    The BOP's Policies and Reliance on Segregated Housing Contrast with the Trends in Other Jurisdictions ......................................................... 24

    D.    The BOP's Rationale for Placement of Inmates in SHUs Is Misguided and Misapplied ................................................................................. 27

II.    The BOP Does Not Properly Diagnose and Treat Individuals with Mental Illness, Which Can Lead to a Violation of Such Individuals' Eighth Amendment Rights When They Are Placed in Solitary Confinement .............................................. 29

III.    Confinement Conditions in BOP Solitary Confinement Units Likely Engender or Dangerously Exacerbate Serious Mental Illness ............................................... 36

CONCLUSION ................................................................................................... 41

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Brown v. Plata*,
    131 S. Ct. 1910 (2011) ........................................................................................32

*Cunningham, et al. v. Fed. Bureau of Prisons*,
    No. 12-cv-01570-RPM (D. Colo. *filed* June 15, 2015) .................................34, 35

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ..........................................................................................33

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ..........................................................................................33

*In re Medley*,
    134 U.S. 160 (1890) ..........................................................................................32

*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000) ..........................................................................14

*Tillery v. Owens*,
    907 F.2d 418 (3d Cir. 1990) ...............................................................................4

*United States v. Parish*,
    308 F.3d 1025 (9th Cir. 2002) ..........................................................................16

*Wilkinson v. Austin*,
    545 U.S. 209 (2005) ............................................................................................4

STATUTES, REGULATIONS AND POLICY STATEMENTS

U.S. CONST. amend. VIII ........................................................................................ *passim*

42 U.S.C. § 1997 ......................................................................................................32

42 U.S.C. § 15601 *et seq* .......................................................................................14

Disciplinary Segregation Status, 5 C.F.R. § 541.24 (2015) ....................................6

Inmate Discipline Program, 5 C.F.R. § 541.1 *et seq.* (2015) ............................6, 27

Prohibited Acts and Available Sanctions, 5 C.F.R. § 541.3 (2015) .......................28

Protection Case—Placement in Administrative Detention Status, 5 C.F.R. § 541.27
    (2105) ................................................................................................................6

Special Housing Unit, 5 C.F.R. § 541.20 (2015)..........................................................................5

Status When Placed In the SHU, 5 C.F.R. § 541.22(b) (2015) ......................................................6

Telephone Regulations for Inmates, 5 C.F.R. § 541.100 *et seq.* (2015)........................................8

Federal Bureau of Prisons, Program Statement 5310.13, "Institution Management of
     Mentally Ill Prisoners" (Mar. 31, 1995)...................................................................................35

Federal Bureau of Prisons, Program Statement 5310.16, "Treatment and Care of Inmates
     With Mental Illness" (May 1, 2014).........................................................................................35

Federal Bureau of Prisons, Program Statement 5264.08, "Inmate Telephone
     Regulations," § 540.101(f) (Feb. 11, 2008) ...............................................................................8

**OTHER AUTHORITIES**

ABA Standards for Criminal Justice on the Treatment of Prisoners, Standard 23-1.0(r)
     (3d ed. 2011) (WLC App. 1-4) ..................................................................................................5

Alice Ristroph, *Sexual Punishments*, 15 Colum. J. Gender & L. 139 (2006) (WLC App.
     5-41).........................................................................................................................................14

Benjamin Wesier, *A Judge's Struggle To Avoid Imposing A Penalty He Hated*, N.Y.
     Times (Jan. 13, 2004), http://www.nytimes.com/2004/01/13/nyregion/a-judge-s-
     struggle-to-avoid-imposing-a-penalty-he-hated.html?_r=0 (WLC App. 42-48).....................16

CCR Statement, Reassessing Solitary Confinement: The Human Rights, Fiscal, and
     Public Safety Consequences, Hearing Before the S. Judiciary Subcomm. on the
     Constitution, Civil Rights, and Human Rights (June 19, 2012), (S. Hrg. 112-879),
     *available at*
     http://www.ccrjustice.org/sites/default/files/assets/files/Statement%20of%20the%20C
     enter%20for%20Constitutional%20Rights.pdf (WLC App. 49-56)..............................7, 25, 26

CNA Analysis and Solutions, Federal Bureau Of Prisons: Special Housing Unit Review
     and Assessment (2014), *available at*
     https://www.bop.gov/resources/news/20150226_cna_shu_review-assessment.jsp
     (WLC App. 57-318).................................................................................................... *passim*

Craig W. Haney, *Mental Health Issues in Long-Term Solitary and "Supermax"
     Confinement*, 49 Crime & Delinquency 124 (2003) (WLC App. 319-351) ..........................38

Cresson Report, U.S. Department of Justice, Letter to the Honorable Tom Corbett, Re:
     Investigation of the State Correctional Institution at Cresson and Notice of Expanded
     Investigation (May 31, 2013), *available at*
     https://www.justice.gov/sites/default/files/crt/legacy/2013/06/03/cresson_findings_5-
     31-13.pdf (WLC App. 352-390) .............................................................................4, 7, 29, 32

Emily Horowitz, *Growing Media and Legal Attention to Sex Offenders: More Safety or More Injustice?*, 2007 J. Inst. Just. Int'l Stud. 143 (2007) (WLC 391-399)............................16

Federal Bureau of Prisons, Special Housing Unit Review and Assessment Report Response: Response to Report by CNA Analysis and Solution (Feb. 2015), *available at available at* https://www.bop.gov/resources/news/20150226_cna_shu_review-assessment.jsp (WLC App. 400-405) ...................................................................................22

GAO Report, U.S. Gov't Accountability Off., GAO-13-429, Report to Congressional Requesters, Bureau of Prisons: Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of Segregated Housing (2013), *available at* http://www.gao.gov/assets/660/654349.pdf (WLC App. 406-477)................................. *passim*

Ian Lovett, *California Agrees to Overhaul Use of Solitary Confinement*, N.Y. Times (Sept. 2, 2015), http://www.nytimes.com/2015/09/02/us/solitary-confinement-california-prisons.html (WLC App. 478-482) ........................................................................11

James E. Robertson, *A Clean Heart and an Empty Head: The Supreme Court and Sexual Terrorism in Prison*, 81 N.C. L. Rev. 433 (2003) (WLC App. 483-532)................................16

James E. Robertson, *Cruel and Unusual Punishment in United States Prisons: Sexual Harassment Among Male Inmates*, 36 Am. Crim. L. Rev. 1 (1999) (WLC App. 533-584) ................................................................................................................................16

James Ridgeway & Jean Casella, *Under Fire, the Federal Bureau of Prisons Audits Its Use of Solitary Confinement—and Buys a New Supermax Prison*, Solitary Watch: News from a Nation on Lockdown (Oct. 18, 2013), http://solitarywatch.com/2013/10/18/fire-federal-bureau-prisons-audits-use-solitary-confinement-buys-new-supermax-prison/ (WLC App. 585-589)............................................19

John J. Gibbons & Nicholas de B. Katzenbach, *Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons*, 22 Wash. U. J.L. & Pol'y 385 (2006) (WLC App. 590-767) .....................................................................................................27

Joseph Stromberg, *The Science of Solitary Confinement*, Smithsonian Magazine (Feb. 19, 2014), http://www.smithsonianmag.com/science-nature/science-solitary-confinement-180949793/?no-ist (WLC App. 768-770).........................................................................11, 40

Juliet Eilperin, *Obama Bans Solitary Confinement for Juveniles in Federal Prisons*, The Washington Post (Jan. 26, 2016), https://www.washingtonpost.com/politics/obama-bans-solitary-confinement-for-juveniles-in-federal-prisons/2016/01/25/056e14b2-c3a2-11e5-9693-933a4d31bcc8_story.html (WLC App. 771-775)................................12

Marcia G. Shein, *The Changing Landscape of Sentencing Mitigation in Possession of Child Pornography Cases*, Champion: The National Association of Criminal Defense Lawyer, May 2011, at 35, 37-38, *available at* https://www.nacdl.org/champion.aspx?id=20607 (WLC App. 776-786)................................16

Mary Sigler, *Just Deserts, Prison Rape, and the Pleasing Fiction of Guideline Sentencing*, 38 Ariz. St. L.J. 561 (2006) (WLC App. 787-802) ...........................................16

Michael Schwitz & Michael Winerip, *New York State Agrees to Overhaul Solitary Confinement in Prisons*, N.Y. Times (Dec. 16, 2015), http://www.nytimes.com/2015/12/17/nyregion/new-york-state-agrees-to-overhaul-solitary-confinement-in-prisons.html (WLC App. 803-807)....................................11

Nadia Ramlagan, *Solitary Confinement Fundamentally Alters the Brain, Scientists Say*, American Association for the Advancement of Science (Feb. 26, 2016), http://www.aaas.org/news/solitary-confinement-fundamentally-alters-brain-scientists-say (WLC App. 808-810) ........................................................................39

National Prison Rape Elimination Commission Report ("NPREC") 217 (June 2009) (Appendix B: NPREC Standards—Adult Prisons and Jails: SC-1), *available at* https://www.ncjrs.gov/pdffiles1/226680.pdf (WLC App. 811-818). .....................................15

Peter Baker & Erica Goode, *Critics of Solitary Confinement Are Buoyed as Obama Embraces Their Cause*, N.Y. Times (July 21, 2015), http://www.nytimes.com/2015/12/17/nyregion/new-york-state-agrees-to-overhaul-solitary-confinement-in-prisons.html (WLC App. 819-823)....................................12

Phillip H. Witt & Natalie Barone, *Assessing Sex Offender Risk: New Jersey's Methods*, 16 Fed. Sentencing. Rep. 3 (2004) (WLC App. 824-829) .......................................16

President Barack Obama, *Why We Must Rethink Solitary Confinement*, The Washington Post (Jan. 25, 2015), https://www.washingtonpost.com/opinions/barack-obama-why-we-must-rethink-solitary-confinement/2016/01/25/29a361f2-c384-11e5-8965-0607e0e265ce_story.html (WLC App. 830-833) ....................................12

Rick Raemisch, *My Night in Solitary*, N.Y. Times (Feb. 20, 2014), http://www.nytimes.com/2014/02/21/opinion/my-night-in-solitary.html (WLC App. 834-837)....................................................................................................40, 41

Sharon Dolovich, *Strategic Segregation in the Modern Prison*, 48 Am. Crim. L. Rev. 1, 13-14 (2011) (WLC App. 838-947)...............................................................14, 23

Stanley L. Brodsky & Forrest R. Scogin, *Inmates in Protective Custody: First Data on Emotional Effects*, 1 Forensic Reports 267 (1988) (WLC App. 948-956) ............................39

Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006) (WLC App. 957-1016) ......................................................4, 23, 36, 37

Timothy Williams, *Prison Officials Join Movement to Curb Solitary Confinement*, N.Y. Times (Sept. 2, 2015), http://www.nytimes.com/2015/09/03/us/prison-directors-group-calls-for-limiting-solitary-confinement.html (WLC App. 1017-1021)........................11

U.N. Secretary-General, *Report of the Special Rapporteur on Torture and Other Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/HRC/31/47 (Jan. 5, 2016) ("U.N. Report"), *available at* https://documents-dds-ny.un.org/doc/UNDOC/GEN/G16/000/97/PDF/G1600097.pdf?OpenElement (WLC App. 1022-1044). ..............................................................................................................26, 27

U.N. Secretary-General, *Interim Report of the Special Rapporteur on Torture and Other Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/HRC/31/47 (Aug. 5, 2011) ("U.N.  Interim Report"), *available at* http://www.ohchr.org/EN/Issues/Torture/SRTorture/Pages/SRTortureIndex.aspx (WLC App. 1045-1071). ...............................................................................................26, 27

U.S. Department of Justice Report and Recommendation Concerning the Use of Restrictive Housing, Final Report (January 2016),  *available at* http://www.justice.gov/dag/file/815551/download (WLC App. 1072-1199)...4, 5, 8, 9, 12, 20, 22, 23

U.S. Department of Justice, Office of the Inspector General, *The Department of Justice's Efforts to Prevent Staff Abuse of Federal Inmates* (Sept. 2009) ("OIG Report"), *available at* https://oig.justice.gov/reports/plus/e0904.pdf (WLC App. 1200-1333) .......15, 24

U.S. Sen. Dick Durbin of Ill., Press Release, Durbin Statement On Federal Bureau Of Prisons Assessment Of Its Solitary Confinement Practices (Feb. 4, 2013), *available at* http://www.durbin.senate.gov/newsroom/press-releases/durbin-statement-on-federal-bureau-of-prisons-assessment-of-its-solitary-confinement-practices (WLC App. 1334-1335) ..................................................................................................................................23

## INTRODUCTION

The Washington Lawyers' Committee for Civil Rights and Urban Affairs ("WLC") respectfully submits this memorandum as *amicus curiae* in the above-captioned matter.[1] Following the June 11, 2015 sentencing hearing, the Court issued an Order directing the parties to brief a number of issues, including "whether sentencing defendant to incarceration in a non-therapy based environment amounted to cruel and unusual punishment, effectively rendering the mandatory minimum, as applied to him, unconstitutional."  Order at 4, June 25, 2015, ECF No. 73.  In connection with that issue, the Court ordered the parties to inform the Court of "what protections or treatment are available . . . to defendant in prison under a fifteen-year sentence" and whether the Court should "take into account that protecting the defendant against sexual attacks may require solitary confinement."  *Id*. at 5.  The Court also invited briefing by *amicus curiae*.  *Id*. at 8.  Subsequently, the Court held an evidentiary hearing on November 23, 2015, December 22-23, 2015, and February 3, 2016.

The following memorandum bears upon the issues identified by the Court by describing the Federal Bureau of Prisons' ("BOP") overuse of solitary confinement and its failure to properly diagnose and treat mentally ill men and women subjected to solitary confinement.  In addition, this memorandum explains how confinement in BOP segregated housing units engenders or exacerbates serious mental illness.  When considered together in the present case, such conditions likely would lead to a violation of Mr. Washington's right to be free from cruel and unusual punishment pursuant to the Eighth Amendment to the United States Constitution.

---

[1] Counsel for the WLC certifies that no counsel for a party authored this memorandum in whole or in part, and no counsel for a party (nor a party itself) made a monetary contribution intended to fund the preparation or submission of this memorandum.  No person other than the WLC, its members, or its counsel made a monetary contribution to its preparation or submission.

As this Court's evidentiary hearing revealed, Mr. Washington faces a high likelihood of being placed into protective custody in a BOP solitary confinement unit if he is sentenced to prison.  This stark reality is due to myriad unfortunate circumstances, including the fact that Mr. Washington has been convicted of a sex-based offense; he is himself a victim of extensive sexual assault, not only during his childhood but more recently while serving a prior prison sentence; he is homosexual; and he suffers from serious mental illnesses.  Compounding the harm such confinement would inflict upon Mr. Washington is the fact that it is also likely that the BOP would place Mr. Washington in solitary confinement for a substantial portion of his imprisonment term—a mandatory minimum of 15 years for the underlying charges.

As this Court appears to be aware by raising the issue *sua sponte* at the June 11 sentencing hearing, *see id*. at 4, and as this memorandum further demonstrates, the BOP currently lacks any constitutionally adequate means of protecting vulnerable men and women like Mr. Washington.  It instead isolates them from meaningful and essential human contact by relegating them to protective custody, which is indistinguishable from punitive forms of solitary confinement, under the guise of securing their safety.  Far from protecting such individuals, studies have shown that the conditions of protective custody are likely to inflict severe harm on these men and women by, for example, causing them to develop mental illnesses or exacerbate pre-existing mental illnesses.  When considered in connection with the information described below, given the likelihood that the only way the BOP will be able to protect Mr. Washington from additional victimization while incarcerated is to place him in solitary confinement for a substantial portion of his sentence, it is likely that imposing the mandatory minimum sentence in this case would violate the Eighth Amendment's protection against cruel and unusual punishment.

The WLC believes that the information detailed in this memorandum will aid the Court in making a just decision in this matter.

## INTERESTS OF THE AMICUS

The WLC was founded in 1968 to address civil rights problems and the effects that poverty and discrimination have on the criminal justice system for Washington, D.C. residents. It does so in part through the mobilization of *pro bono* legal resources of volunteer lawyers and law firms to address civil rights, poverty, and criminal justice issues implicating D.C. residents. Because of the District of Columbia's status as a federal district, individuals convicted of local felonies in the District are imprisoned in BOP facilities.  Indeed, over 8,000 convicted D.C. offenders currently reside in BOP facilities across the country.  Thus, the WLC is one of the only national legal advocacy organization that takes a systematic interest in all BOP facilities.  To that end, the WLC's D.C. Prisoners' Project engages in advocacy for the humane treatment and dignity of all persons imprisoned in BOP facilities nationwide.

The WLC also promotes progressive criminal justice reform.  A priority of the organization is the overuse of solitary confinement by prisons, especially for people who have mental health illnesses and those who have suffered former sexual victimization.  The WLC has submitted *amicus* memoranda in multiple cases involving the inhumane treatment of prisoners in a variety of BOP facilities.

# BACKGROUND

## A.      The BOP and Protective Custody in Special Housing Units

The BOP is responsible for the custody and care of approximately 195,785 federal inmates.[2]  As of March 2016, the BOP operates 122 federal prisons across the country, as well as 15 privately contracted prisons.[3]

Almost all of the BOP's facilities contain special "solitary confinement"[4] units used to segregate certain inmates from the general population.[5]  Specifically, the BOP uses three general

---

[2] *About Our Agency*, Federal Bureau of Prisons, http://www.bop.gov/about/agency (last visited Mar. 8, 2016).

[3]      *About Our Facilities*, Federal Bureau of Prisons, http://www.bop.gov/about/facilities/federal_prisons.jsp (last visited Jan. 5, 2016); *see also Contract Prisons*, Federal Bureau of Prisons, https://www.bop.gov/about/facilities/contract_facilities.jsp (last visited Mar. 1, 2016).  The BOP also holds "about 41,700, or about 19 percent, of the total BOP federal inmate population in community confinement (residential reentry and home confinement) and 15 privately managed prisons."  U.S. Gov't Accountability Off., GAO-13-429, Report to Congressional Requesters, Bureau of Prisons: Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of Segregated Housing (2013) ("GAO Report") at 1 n.1, *available at* http://www.gao.gov/assets/660/654349.pdf (WLC Appendix ("App.") 406-477).

[4] For purposes of this memorandum, the term "solitary confinement" is used to mean "the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others," as defined by the Department of Justice.  *See* U.S. Department of Justice, Letter to the Honorable Tom Corbett, Re: Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation, May 31, 2013, at 5 ("Cresson Report") (citing *Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005) (describing solitary confinement as limiting human contact for 23 hours per day) and *Tillery v. Owens*, 907 F.2d 418, 422 (3d Cir. 1990) (defining solitary confinement as confinement 21 to 22 hours per day)) (WLC App. 352-390); *see also* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006) (defining solitary confinement as "the confinement of a prisoner alone in a cell for all, or nearly all, of the day with minimal environmental stimulation and minimal opportunity for social interaction.") (WLC App. 957-1016).  In January 2016, the DOJ defined "solitary confinement in its Report and Recommendations Concerning the Use of Restrictive Housing "as any type of detention that involves: (1) removal from the general inmate population, whether voluntary or involuntary; (2) placement in a locked room or cell, whether alone or with another inmate; and (3) inability to leave the room or cell for the vast majority of the day, typically 22 hours or more.  Even this definition, however, leaves substantial room for variation.  Restrictive housing takes many forms, and an inmate's experience in segregation can vary considerably depending on certain

categories of solitary confinement units: (1) Special Housing Units ("SHUs"), (2) Special Management Units ("SMUs"), and (3) the Administrative Maximum ("ADX") facility in Florence, Colorado.[6]  The specific placement criteria and conditions of confinement vary for each type of solitary confinement unit, as do the types of units among BOP facilities.[7]  However, WLC's focus is on SHUs, which are the most common type of solitary confinement in federal prisons, used in 109 of the 122 BOP facilities.[8]

The BOP outlines two types of segregation status when an individual is placed in SHUs: "Disciplinary Segregation" and "Administrative Detention."[9]  Disciplinary Segregation is used to separate an inmate from the general population for a specified period of time for infractions of

---

external factors, such as the length of stay, conditions of confinement, and degree of social isolation, as well as factors specific to each inmate, such as age and psychological resiliency.  As this report makes clear, it is not enough to say that an inmate is in 'restrictive housing' (or 'solitary confinement,' for that matter); it is just as important to know the details of the placement."  U.S. Department of Justice Report and Recommendation Concerning the Use of Restrictive Housing, Final Report, January 2016 ("2016 DOJ Report"), at 3-4, *available at* http://www.justice.gov/dag/file/815551/download (WLC App. 1072-1199).  However, according to BOP officials, the "BOP does not hold anyone in solitary confinement because BOP staff interacts with inmates who are held in single cells alone."  GAO Report at 12.  To avoid this definitional morass, the ABA has created a general definition of "segregated housing," which means "housing of a prisoner in conditions characterized by substantial isolation from other prisoners, whether pursuant to disciplinary, administrative, or classification action" and "includes restriction of a prisoner to the prisoner's assigned living quarters."  ABA Standards for Criminal Justice on the Treatment of Prisoners, Standard 23-1.0(r) (3d ed. 2011) (WLC App. 1-4).

[5] GAO Report at 59 (as of November 2013, "BOP ha[d] SHUs in 109 out of its 119 facilities.").

[6] *Id.* at 5.  The BOP is also bringing on line a new facility, AUSP Thomson, in Thomson, Illinois.  The prison is slated to be an "administrative security U.S. penitentiary," but an exact mission has not been publicly defined.  *See AUSP Thomson*, Federal Bureau of Prisons, http://www.bop.gov/locations/institutions/tom/ (last visited Mar. 10, 2016).

[7] *See, e.g.*, GAO Report at 16-33.

[8] *Id.* at 59.

[9] *See* Special Housing Unit, 5 C.F.R. § 541.20 *et seq.* (2015).

institutional and BOP rules.[10]   Administrative Detention is used when the continued presence of the inmate within the general population would pose a security threat.[11]   Inmates placed in Administrative Detention may include (1) inmates who require protective custody, (2) inmates who are traveling to another institution, and (3) inmates who are awaiting a disciplinary hearing.[12]

The BOP will place an inmate in need of protective custody into an Administrative Detention SHU if the inmate meets one of the following criteria:  (1) the inmate was the victim of an inmate assault or has been threatened by other inmates, including threats of harm if the inmate does not act in a certain way, such as engaging in sexual activity; (2) the inmate was threatened because he or she has provided, or is perceived as having provided, information to staff or law enforcement authorities; (3) the inmate refuses to enter the general population; or (4) based on evidence, BOP staff believes the inmate's safety may be seriously jeopardized by placement in the general population.[13]

Although the BOP considers Administrative Detention "non-punitive" under BOP policy, all inmates in the SHUs, including those placed there for protective custody, are exposed to the same general confinement conditions.[14]   Such conditions may vary depending on the BOP facility, but the cells are often windowless and "contain a toilet, a shower, and a slot large

---

[10] *See* Inmate Discipline Program, 5 C.F.R. § 541.1 *et seq.* (2015); *see also* Status When Placed In the SHU, 5 C.F.R. § 541.22(b) (2015); Disciplinary Segregation Status, 5 C.F.R. § 541.24 (2015).

[11] *See* Administrative Detention Status, 5 C.F.R. § 541.23 (2015).

[12] *See id.*

[13] Protection Case—Placement in Administrative Detention Status, 5 C.F.R. § 541.27 (2105).

[14] CNA Analysis and Solutions, Federal Bureau Of Prisons: Special Housing Unit Review and Assessment 82-83 (2014), (the "CNA Report") (WLC App. 57-318).

enough for a guard to slip a food tray through."[15] All meals are eaten in the inmate's cell.[16] Inmates are confined to their cells for approximately 23 hours or more per day.[17] BOP policy only requires that inmates in SHUs receive five hours of out-of-cell exercise per week.[18] As these five hours can occur on different days, inmates can be confined to their cells 24 hours per day on at least two days a week. Moreover, the out-of-cell "recreation" that inmates are allotted is often nothing more than "being escorted, frequently in handcuffs and shackles, to another solitary cell where prisoners can pace alone for an hour before being returned to their cell."[19] Severe restrictions are placed on segregated inmates' "ability to engage in even basic activities, such as reading, and to have contact, even by phone, with loved ones and friends."[20] The BOP only requires that inmates in the SHU be allowed one phone call per month.[21] In contrast,

---

[15] *See, e.g.*, Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences, Hearing Before the S. Judiciary Subcomm. on the Constitution, Civil Rights, and Human Rights (July 19, 2012), (S. Hrg. 112-879) (statement of the Center for Constitution Rights at 2) ("CCR Statement"), *available at* http://ccrjustice.org/sites/default/files/assets/files/CCR_CAT%20Submission_SolitaryConfinement.pdf (WLC App. 49-56); *see also* Cresson Report at 6 ("[C]ells are all less than 100 square feet in size. Each cell contains a steel sink, a steel toilet, a steel desk, and a steel bed frame with a mattress . . . . All of the isolation cells have solid metal doors with narrow slots at shoulder level, wide enough for food trays to pass through, and small plastic windows facing into the housing unit's common area.").

[16] CNA Report at 30.

[17] GAO Report at 7; Cresson Report at 5 ("For approximately 23 hours per day, they are locked down in small cement cells (usually they are on their own, but sometimes, because of overcrowding, two prisoners must share the same RHU cell).").

[18] GAO Report at 7.

[19] CCR Statement at 2.

[20] Cresson Report at 5.

[21] GAO Report at 7.

inmates in the general population can place numerous phone calls per month under BOP policies.[22]

As of February 2013, the BOP placed approximately 12,460 inmates in all of its solitary confinement units.[23]   Of these inmates, 81 percent were held in SHUs (approximately 10,050 inmates) and the remainder were held in SMUs (approximately 1,960 inmates) and the ADX unit (450 inmates).[24]   As of June 2014, 15 percent of inmates housed in SHUs were placed there based on a need for protection.[25] The most recent available number provided by the BOP is from January 29, 2016; on that day, 8,582 inmates were being held in units designated as SHU.[26]

According to the DOJ's recently released Report and Recommendations Concerning the Use of Restrictive Housing (the "2016 DOJ Report"), prior to January 2013, the BOP had "only a limited ability to track inmates housed in SHU."[27]   Since the beginning of 2013, however, the BOP has implemented its "SHU Application," which provides BOP staff with a "snapshot" of the number of inmates housed in protective custody on any given day.[28]   But the 2016 DOJ Report further points out that there are "limitations to the data collected by the SHU

---

[22] *See* Telephone Regulations for Inmates, 5 C.F.R. § 540.100 *et seq.* (2015); *see also* Federal Bureau of Prisons, Program Statement 5264.08, "Inmate Telephone Regulations," § 540.101(f) (Feb. 11, 2008) ("Inmates with ITS accounts are limited to 300 minutes per calendar month. This applies to all inmates with an ITS account in Bureau institutions, and may be used for any combination of collect or direct-dial calls at the inmate's discretion.  Ordinarily, the inmates will be allowed an extra 100 minutes per month in November and December.").

[23] GAO Report at 2.

[24] *Id.* at 13.

[25] CNA Report at 14, 82.

[26] Defense Exhibit 1, SHU Application Data.

[27] 2016 DOJ Report at 31.

[28] *Id.*

Application."[29]  Indeed, the 2016 DOJ Report concludes that the SHU Application is incapable of tracking how long an individual inmate has been housed in the SHU, the number of times that inmate has returned, or even if that inmate's status has changed over time from, for example, protective custody to disciplinary segregation.[30]

The DOJ's recent identification of the limitations in the SHU Application was confirmed at Mr. Washington's hearing by the testimony of Bradley M. Trate, a correctional services administrator in the BOP's Central Office.   Mr. Trate is the recipient of daily snapshots generated by the SHU Application; with this information, it his job to coordinate with the BOP's various facilities to manage the SHU populations.  Feb. 3 Tr. 10:14-11:17.[31]  Yet, Mr. Trate testified that the SHU Application tracks numbers daily but does not do so over time.  Feb. 3 Tr. 88:5-7.[32]  Mr. Trate further testified that it is impossible for the BOP to track how long an inmate has been housed in solitary confinement and, moreover, whether that inmate's status has changed over time.  Feb. 3 Tr. 98:9-12, 97:24-98:2.

Indeed, the length of stay inmates serve in solitary confinement units varies, and the BOP refuses to track an individual inmate's total length of stay or establish a maximum length of stay

---

[29] *Id.*

[30] *Id.*

[31] Numbers preceded by "Nov. 23 Tr." refer to pages from the transcript of the first day of Mr. Washington's evidentiary hearing, which occurred on November 23, 2015.  Numbers preceded by "Dec. 22 Tr." refer to pages from the transcript for the second day of Mr. Washington's evidentiary hearing, which occurred on December 22, 2015.  Lastly, numbers preceded by "Feb. 3 Tr." refer to pages from the transcript for the fourth day of Mr. Washington's evidentiary hearing, which occurred on February 3, 2016.

[32] Counsel for Mr. Washington was required to generate its own graphs utilizing the few SHU Application snapshots Mr. Washington was provided in response to his subpoena to attempt to chart the trends in the SHU population since the CNA Report's release. *See generally* Defendant's Memorandum of Points and Authorities and Defendant's Exhibits at ECF Nos. 130, 130-1.

for inmates in any type of solitary confinement unit.[33]   Accordingly, for an inmate placed in solitary confinement for protective custody, it is possible and likely that such inmate will remain there for as long as the need for protection exists, which could extend for the full term of the inmate's imprisonment.

### B.      Procedural Background Relevant to Mr. Washington

Mr. Washington faces a 15-year mandatory minimum term of incarceration in the BOP for the two charges against him.  *See* Order at 4.  Mr. Washington has been diagnosed as bi-polar, also with borderline personality disorder, severe depression, agoraphobia, and post-traumatic stress disorder.  *Id.* at 1-2.  Such diagnoses followed severe abuse inflicted upon Mr. Washington as a child and later as an adult while incarcerated.  *Id.*  Specifically, this Court noted that at age five, Mr. Washington exhibited symptoms of a child who had been exposed to illegal drugs as a fetus.  *Id.*  He was then removed from his biological parents and placed into foster care, where he was raped repeatedly until he was adopted at the age of nine.  *Id.*

In 2009, at the age of 20, Mr. Washington pled guilty to two counts of sexual abuse and one count of endangering the welfare of a minor.  *Id.* at 2.  He was incarcerated for three years and again became a victim of rape.  *Id.*  Upon his release, he was forced to live in a shelter on Randall's Island.  *Id.*  In 2013, at the age of 24, Mr. Washington was arrested and ultimately charged with Sexual Exploitation of Children and Possession of Child Pornography.  *Id.* at 2-3.  He pled guilty and now faces a mandatory minimum sentence of 15 years in prison.  *Id.*

---

[33] CNA Report at 59-60.

**ARGUMENT**

I.    **The BOP Overuses Solitary Confinement, including Placing Vulnerable Inmates into the Harmful and Degrading Conditions of Protective Custody**

The BOP's use of damaging solitary confinement stands in stark contrast to the recent trends among its correctional system peers both in this country and abroad.  Although a number of state correctional systems have been exploring and adopting ways to limit the use of solitary confinement[34] and it has been largely discontinued in many countries,[35] the BOP has instead continued its overuse of solitary confinement over the last decade, thus ignoring repeated warnings of its extreme dangers.  Moreover, as discussed above, those placed in solitary confinement include not only individuals placed in disciplinary segregation, but also vulnerable individuals placed in protective custody, who are then subjected to the same confinement conditions as inmates being punished.[36]

Yet as recently as last summer, President Obama, who became the first sitting president to visit a federal prison, spoke out vehemently against the BOP's current use of solitary

---

[34]  Michael Schwirtz & Michael Winerip, *New York State Agrees to Overhaul Solitary Confinement in Prisons*, N.Y. Times (Dec. 16, 2015), http://www.nytimes.com/2015/12/17/nyregion/new-york-state-agrees-to-overhaul-solitary-confinement-in-prisons.html (WLC App. 803-807); Timothy Williams, *Prison Officials Join Movement to Curb Solitary Confinement*, N.Y. Times (Sept. 2, 2015), http://www.nytimes.com/2015/09/03/us/prison-directors-group-calls-for-limiting-solitary-confinement.html (WLC App. 1017-1021); Ian Lovett, *California Agrees to Overhaul Use of Solitary Confinement*, N.Y. Times (Sept. 2, 2015), http://www.nytimes.com/2015/09/03/us/prison-directors-group-calls-for-limiting-solitary-confinement.html (WLC App. 478-482).

[35]  Joseph Stromberg, *The Science of Solitary Confinement*, Smithsonian Magazine (Feb. 19, 2014), http://www.smithsonianmag.com/science-nature/science-solitary-confinement-180949793/?no-ist  (quoting psychologist Craig Haney, "The United States, in many ways, is an outlier in the world"; "[w]e really are the only country that resorts regularly, and on a long-term basis, to this form of punitive confinement.") (WLC App. 768-770).

[36]  *See, e.g.*, CNA Report at 82 ("Despite the very different purposes of the SHU, all inmates, including those in protection status are exposed to the same security and operational restrictions as well as the same access to programs and privileges.").

confinement.[37]   On July 14, 2015, President Obama asked Attorney General Loretta Lynch to conduct a review of "the overuse of solitary confinement across American prisons."[38]   Most recently, in January 2016, through a series of executive actions, the President banned the use of solitary confinement for juveniles in BOP facilities.[39]   The President simultaneously published an op-ed in The Washington Post outlining the changes needed regarding the use of solitary confinement in this country.[40]   Yet, as will be further explained below, despite the positive direction of these actions, they do not remedy the BOP's current and sustained dramatic overuse of solitary confinement, including for inmates who are in need of protection.   Indeed, the BOP's lack of alternative housing units for the many inmates like Mr. Washington necessarily ensures the BOP's sustained abuse of solitary confinement.

According to the GAO, "from fiscal year 2008 through February 2013, the total inmate population in segregated BOP housing units increased approximately 17 percent—from 10,659

---

[37] Peter Baker & Erica Goode, *Critics of Solitary Confinement Are Buoyed as Obama Embraces Their Cause*, N.Y. Times (July 21, 2015), http://www.nytimes.com/2015/07/22/us/politics/critics-of-solitary-confinement-buoyed-as-obama-embraces-cause.html (WLC App. 819-823).

[38] 2016 DOJ Report at 1 ("The President directed that the purpose of the review be not simply to understand how, when, and why correctional systems isolate certain prisoners from the general inmate population, but also to develop strategies for reducing the use of this practice across our nation's criminal justice system. Over the past several months, a team of senior officials at the U.S. Department of Justice met regularly to study the issue of solitary confinement—or 'restrictive housing,' to use the more general corrections term—and formulate policy solutions. This Report is the culmination of that review.").

[39] Juliet Eilperin, *Obama Bans Solitary Confinement for Juveniles in Federal Prisons*, The Washington Post (Jan. 26, 2016), https://www.washingtonpost.com/politics/obama-bans-solitary-confinement-for-juveniles-in-federal-prisons/2016/01/25/056e14b2-c3a2-11e5-9693-933a4d31bcc8_story.html (WLC App. 771-775).

[40] President Barack Obama, *Why We Must Rethink Solitary Confinement*, The Washington Post (Jan. 25, 2015), https://www.washingtonpost.com/opinions/barack-obama-why-we-must-rethink-solitary-confinement/2016/01/25/29a361f2-c384-11e5-8965-0607e0e265ce_story.html   (WLC App. 830-833).

to 12,460 inmates."[41]   In contrast, the total inmate population at BOP facilities only increased by about 6 percent during the same period.[42]   After increased public scrutiny and multiple hearings regarding solitary confinement before the Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights, the segregated population in the BOP had declined to about 10,747 inmates, or 5 percent of the total BOP inmate population, in June 2014.[43]   On January 29, 2016, that number was 8,582.[44] However, as described below, even this figure is alarming given the trends and practices of other jurisdictions and the documented real and lasting destructive effects of solitary confinement.

### A.   The BOP Would Likely Place an Inmate with a History of Victimization, Sexual Offenses against Minors, and Mental Illness into Protective Custody

As illustrated below, a history of "vulnerability"—including one's status as a rape victim, the commission of crimes against minors, and psychiatric instability—marks one as a candidate for sexual assault within prison.   Given such "candidacy," these individuals are routinely placed into protective custody.   As such, based upon his background and the crimes for which he will be sentenced, studies suggest—and the evidentiary hearing testimony support—that Mr. Washington would be the subject of further abuse in prison, which in turn would likely cause the BOP to place him in protective custody.   As the studies described in Section III below also indicate, such placement is likely to inflict even further harm upon Mr. Washington.

---

[41] GAO Report at 14.

[42] *Id.*

[43] CNA Report at 22.   The BOP has not explained how these reductions were made, but the largest decrease occurred in the number of inmates placed in SHUs.   *See id*. at 21 ("Much of the total decline is attributed to a reduction in the SHU population and, in particular, inmates who have been assigned to protective custody or are serving disciplinary segregation sanctions.").

[44] Defense Exhibit 1, SHU Application Data.

Indeed, studies have confirmed many of the factors that mark an incoming prisoner as a target for sexual assault.  Key among those is having been a victim of a prior sexual assault while imprisoned.  As Professor Sharron Dolovich observed: "Whatever method is used to force the victim to submit to sexual penetration, once this aim is accomplished, the victim is redefined in the prison culture as a 'punk.'  This experience of being 'punked' will signify only the beginning of his sexual victimization; as even the federal courts have recognized, '[o]nce raped, an inmate is marked as a victim and is subsequently vulnerable to repeated violation.'"[45]  A rape victim would likely be forced to fight or submit to further sexual assault upon arrival at a BOP facility.  Studies have found that "sexual abuse victims are more often inmates who are unwilling to fight."[46]  One of the consequences of this disturbing dynamic is clear:  it is far more likely that an already victimized inmate will continue to be sexually abused in prison.[47]

In the face of these realities, the National Prisoner Rape Elimination Commission, acting pursuant to the Prisoner Rape Elimination Act,[48] recommended that prisons screen incoming inmates for risk of victimization and, in defining the conditions that prisons must screen for, included "mental . . . disability, young age, nonviolent history, prior convictions for sex offenses against an adult or child, . . . prior sexual victimization, and the inmate's own perception of

---

[45] Sharon Dolovich, *Strategic Segregation in the Modern Prison*, 48 Am. Crim. L. Rev. 1, 13-14 (2011) (quoting *Schwenk v. Hartford*, 204 F.3d 1187, 1203 n.14 (9th Cir. 2000)); *see also id.* at 19 ("This environment is a hellish one for anyone tagged as weak. . . .  For this reason, all individuals who are subject to ongoing sexual victimization in prison must be protected.") (WLC App. 838-847).

[46] *See* Alice Ristroph, *Sexual Punishments*, 15 Colum. J. Gender & L. 139, 155 (2006) (noting that "those who end up as the victim of sexual abuse are more often inmates who are unwilling to fight than they are inmates who fought and lost") (WLC App. 5-41).

[47] *See id.*

[48] 42 U.S.C. § 15601 *et seq.*

vulnerability."[49]   An inmate fitting any of those categories would likely be considered at risk for victimization.   In an effort to "protect" such individuals, the BOP would likely place an inmate with any of those risk factors—such as Mr. Washington—into protective custody for a significant period, whether it followed the Commission's recommendation or its own common practice regarding such victims.[50]

Phillip Wise, a former BOP warden with extensive experience in the classification of vulnerable inmates, confirmed these findings at Mr. Washington's hearing.   Mr. Wise testified that "those previously assaulted in prison are more likely to be assaulted than the general population, as gay inmates are more likely to be assaulted than straight inmates."   Nov. 23 Tr. 38:16-19.   He added that "if an inmate was sexually assaulted in the past, there was some trigger for that" and "those same reasons for him being targeted before are still there and are likely to be perceived by inmates again in the future."   Nov. 23 Tr. 38:21-39:2.   Mr. Wise cautioned that "inmates are very, very good at reading vulnerabilities . . . they're just masters at recognizing and taking advantage of vulnerabilities."   Nov. 23 Tr. 39:2-6.

Accordingly, it is likely that a previously victimized inmate will feel coerced to "pair up" with a more dominant inmate for protection, in exchange for perpetual sexual slavery.[51]   Related scholarship further bears out the fact that sex offenders are particularly vulnerable to "heightened abuse from both correction officers and fellow inmates" and that "sex offenders themselves are

---

[49]   National Prison Rape Elimination Commission Report ("NPREC") 217 (June 2009) (Appendix B: NPREC Standards—Adult Prisons and Jails: SC-1), *available at* https://www.ncjrs.gov/pdffiles1/226680.pdf (WLC App. 811-818).

[50]   *See* U.S. Department of Justice, Office of the Inspector General, *The Department of Justice's Efforts to Prevent Staff Abuse of Federal Inmates* (Sept. 2009) at 34 (the "OIG Report") (finding that BOP officials "frequently attempt to protect potential victims by isolating them in a special housing unit . . . without considering alternatives") (WLC App. 1200-1333).

[51]   *See id.* at 155-56 (explaining the compulsion that vulnerable prisoners have to "trade sex for protection").

disproportionately likely to be the target of sexual assault in prison."[52] Indeed, several academics, practitioners, and jurists have recognized the increased vulnerability to physical and sexual assault of child sex offenders in prison.[53] One scholar noted that, in considering appropriate sentences in relevant cases, judges should consider the "extreme vulnerability to abuse in prison that a viewer of child pornography will be exposed."[54] In fact, sex offenders and child molesters represent the "bottom rung" of the prison hierarchy and, as such, are prime targets for abuse.[55]

---

[52] *Id.* at 159-60; *see also* Phillip H. Witt & Natalie Barone, *Assessing Sex Offender Risk: New Jersey's Methods*, 16 Fed. Sentencing Rep. 3, 171 (2004) (noting that sex offenders generally face harassment and abuse in prisons as a consequence of their offense) (WLC App. 824-829).

[53] *See* Mary Sigler, *Just Deserts, Prison Rape, and the Pleasing Fiction of Guideline Sentencing*, 38 Ariz. St. L.J. 561, 571-72 (2006) (noting a federal jurist's departure from the Federal Guidelines upon his finding that, *inter alia*, the nature of the defendant's offense (possession of child pornography) justified a downward departure and noting the Supreme Court's ratification of downward departures due to a convict's susceptibility to abuse in the Rodney King case) (WLC App. 787-802); James E. Robertson, *A Clean Heart and an Empty Head: The Supreme Court and Sexual Terrorism in Prison*, 81 N.C. L. Rev. 433, 461-62 (2003) (noting that sex offenders, "especially those convicted of victimizing children," represent an "anathema in inmate subculture" where norms call for their savage beating) (WLC App. 483-532); Emily Horowitz, *Growing Media and Legal Attention to Sex Offenders: More Safety or More Injustice?*, 2007 J. Inst. Just. Int'l Stud. 143, 155-56 (2007) ("Sex offenders are aware that being a murderer is a much less threatening and offensive crime among prison populations. In a Massachusetts prison in 2003, defrocked priest John J. Geoghan, an elderly convicted child molester, was beaten to death by another inmate while in protective custody.") (WLC App. 391-399); *see also* Benjamin Wesier, *A Judge's Struggle To Avoid Imposing A Penalty He Hated*, N.Y. Times (Jan. 13, 2004), http://www.nytimes.com/2004/01/13/nyregion/a-judge-s-struggle-to-avoid-imposing-a-penalty-he-hated.html?_r=0 (WLC App. 42-48).

[54] Marcia G. Shein, *The Changing Landscape of Sentencing Mitigation in Possession of Child Pornography Cases*, Champion: The National Association of Criminal Defense Lawyer, May 2011, at 35, 37-38, *available at* https://www.nacdl.org/champion.aspx?id=20607 (WLC App. 776-786).

[55] *See* James E. Robertson, *Cruel and Unusual Punishment in United States Prisons: Sexual Harassment Among Male Inmates*, 36 Am. Crim. L. Rev. 1, 51 (1999) (describing the "sex role" hierarchy among prison inmates, whereby "skinners" (*i.e.*, sex offenders) are second to last and "diddlers" (*i.e.*, child molesters) are last); *see also United States v. Parish*, 308 F.3d 1025, 1025 (9th Cir. 2002) (holding that the district court did not abuse its discretion in determining that the nature of the defendant's offense—possession of child pornography—warranted a downward

Testimony during the evidentiary hearing supports the findings of these studies.  For example, Nelson Aponte, a former BOP official with extensive experience as an investigator of prison incidents, testified of an obviously unsanctioned but nevertheless existent BOP practice.  According to Mr. Aponte, correction officers may arrange for a new and vulnerable inmate who identifies as homosexual to be "married" off to a stronger, more established inmate who is also known to the staff members to be a homosexual.  This is done in order to secure a "sexual relationship" in exchange for the "protection" of the new vulnerable inmate.  Dec. 22 Tr. 160:5-14.  Mr. Aponte added that being raped in exchange for "protection" allows the victimized inmate to leave solitary confinement and "program"—*i.e.*, function in the general population.  Dec. 22 Tr. 160:18-25.

Mr. Wise further testified that because Mr. Washington is "young, he is identifiable as gay, he has been sexually assaulted in the past; and he's charged with a sex offense that involves children," "[t]hose all make him substantially more vulnerable than he might otherwise be."  Nov. 23 Tr. 35:14-17.  Mr. Wise added that the inmates who pose threats to Mr. Washington would "try to get that offender off the compound, out of the general population" by telling him: "you need to check in," meaning put yourself into solitary confinement.  Nov. 23 Tr. 37:12-21.  Mr. Wise unequivocally concluded that Mr. Washington has a very high probability of extensive further abuse once imprisoned.  Nov. 23 Tr. 37:22-39:6.

In addition, Mr. Aponte testified that because of Mr. Washington's sexual orientation and the nature of his conviction, his assigned cell mate may "object" and say "I don't want that fag in my cell."  Dec. 22 Tr. 139:20-140:13.  Mr. Aponte stated that he has seen inmates with Mr.

---

departure from the Guidelines, when considered with his demeanor and inexperience) (WLC App. 533-584).

Washington's vulnerabilities get "immediately assaulted" by assigned cellmates in order to get the new "inmate out of the cell . . . so that [the inmate's] reputation is intact." Dec. 22 Tr. 140:8-10. Mr. Aponte described the dynamic as: "They try to put a homosexual in my cell, I didn't want him, I assaulted him. . . ." Dec. 22 Tr. 140:10-11. Mr. Aponte also described how Mr. Washington will likely fall prey to either the "predators" who "are going to want to know if he's available and if he's really a homosexual" or a gang or group who will "claim him" as their sexual property. Dec. 22 Tr. 140:14-18. According to Mr. Aponte, Mr. Washington faces grim prospects: he can either fight or "accept" the abuse and rape. If he is unable or unwilling to do so, he can "'check in,' which means going down to the Special Housing Unit." Dec. 22 Tr. 140:25-141:3.

Mr. Aponte further testified that it is likely that BOP staff will refuse to assist Mr. Washington when he faces these attacks. Mr. Aponte opined specifically with regard to Mr. Washington and stated that a typical BOP staff member response to his plight could be: "[H]e's a pedophile, he's gay. Screw him." Dec. 22 Tr. 145:8-9. Mr. Aponte added that the "Code of Silence" exists in the BOP, which means "you don't snitch on another staff member." Dec. 22 Tr. 142:13-23.

Moreover, Mr. Aponte testified that administrative detention, or protective custody through solitary confinement, is the primary tool used by the BOP for protecting a vulnerable inmate. Dec. 22 Tr. 148:21-25. Mr. Aponte has witnessed numerous inmates stay in solitary confinement for purposes of protection for months or years because "they choose to remain there because they do not want to go back out to general population." Dec. 22 Tr. 152:13-18. Indeed, Mr. Trate agreed that "[t]here is a minority of sex offenders who are not able to program in general population." Feb. 3 Tr. 104:7-11. Yet, an inmate's decision to remain in protective

custody subjects that inmate to incident reports for refusing to "program," a disciplinary infraction, which in turn will cause that inmate's security level to increase from medium to high. Dec. 22 Tr. 156:16-157:10, 161:9-162:4.  As a result, the inmate may be moved to a different, higher security facility with even more dangerous inmates.

Finally, in December 2014, CNA—a nonprofit research organization located in Arlington, Virginia,[56]—issued a report "provid[ing] an independent, comprehensive review of the Federal Bureau of Prisons' operation of restrictive housing and identif[ying] potential operational and policy improvements."[57]  The findings and recommendations detailed in the CNA Report are based on information and data collected during visits to the BOP's restrictive housing units (SHUs, SMUs, and ADX Florence) conducted from November 2013 through May 2014.[58]  As part of its investigation, CNA examined the mental health assessment and treatment of individuals confined in solitary confinement units.

The CNA Report found that "mentally ill inmates are more frequently segregated," "often spend a longer time in segregation," and are "placed in segregation for protective custody reasons" and "because of a lack of proper placement options."[59]  The CNA Report notes that "[r]esearchers have struggled to disentangle the relationship between high rates of mental illness in the segregation population and the potential role that segregation may play in the deterioration

---

[56] *See About Us*, CNA Analysis and Solutions, https://www.cna.org/about/ (last visited Mar. 8, 2016).

[57] CNA Report at i.  The CNA Report was commissioned after BOP director Charles Samuels acknowledged, in response to questioning by a Senate Judiciary subcommittee, that he did not know how many people with mental illness were in isolation in federal prisons.  *See* James Ridgeway & Jean Casella, *Under Fire, the Federal Bureau of Prisons Audits Its Use of Solitary Confinement—and Buys a New Supermax Prison*, Solitary Watch: News from a Nation on Lockdown (Oct. 18, 2013), http://solitarywatch.com/2013/10/18/fire-federal-bureau-prisons-audits-use-solitary-confinement-buys-new-supermax-prison/ (WLC App. 585-589).

[58] *See* CNA Report at i.

[59] *Id.* at 39.

of mental health states," and offers that "[i]t may be the case that higher rates of mental illness in segregation reflect the self-selection of mentally ill offenders into segregation placements."[60] Regardless of the reason, it is well-documented that an inmate with mental health issues faces a high likelihood of being placed into solitary confinement.

Mr. Aponte's testimony supports CNA's observations.  He stated that "inmates that have mental health problems are not looked upon favorably . . . because they have issues that nobody wants to deal with.  It's like they're there but keep away from them."  Dec. 22 Tr. 137:9-12, 130:1-2, 135:6-11.  Mr. Wise also testified that a bipolar inmate, such as Mr. Washington, faces a high likelihood of conflict both with BOP officials and fellow inmates, which in turn may increase the inmate's likelihood of being placed in solitary confinement.  Nov. 23 Tr. 42:1-14.

As described more fully in Section III below, far from protecting such individuals, placement in "protective" custody likely will result in inflicting further harm upon the inmate.

### B. The BOP's Protective Custody Is Just as Damaging and Degrading as Punitive Solitary Confinement

The CNA Report found there to be a "disproportionate number of inmates . . . housed in the SHUs based on protection claims."[61]  These inmates, who have "legitimate protection needs" are assigned to the same confinement conditions, and have many of the same restrictions, as inmates in punitive segregation.[62]  Two years later, the 2016 DOJ Report recommended the persisting need to "[e]xpand the Bureau's ability to divert 'protective custody' inmates to less restrictive forms of housing . . . ."[63]  Indeed, inmates have no other choice but to subject

---

[60] *Id.* at 41.

[61] *Id.* at 82.

[62] *Id.* at 82-83.

[63] 2016 DOJ Report at 23-25, 110-11.

themselves to solitary confinement because there are no "special protective" general population units for inmates such as Mr. Washington within BOP facilities.  Nov. 23 Tr. 85:10-22.

There is little, if any, difference between the conditions in the BOP's punitive solitary confinement units and its protective custody solitary confinement units.  Both sections subject inmates to long periods of social isolation from human beings and delimit a prisoner's ability to engage in potentially rehabilitative or otherwise productive activities.  In so doing, the BOP effectively creates a distinction without a difference between its punitive "disciplinary segregation" and its "administrative detention."

Both Mr. Wise and Mr. Aponte testified that there is no real difference between a solitary confinement unit to which Mr. Washington would "check in" for protection purposes and one in which an inmate would be placed for punitive purposes.  Nov. 23 Tr. 84:12-85:9 (Wise); Dec. 22 Tr. 156:5-11 (Aponte).  As outlined more fully in Section I.C below, both types of units would confine Mr. Washington to his cell for at least 23 hours a day.  Nov. 23 Tr. 84:12-16.  An inmate placed in protective custody cannot work, attend courses, or make phone calls as the inmates in general population are entitled to do.  Nov. 23 Tr. 84:22-85:9.

These observations and conclusions are also supported by the CNA Report.  The report explained that inmates with verified protection needs are presently housed in administrative detention.[64]  Although such status is deemed non-punitive under BOP policy, inmates in this protective custody are assigned to the same SHUs as inmates in punitive segregation, and thus the CNA Report found that the conditions of confinement between the two populations were "not much different."[65]  As a result, CNA further found that the BOP's "application of the same security and operational restrictions to the protective custody population as to others in

---

[64] CNA Report at 83.

[65] *Id.*

administrative segregation is contrary to nationally accepted practices."[66]   In response to this reality, the CNA Report recommended in 2014 (and the DOJ Report recommended in 2016) that the BOP "[e]xpand housing alternatives for inmates in verified protective custody status that have levels of programs and privileges that are equivalent to those for general population inmates."[67]

In response to the CNA Report's recommendation that the BOP develop alternative units for inmates in need of sustained protection, the BOP stated flatly that it is "looking for ways to expand" general population programming opportunities to inmates placed in protective custody.[68]   However, the BOP raised the issue of its "limited resources, in terms of staffing and space."[69]   The BOP cited only its Federal Correctional Institution in Otisville, New York, which has a Security Threat Group Drop-Out institution and the Reintegration Housing Unit ("RHU")[70]

---

[66] *Id.*

[67] *Id.* at 85; *see also* 2016 DOJ Report at 111 ("This Report recommends that the Bureau expand its RHU program, with the goal of eventually housing all inmates with a verified need for protective custody who cannot be housed in any other Bureau facilities.").

[68] Federal Bureau of Prisons, Special Housing Unit Review and Assessment Report Response: Response to Report by CNA Analysis and Solution, February, 2015 ("BOP Response to CNA"), at 2, *available at* https://www.bop.gov/resources/news/pdfs/CNA_Response-V05a-saa.pdf (WLC App. 400-405).

[69] *See id.*

[70] The RHU is defined as a "program [ ] designed for protective custody inmates with more than six months remaining on their sentence who are designated for medium- or high-security facilities, do not require substantial medical or mental health treatment, and consistently refuse to enter general population at multiple institutions. The goal is to help inmates eventually re-integrate with general population over the course of a three-phase program, which typically takes six to eight months. Participants live, work, and program in a residential unit, in which they are allowed to move freely. Inmates also engage in activities outside the unit—eating in the dining hall, recreating in the yard, and attending pill lines—albeit separated from the general population. Inmates participate in biweekly meetings and other programming designed to improve coping skills and help them interact with other prisoners. The program is staffed with correctional officers, a psychologist coordinator, and treatment specialists. The RHU Unit at FCC Oakdale can currently house a maximum of 128 inmates at a time. Inmates housed within the RHU are out of the cell for 16 hours per day." 2016 DOJ Report at 24.

at the Federal Correctional Complex in Oakdale, Louisiana.[71]   Yet, both of these facilities are experimental and can hold only very small populations.[72]

At the evidentiary hearing, Mr. Trate confirmed that very little progress has been made since the BOP's response to the CNA Report in 2013.  Feb. 3 Tr. 125:10-12.  Mr. Trate stated that the BOP is only in the process of "[i]dentifying sites that are appropriate and in the planning phases, to look at sites in order to potentially expand it, you know, to three to five facilities throughout our various facilities across the country."  Feb. 3 Tr. 125:4-7.  Mr. Trate confirmed that the RHU still only has a limited number of beds ranging anywhere from 160 to 208, but recently decreased to 128.  Feb. 3 Tr. 128:20-25.  Given the similarities in conditions of confinement, the BOP's version of protective custody necessarily carries the same risks to an inmate's mental health as any other form of solitary confinement.[73]

Other studies support this finding.  One characterized protective custody as living in "a tiny cell for twenty-one to twenty-four hours a day[,] the loss of access to any kind of programming (school, drug treatment, etc.) and even deprivation of basics like phone calls, showers, group religious worship, and visitation," forcing those most in need of protection to choose between the threat of violence and basic human social needs.[74]  The deprivation of such necessary programs to a vulnerable inmate, compounded with the increased risk of emotional stress and re-victimization, makes clear that protective custody would work the same harm on the inmate as any other form of solitary confinement.[75]  Moreover, the uncertainty of time that a

---

[71] *See id.* at 24-25.

[72] *See id.*

[73] *See generally* Grassian at 333-38.

[74] *See* Dolovich at 3-4 (internal quotation marks omitted).

[75] *See also* U.S. Sen. Dick Durbin of Ill., Press Release, Durbin Statement On Federal Bureau Of Prisons Assessment Of Its Solitary Confinement Practices (Feb. 4, 2013) at 2 ("Prisoners in

"protected" prisoner must survive within these conditions can vary widely, which could increase the psychiatric torment such individuals experience.[76]

In sum, there is no substantive difference between protective custody and punitive disciplinary segregation within BOP facilities.  Both entail the same level of social isolation from the wider prisoner populace and both greatly limit the prisoner's opportunities for educational or psychiatric support.  As such, both protective custody and disciplinary segregation pose the same dangers to mental health (discussed in Section III below), to an already precarious psyche and may violate the Eighth Amendment.

### C.   The BOP's Policies and Reliance on Segregated Housing Contrast with the Trends in Other Jurisdictions

The BOP's overreliance on solitary confinement and its policies for placement in SHUs stand in stark contrast with other prison systems. Many state and foreign systems have taken steps to reform their solitary confinement practices so to better protect their inmates from the constitutionally suspect arbitrary and capricious application of long-term solitary confinement.

A number of states, including Colorado, Kansas, Maine, Mississippi, and Ohio, "have reduced their reliance on segregation."[77]   States have achieved these reductions by "narrowing

---

isolation are often confined to small cells without windows, with little to no access to the outside world or adequate programs and treatment.  Inmates are confined to these cells for up to 23 hours a day.  Such extreme isolation can have serious psychological effects on inmates and can lead to mental illness, self-mutilation and suicide.") (WLC App. 1334-1335).

[76] *See* OIG Report at 36 (noting a BOP warden's statement that an individual's confinement to such conditions could last from 1-2 weeks, a month, or even a year, depending on the investigation and any subsequent prosecution of a sexual assault); *see also id*. at 35 (noting that BOP clinical psychologists stated that isolation in a special housing unit can be emotionally and physically stressful to victims and result in a form of re-victimization and that disruptions in the inmate's treatment and education programs are also likely to occur if an inmate is kept in the special housing unit for more than a week).

[77] GAO Report at 34; CNA Report at 47.

the criteria for placement in segregation and/or reducing the period of segregation."[78]   Both Mississippi and Colorado have reduced their populations of inmates in segregated housing to about 1 percent of the total inmate populations.[79]   Another study noted that:

> States such as Massachusetts, Vermont, and Washington have long limited the length of time a prisoner may be placed in solitary confinement to 15, 30, and 20 days, respectively, that Colorado and New Mexico have recently passed legislation to limit or study the effects of solitary confinement; similar bills have been introduced in Virginia, Pennsylvania, and Texas.  Other states, including Maine, Mississippi, and Ohio, have significantly reduced their solitary confinement population in the last decade through voluntary changes.  To our knowledge, in none of these states did prison violence increase after the use of solitary confinement diminished.[80]

In addition, it is clear that global institutions have rejected the BOP's outmoded reliance on solitary confinement.  For example, the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment released its 21st General Report on November 20, 2011, wherein it specifically addressed the issue of solitary confinement.[81]   It found that solitary confinement, in and of itself, implicates issues "in relation to the prohibition of torture and inhuman and degrading treatment or punishment"[82] and called for jurisdictions to "reduce resort to solitary confinement to an absolute minimum, to ensure that . . . it is used . . . for the shortest necessary period of time."[83]   It further found that jurisdictions should "make each of the solitary confinement regimes as positive as possible."[84]  With regard to protective custody,

---

[78] *Id.* at 47.

[79] *Id.* at 47-48.

[80] CCR Statement at 7.

[81] *See generally id*. at 39-50.

[82] *Id.*

[83] *Id*.

[84] *Id.* at 39.

the report advised that "[s]tates have an obligation to provide a safe environment to those confined to prison" and recommended that states should allow as much social interaction between prisoners as possible, even those confined under protective custody.[85]   The report finally concluded that "solitary confinement should only be used in exceptional circumstances, as a last resort, and for the shortest possible time."[86]

A report by the United Nations' Special Rapporteur of the Human Rights Council reached similar conclusions.[87]   The report noted that the Rapporteur's predecessors had found that "prolonged solitary confinement may itself amount to prohibited ill-treatment or torture."[88] The report also recognized that placing an individual with pre-existing mental illness into solitary confinement "often results in severe exacerbation of a previously existing mental condition" and that prisoners with mental health issues deteriorate "dramatically" when placed in solitary confinement, sometimes resulting in "extreme acts of self-mutilation and even

---

[85] *Id.* at 44.

[86] *Id.* at 50.

[87] *See generally,* U.N. Secretary-General, *Interim Report of the Special Rapporteur on Torture and Other Inhuman or Degrading Treatment or Punishment,* U.N. Doc. A/HRC/31/47 (Aug. 5, 2011) ("U.N. Interim Report"), *available at* http://www.ohchr.org/EN/Issues/Torture/SRTorture/Pages/SRTortureIndex.aspx (WLC App. 1022-1044); *see also* U.N. Secretary-General, *Report of the Special Rapporteur on Torture and Other Inhuman or Degrading Treatment or Punishment,* U.N. Doc. A/HRC/31/47 (Jan. 5, 2016) ("U.N. Report"), *available at* https://documents-dds-ny.un.org/doc/UNDOC/GEN/G16/000/97/PDF/G1600097.pdf?OpenElement (WLC App. 1044-1071).

[88] *Id.* at ¶ 21; *see also id. ¶* 38 (stating that the Inter-American Court for Human Rights has found that the conditions of solitary confinement results in psychological and physical suffering that could constitute torture).

suicide."[89]   The Special Rapporteur ultimately concluded that "solitary confinement should be used only in very exceptional circumstances, as a last resort, for as short as time as possible."[90]

From the conclusions reached in these reports, it is clear that the BOP's continued reliance on segregated housing—including the use of solitary confinement as a means to "protect" vulnerable inmates who are likely to be subject to abuse if confined along with the general population of inmates—conflicts with emerging trends in both state and foreign prison systems that have recognized the harmful effects of solitary confinement.[91]

### D.   The BOP's Rationale for Placement of Inmates in SHUs Is Misguided and Misapplied

Also troubling and important to underscore is the large number of inmates placed in SHUs and other solitary confinement units for disciplinary reasons as a result of broad BOP policies allowing the use of long-term segregation for relatively minor infractions.  Prior to August 2011, disciplinary segregation was allowed "only when other available dispositions [were] inadequate to achieve the purpose of punishment and deterrence."[92]  Now, the current policy allows a discipline hearing officer to impose disciplinary segregation regardless of other available dispositions from one to 18 months based on the severity of the underlying offense.

---

[89] *Id.* at ¶ 68; *see also id.* at 25-26 (an annex created by Dr. Sharon Shalev detailing the negative effects of solitary confinement).

[90] *Id.* at ¶ 89; *see also id.* ¶ 91 (stating that the physical conditions and prison regime of solitary confinement must be used only as a last resort).

[91] *See also* John J. Gibbons & Nicholas de B. Katzenbach, *Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons*, 22 Wash. U. J.L. & Pol'y 385, 464 (2006) (stating that the European approach to solitary confinement, wherein dangerous prisoners are housed in units of 10 people and receive special programming, is a workable approach, as opposed to the American system of "isolating them in locked cells for 23 hours a day") (WLC App. 590-767).

[92] *See* Inmate Discipline Program, 5 C.F.R. § 541.1 *et seq.* (2011).

This range is a dramatic increase from the maximum of 60 days allowed under the previous policy.[93]

Although violations of BOP rules should be punished, under current BOP policies, the allowable punishments for violations are beyond any sense of proportionality or reasonableness. For example, engaging in sexual acts—including masturbation—may be punished with six months in segregation, or up to a year in segregation for a second offense occurring within 18 months. Other violations, like simple fighting, adulteration of food, or even self-tattooing can be similarly punished. Refusing to obey any staff order (no matter how small) or "insolence" may be punished with three months of disciplinary segregation; six months if there are two or more violations within one year. The severity of this punishment extends to other acts such as failing to precisely follow a staff member's work instructions, failing to follow a material safety data sheet describing the handling of a cleaning product, failing to stand for count, or being "untidy." Even "circulating a petition," no matter the topic, can be grounds for three months of disciplinary segregation.[94]

As explained by Mr. Aponte during the hearing, Mr. Washington will "have a hard time adjusting." Dec. 22 Tr. 135:22. Specifically, many of the characteristics that make Mr. Washington more susceptible to abuse in prison will also likely increase the number of disciplinary infractions he might accrue if, for example, he attempts to defend himself by fighting or carrying a weapon. Dec. 22 Tr. 161:5-8. This, compounded with the evident over-use of solitary confinement as a punishment for minor infractions, even further increases the

---

[93] *See id.*

[94] Prohibited Acts and Available Sanctions, Table 1—Prohibited Acts and Available Sanctions, 5 C.F.R. § 541.3 (2015); *see also id.* Table 2—Additional Available Sanctions for Repeated Prohibited Acts Within the Same Severity Level.

likelihood that Mr. Washington will spend a substantial portion of his prison term in solitary confinement.

## II.     The BOP Does Not Properly Diagnose and Treat Individuals with Mental Illness, Which Can Lead to a Violation of Such Individuals' Eighth Amendment Rights When They Are Placed in Solitary Confinement

Studies have found that the BOP fails to properly diagnose individuals with mental illnesses and provide adequate treatment to such persons when confined in segregated housing. The result of such failures can inflict serious harm on inmates and lead to a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  Indeed, as described below, a study conducted by the U.S. Department of Justice ("DOJ") of a Pennsylvania state prison found that the facility's use of solitary confinement on prisoners with serious mental illness violated the Eighth Amendment.[95]   Although that study involved a state prison, the treatment of prisoners with mental illness placed in isolation at that institution that the DOJ found unlawful parallels the treatment of inmates at BOP facilities, as explained in the CNA Report.

As outlined in the CNA Report, the BOP has established four mental health care "levels": "Level 1—no significant mental health care," "Level 2—routine outpatient mental health care or crisis-oriented mental health care," "Level 3—enhanced outpatient mental health care or residential mental health care," and "Level 4—inpatient psychiatric care."[96]  Although the "vast majority" of restrictive housing inmates have been assigned by the BOP to the lowest level of mental health care, Level 1, CNA's investigation revealed "questions on the accuracy of the mental health ratings provided by the [BOP's] mental health staff."[97]  Thus, despite the fact that

---

[95] *See* Cresson Report at 1.

[96] CNA Report at 54.

[97] *Id.* at 55.

"only a small percent of the [BOP's] restrictive inmate population has been identified with a significant mental illness of some kind," CNA found that "[t]his figure likely represents an under identification of those inmates who are truly suffering from some form of a mental health illness."[98]   Indeed, the BOP's classification of only a small percentage of individuals in restrictive housing with mental illness conflicts with what is suggested by the literature reviewed by CNA, which has found that "large proportions of the segregated populations suffer from mental illnesses that either predate admission to restrictive housing and/or develop as a result of the restrictive housing experience."[99]

One possible explanation for the under identification of inmates with mental illness is the failure of the BOP mental health staff to properly diagnose mental illness in individuals.  As part of its investigation, CNA "evaluate[d] those inmates in the [BOP] with a serious mental health problem to determine if the diagnosis and treatment plans prescribed by the [BOP were] appropriate."[100]   Specifically, two board-certified psychiatrists were retained to conduct independent mental health assessments consisting of a review of existing BOP mental health records and in-person interviews of inmates assigned to the various restrictive housing units within the BOP (SHUs, SMUs, and ADX).[101]   Based on this assessment, CNA's independent psychiatrists disagreed with the BOP diagnosis in nearly *two-thirds* of the cases reviewed.[102] The assessment also included individuals classified as mental health care Level 1—meaning "no significant mental health care"—and found that 20 percent of the individuals reviewed had "a

---

[98] *Id.* at 111.

[99] *Id.* at 111.

[100] *Id.* at 113.

[101] *See id.* at 113.

[102] *See id.* at 117; Table 28.

significant mental health problem," which suggests that a similar proportion of "the entire Care Level 1 population may have a significant mental health issue that has been missed by the [BOP] mental health system."[103]

One of the reasons identified for the "considerable diagnostic disagreement" between the BOP mental health staff and CNA's independent psychiatrists is the infrequent updates of initial mental health assessments.[104]   As CNA explained, although the BOP conducts a comprehensive psychological assessment at the time of admission to the BOP, there is no similarly comprehensive re-evaluation during the course of an individual's placement in restrictive housing other than "monthly progress notes," which are completed only for those on the BOP mental health case load.   Moreover, these assessments are "usually based on brief, cell-front visits."[105]   As a result of its findings, CNA recommended that "[a]ll inmates should be seen in a private setting for a comprehensive mental health evaluation prior to placement in any restrictive housing environment."[106]

In addition, the CNA assessment found that the treatment offered by the BOP to inmates with mental illnesses placed in solitary confinement was "insufficient or inappropriate in *over half* of the cases reviewed."[107]   CNA further found that "approximately one-third of the cases reviewed should not be assigned to restrictive housing and about 30 percent should be placed in a

---

[103] *Id.* at 115-16.

[104] *See id.* at 118.

[105] *Id.* at 118-19.

[106] *Id.* at 119.  The CNA Report also states that the BOP attempts to screen suicidal candidates out of solitary confinement, but further notes that the utter lack of any meaningful follow-up assessments drastically undercuts the efficacy of any so-called screening, ultimately recommending that the BOP implement 30-day re-assessments of prisoners placed in SHU, at a minimum.  *See id.* at 119-20.

[107] *Id.* at 117 (emphasis added).

specialized mental health program or residential treatment unit."[108]   These discrepancies are further troubling in light of the time the individuals assessed remained in solitary confinement. The CNA Report found that the average overall time in restrictive housing at the time the reviews were conducted was 242 days, with individuals confined in SHUs averaging 107 days.[109] In sum, CNA concluded from its assessment that "[m]ental health services in restrictive housing require improvement in three specific areas:   1) proper mental health diagnoses; 2) more effective treatment; and 3) providing sufficient psychiatric staffing."[110]

The BOP's inability to properly diagnose and treat inmates with mental illnesses who are placed in segregated housing units, including for protective custody, can lead to a violation of those individuals' Eighth Amendment rights, as suggested by the results of a DOJ investigation into the use of isolation on prisoners with serious mental illness at a Pennsylvania Department of Corrections facility.[111]   In 2012, the DOJ conducted an investigation into the conditions of confinement at Pennsylvania State Correctional Institution at Cresson ("Cresson") pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, and memorialized its findings in a May 31, 2013 report to then-Governor Tom Corbett (the "Cresson Report").[112]   It

---

[108] *Id.* at 117.

[109] *See id.* at 116-17, Table 27.

[110] *See id.* at iv.

[111] *See* Cresson Report at 4, 7-8 (citing *Brown v. Plata*, 131 S. Ct. 1910 (2011) ("Prisoners retain the essence of human dignity inherent in all persons.") and *In re Medley*, 134 U.S. 160, 168 (1890) (in discussing extreme forms of solitary confinement, the Supreme Court described that "[a] considerable number of prisoners fell, after even a short confinement [in isolation], into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide.")).

[112] *See id.* at 1.

concluded that "the manner in which Cresson uses isolation on prisoners with serious mental illness violates the Eighth Amendment."[113]

The Cresson Report explained that the Eighth Amendment prohibits prison officials from acting with deliberate indifference to conditions of confinement presenting a substantial risk of serious harm to inmates and noted that deliberate indifference can be inferred where the risk of harm is serious.[114]   The report found that Cresson "ignored obvious and serious risks in its approach to the use of isolation on prisoners with serious mental illness."[115]   Specifically, the DOJ found that Cresson's Eighth Amendment violations included, among other things, Cresson's practices of:  (i) "unnecessarily placing [individuals with serious mental illnesses] into isolation for prolonged periods of time despite clear evidence in numerous cases that such conditions pose risks;" (ii) "plac[ing] prisoners with serious mental illness in isolation automatically because of their mental illness, and  . . .  fail[ing] to ensure that such placements are reviewed by mental health staff;" (iii) "denying them adequate mental health care while they languish in prolonged isolation;" and (iv) "combining prolonged isolation with other extreme conditions and unnecessary uses of force."[116]

Notably, the same or similar practices and conditions that the DOJ found to violate the Eighth Amendment at Cresson were also found at BOP facilities, as discussed in the CNA

---

[113] *Id.*   The DOJ also found that "Cresson uses isolation in a way that violates the rights of prisoners with serious mental illness, as well as on prisoners with intellectual disabilities, under Title II of the Americans with Disabilities Act."  *Id.*

[114] *See id.* at 7 (citing *Hope v. Pelzer*, 536 U.S. 730, 738, 745 (2002) (finding officials deliberately indifferent where handcuffing prisoners to hitching posts for long hours resulted in an obvious and substantial risk of harm to prisoners) and *Farmer v. Brennan*, 511 U.S. 825 (1994) (holding deliberate indifference of confinement poses serious risks to prisoners)).

[115] *Id.* at 1, 7.

[116] *Id.* at 1, 7.

Report.  For example, as detailed above, CNA found that individuals placed in solitary confinement (i) were placed in segregated housing for prolonged periods of time (those assessed averaged 242 days in restrictive housing);[117] (ii) did not receive a comprehensive psychological re-evaluation during the course of their incarceration within the restrictive housing units;[118] and (iii) were denied adequate mental health care as CNA's assessment found that the treatment being offered by the BOP was insufficient or inappropriate in over half of the cases reviewed and most restrictive housing units had no mental health programming and no out-of-cell programming.[119]  These findings are particularly troubling in light of the fact that the GAO found in its 2013 report that the BOP had not even assessed the long-term impact of solitary confinement on inmates.[120]  Accordingly, based upon the DOJ's own conclusions from its findings of parallel conduct and practices at Cresson, the placement of individuals with mental illnesses into restrictive housing at BOP facilities likely violates the Eighth Amendment.

Indeed, anecdotal evidence demonstrates the serious risks and harm inflicted on mentally ill individuals placed in restrictive housing in BOP facilities.  On June 15, 2015, a Second Amended Complaint was filed in the U.S. District Court for the District of Colorado by a class of inmates alleging that the BOP has systematically violated the rights of mentally ill prisoners confined at ADX Florence.[121]  The complaint describes the conditions of confinement inmates are subjected to and the resulting harm inflicted, all allegedly stemming from the BOP's

---

[117] *See* CNA Report at 116.

[118] *See id.* at 118-19.

[119] *See id.* at 117, 127.

[120] GAO Report at 33.

[121] *See generally* Second Amended Complaint, *Cunningham v. Fed. Bureau of Prisons*, No. 12-cv-01570-RPM (D. Colo. *Filed* June 15, 2015) ("Cunningham Compl.").  The WLC is co-counsel for plaintiffs in the *Cunningham* action.

inadequate mental health screening procedures.  For example, the complaint alleges that the BOP does not comply with its own revised policies regarding the screening of prisoners entering the facility and that ADX's typical medical health screening of incoming prisoners consists merely of "a few questions asked in a minute or two" wherein BOP employees "often ignored key factors indicating mental illness . . . such as . . . the fact that the prisoner was taking medication for a serious mental illness immediately before arriving at ADX.[122]  Although the BOP's own current and former regulations require that mentally ill prisoners committed to solitary confinement receive at least a monthly interview to assess such prisoners' treatment,[123] the BOP's failure to comply with its own regulations is strongly suggested from a small sampling of the cases described in the complaint.[124]

In sum, studies have shown that the BOP fails to properly diagnose and treat individuals suffering from mental illnesses confined in restrictive housing units.  Such failures not only can inflict serious harm on these inmates, but, as the conclusions reached by the DOJ from its investigation of the Cresson facility indicate, also likely lead to violations of the Eighth Amendment's prohibition against cruel and unusual punishment.

---

[122] *Id.* at ¶ 56.

[123] *See* BOP, Program Statement 5310.13, "Institution Management of Mentally Ill Prisoners" (Mar. 31, 1995) at 5; BOP, Program Statement 5310.16, "Treatment and Care of Inmates With Mental Illness" (May 1, 2014) at 10-11.

[124] *See, e.g.*, Cunningham Compl. at ¶ 63 (describing an account of an ADX inmate who did not speak an intelligible word during his two years at ADX, spending most of his time caked in feces and staring blankly at his cell walls); *id.* at ¶¶ 89-90 (describing an account of an ADX inmate who, in his six years at the facility, engaged in extensive self-mutilation, ate inanimate objects and his own feces, attempted to commit suicide multiple times, and who responded to a radio "bribe" from ADX's incumbent head psychologist by smashing the radio and eating the pieces).

### III.    Confinement Conditions in BOP Solitary Confinement Units Likely Engender or Dangerously Exacerbate Serious Mental Illness

Respected psychiatric and penological authorities have concluded that a prisoner's placement within a long-term solitary confinement environment can either cause the onset of serious mental illness in previously healthy individuals or dangerously increase risks for those with pre-existing mental illness.  Accordingly, placement of a person suffering from post-traumatic stress disorder, borderline personality disorder, agoraphobia, a learning disability, and severe depressive disorder in long-term solitary confinement would risk exacerbating these conditions and, thus, could lead to a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

The research of Dr. Stuart Grassian, a board-certified psychiatrist with extensive experience in evaluating the psychiatric effects of solitary confinement, has found that long-term solitary confinement often leads to an "acute organic brain syndrome—delirium," the symptoms of which include:    a) hyper-responsivity to external stimuli; b) perceptual distortions, hallucinations, or illusions; c) panic attacks; d) difficulties with thinking, concentration, and memory; e) intrusive obsessional thoughts or primitive aggressive ruminations; f) overt paranoia; and g) problems with impulse control.[125]  Dr. Grassian tied the development of this delirium syndrome to verifiable EEG abnormalities in the brain that arise directly from the conditions of solitary confinement.[126]  Reviewing the literature on the subject stretching back to the nineteenth century, Dr. Grassian concluded that "multiple reports based on careful clinical observation suggested that a substantial majority of these prison psychoses were direct reactions to the conditions of imprisonment itself" and, in attempting to explain the cause of these psychoses,

---

[125] *See* Grassian at 333-38 (2006).

[126] *Id*. at 338.

"the most consistent factor described, reported in over half the total literature, was solitary confinement."[127]  Moreover, Dr. Grassian's research found that the same set of symptoms are also observed in other settings besides isolation in prisons (*e.g.*, aviation settings, explorations, medical conditions), indicating that other conditions of being imprisoned are less responsible for inducing this kind of delirium.[128]  Thus, Dr. Grassian's research suggests that long-term solitary confinement creates a high risk of developing a serious mental illness.

Dr. Grassian also found that solitary confinement is especially dangerous to the mental health of those who already suffer from a mental illness.  More specifically, Dr. Grassian concluded that "individuals with primitive or psychopathic functioning or borderline cognitive capacities, impulse-ridden individuals, and individuals whose internal emotional life is chaotic or fearful are especially at risk for severe psychopathologic reactions to . . . isolation."[129]  Moreover, Dr. Grassian further explained that there is "clear evidence that, in a situation of restricted environmental stimulation [such as would exist in solitary confinement], preexisting central nervous system dysfunction is a major predisposing factor to the development of adverse psychiatric reactions and of overt delirium."[130]  Any individual with a history of serious psychiatric diagnoses and learning disabilities would likely fit such criteria and be susceptible to develop adverse psychiatric reactions.

---

[127] *Id.* at 343; *see also id.* at 383 (discussing Dr. Grassian's evaluation of a patient with "strong psychological adjustment and no prior psychiatric history" who became "significantly ill" due to solitary confinement).

[128] *See id.* at 356-66 (detailing investigations into the effects of solitary confinement outside of the prison context).

[129] *Id.* at 348.

[130] *Id.*; *see also id.* at 349 (summarizing findings of a study involving inmates in segregated housing at Pelican Bay State Prison, which concluded that the data "dramatically" demonstrated that psychologically vulnerable inmates were most likely to develop overt psychoses as a result of solitary confinement).

Another respected researcher in this area, Dr. Craig Haney, a psychologist and professor at the University of California-Santa Cruz, detailed strikingly similar findings in a 2003 article.[131]   Dr. Haney flatly states that "[e]mpirical research on solitary and supermax-like confinement has consistently and unequivocally documented the harmful consequences of living in these kinds of environments. . . .  [T]he harmful psychological consequences of solitary and supermax-type confinement are extremely well documented."[132]   Dr. Haney also reviewed the relevant literature, which discusses symptoms coinciding with the delirium that Dr. Grassian described.[133]   Dr. Haney ultimately concluded that "there is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days, where participants were unable to terminate their isolation at will, that found that solitary confinement failed to result in negative psychological effects."[134]   Dr. Haney also discussed a study that found high rates of psychological trauma in individuals placed in protective custody, "so much so that [the authors of that study] worried about the 'strong

---

[131] Craig W. Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 130 (2003) (WLC App. 319-351).

[132] *Id.*

[133] *Id.* at 130-32.

[134] *Id.* at 132.  Dr. Haney explained that the damaging psychological effects "included such clinically significant symptoms as hypertension, uncontrollable anger, hallucinations, emotional breakdowns, chronic depression, and suicidal thoughts and behaviors."  *Id.*  Dr. Haney's findings undercut the views expressed by certain BOP officials.  For example, the 2013 GAO Report discussed above explained that "BOP officials, including psychologists, at four of the six facilities we visited reported little or no adverse impact of segregation on inmates."  GAO Report at 39.  These views also conflict with both studies reviewed by the GAO that "suggest that long-term segregation or solitary confinement can cause significant adverse impacts" and the BOP's own Psychology Services Manual which "explicitly acknowledges the potential mental health risks of inmates placed in long-term segregation."  *Id.* at 40.  Specifically, that manual states that the BOP "recognizes that extended periods of confinement in Administrative Detention or Disciplinary Segregation Status may have an adverse effect on the overall mental status of some individuals."  *Id.*

potential for harmful effects' that such [protective custody] confinement represented."[135]   Dr. Haney's own study of inmates in segregated housing at California's Pelican Bay State Prison found that a "very high percentage" of inmates suffered many symptoms similar to those associated with the "syndrome-like condition" that Dr. Grassian detailed in a prior study.[136]

Like Dr. Grassian, Dr. Haney also found that individuals with pre-existing mental illnesses are at greater risk of suffering increased harm from being isolated in solitary confinement units.  Specifically, Dr. Haney explained that in his experience, although "virtually everyone" subjected to supermax environments suffers, "prisoners with preexisting mental illnesses are at greater risk of having this suffering deepen into something more permanent and disabling," and that those at greatest risk for further deterioration include "persons who are emotionally unstable, who suffer from clinical depression or other mood disorders, who are developmentally disabled, and those whose contact with reality is already tenuous."[137]

Other sources, both scientific and anecdotal, further support these conclusions.  For example, Dr. Huda Akil, a neuroscientist with the University of Michigan, has suggested that solitary confinement likely causes inmates who are already prone to depression to display worse symptoms of depression due to the lack of sunlight that inmates in solitary confinement receive.[138]  Dr. Akil further believes that the conditions of solitary confinement could cause the

---

[135] Haney at 135 (quoting Stanley L. Brodsky & Forrest R. Scogin, *Inmates in Protective Custody: First Data on Emotional Effects*, 1 Forensic Reports 267 (1988) (WLC App. 948-956)).

[136] *Id*. at 137.  Specifically, Dr. Haney found that "a high percentage of prisoners in the present study reported suffering from heightened anxiety (91%), hyper-responsivity to external stimuli (86%), difficulty with concentration and memory (84%), confused thought processes (84%), wide mood and emotional swings (71%), aggressive fantasies (61%), perceptual distortions (44%), and hallucinations (41%)." *Id*.

[137] *Id*. at 142.

[138] Nadia Ramlagan, *Solitary Confinement Fundamentally Alters the Brain, Scientists Say*, American Association for the Advancement of Science (Feb. 26, 2016),

hippocampus to shrink.   As such, she believes that "in keeping inmates in full isolation, authorities are 'ruining a very critical component of the brain that's sensitive to stress.'"[139]

The story of Rick Raemisch—the Executive Director of the Colorado Department of Corrections—is as compelling as the scientific studies detailed above.  In January 2013, having recently been appointed as the head of Colorado's corrections department and wanting to learn more about administrative segregation, Mr. Raemisch volunteered to spend a night in solitary confinement.[140]  Mr. Raemisch did not report any history of mental illness and was in full control of the situation at all times.  Mr. Raemisch noted that the "[f]irst thing you notice is that it's anything but quiet.  You're immersed in a drone of garbled noise . . . .  I couldn't make sense of any of it, and was left feeling twitchy and paranoid. . . .  For a sound mind, those are daunting circumstances."[141]  Mr. Raemisch eventually broke a promise he made to himself and asked a guard for the time.  Although only roughly 16 hours had passed, Mr. Raemisch stated that "I felt as if I'd been there for days.  I sat with my mind.  How long would it take before [administrative segregation] chipped that away?  I don't know, but I'm confident that it would be a battle I would lose."[142]

One must closely consider Mr. Raemisch's circumstances.  Mr. Raemisch entered solitary confinement at the height of his professional career with full control of the situation, and

---

http://www.aaas.org/news/solitary-confinement-fundamentally-alters-brain-scientists-say   (WLC App. 808-810).

[139]   Joseph Stromberg, *The Science of Solitary Confinement*, Smithsonian Magazine (Feb. 19, 2014),                http://www.smithsonianmag.com/science-nature/science-solitary-confinement-180949793/?no-ist (WLC App. 768-770).

[140]   Rick   Raemisch,   *My   Night   in   Solitary*,   N.Y.   Times   (Feb.   20,   2014), http://www.nytimes.com/2014/02/21/opinion/my-night-in-solitary.html (WLC App. 834-837).

[141] *Id.*

[142] *Id.*

apparently suffered from no pre-existing mental illness.  He felt the effects of isolation in the short time that he remained in administrative confinement, a total of only 20 hours.[143]  Given Mr. Raemisch's story, there can be no credible claim that the Eighth Amendment allows for the placement of mentally ill inmates in solitary confinement.

As shown above, the conditions associated with long-term solitary confinement can cause serious mental illness in previously healthy individuals or can exacerbate existing mental illness. The scientific and experiential evidence shows that placing an inmate with a history of mental illness in solitary confinement could lead to a dangerous exacerbation of his or her mental illnesses in violation of his or her Eighth Amendment right to be free from cruel and unusual punishment.

## CONCLUSION

It is clear that Mr. Washington's status as a victim of prison rape, his conviction of sex offenses involving minors, his identification as homosexual, and his serious mental illness create a very high probability that he will be assaulted and raped in prison.  In response to these certain threats, Mr. Washington faces few options:  he can fight; he can "accept" this terrible fate; or he can "check in" to solitary confinement.  Once placed in solitary confinement, Mr. Washington will likely stay there for as long as these threats exist, which for him may be the entire duration of his prison term—15 years if sentenced to the mandatory minimum.

The BOP possesses no constitutionally permissible alternative to this outcome.  Instead, the BOP endeavors to "protect" its vulnerable inmates by placing them into solitary confinement. However, numerous studies have found that long-term exposure to solitary confinement is deleterious, and for those individuals with pre-existing mental health issues like Mr. Washington,

---

[143] *Id.*

solitary confinement will likely only worsen their condition.  Given the inadequacy of the BOP's facilities to protect inmates like Mr. Washington, sentencing him to a mandatory minimum term of prison would be a violation of his Eighth Amendment right to be free from cruel and unusual punishment at the hands of the Government.

Dated:  March 10, 2016                    Respectfully submitted,

By:    /s/ Brandon W. Duke
        Brandon W. Duke
        Winston & Strawn LLP
        1111 Louisiana Street, 25th Floor
        Houston, Texas 77002
        Tel: (713) 651-2636
        Fax: (713) 651-2700
        bduke@winston.com

        Jeffrey J. Amato
        Benjamin Sokoly
        Jonathan R. McCoy
        Sean R. Anderson
        Winston & Strawn LLP
        200 Park Avenue
        New York, New York 10002
        Tel: (212) 294-6700
        Fax: (212) 294-4700
        jamato@winston.com
        bsokoly@winston.com
        jmccoy@winston.com
        sranderson@winston.com

        *Counsel for* Amicus Curiae *The Washington Lawyers' Committee for Civil Rights and Urban Affairs*

42

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2016, the foregoing Memorandum of *Amicus Curiae*

The Washington Lawyers' Committee for Civil Rights and Urban Affairs was served by

operation of the Court's CM/ECF filing system upon all counsel of record.


Dated: March 10, 2016                    By:  /s/ Brandon W. Duke

                                         Brandon W. Duke
                                         Winston & Strawn LLP
                                         1111 Louisiana Street, 25th Floor
                                         Houston, Texas 77002
                                         Tel: (713) 651-2636
                                         Fax: (713) 651-2700
                                         bduke@winston.com