TM:EDP
F. #2013R00311

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                    Docket No. <u>13-CR-173 (JBW)</u>

DARNELL WASHINGTON,

             Defendant.

– – – – – – – – – – – – – – – – –X

<u>MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S
REQUEST FOR AN INCARCERATORY SENTENCE BELOW THE
STATUTORILY-REQUIRED MANDATORY MINIMUM</u>

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Erik D. Paulsen
Assistant U.S. Attorney
    (Of Counsel)

TABLE OF CONTENTS

I.  FACTUAL BACKGROUND ......................................................................................... 1

    A.  The Defendant's Criminal Conduct ............................................................ 1

        1.  The Defendant's Molestation of Children on School Buses ................................. 1

        2.  The Defendant's Molestation of Additional Children and Production of Child
            Pornography ....................................................................................... 1

        3.  The Defendant's Custody in State Prison............................................................ 3

        4.  The Defendant's Distribution, Receipt and Possession of Child Pornography ....... 3

    B.  The Defendant's Incarceration at the Metropolitan Detention Center......................... 5

        1.  The Defendant's Screening and Intake Upon Entry............................................... 5

        2.  The Defendant's Violations of Prison Regulations.................................................. 5

        3.  The Defendant's Safety During His Stay at the MDC ........................................... 6

    C.  The Defendant's Guilty Plea ...................................................................................... 7

    D.  The June 11, 2015 Sentencing Hearing and Subsequent Evidentiary Hearings ........... 7

II.  THE COURT IS REQUIRED TO FOLLOW THE LAW AND IMPOSE A SENTENCE
     OF AT LEAST FIFTEEN YEARS INCARCERATION ............................................... 11

III. IMPOSITION OF A LAWFUL SENTENCE OF AT LEAST FIFTEEN YEARS Of
     INCARCERATION WOULD NOT CONSTITUTE CRUEL OR UNUSUAL
     PUNISHMENT ................................................................................................................ 12

    A.  The Eighth Amendment and the Assessment of Prison Conditions in the Context of
        Civil Lawsuits ............................................................................................................ 13

    B.  The Government Has Not Been and Will Not Be Deliberately Indifferent to the Issues
        of Sexual Assault and Restrictive Custody in its Prisons ........................................... 15

        1.  The Government Has Made Considerable Efforts to Address the Issue of Sexual
            Assault in Prisons ............................................................................................... 19

        2.  The Government Has Made Considerable Efforts to Address the Use of Protective
            Custody in Prisons .............................................................................................. 22

3.  The Government's Collection and Presentation of Statistics Support its Position That It Has Not Been Deliberately Indifferent to the Issues Concerning Sexual Assault and Restrictive Housing .......................................................................... 26

4.  The Government's Efforts Described Above Not Only Rebut An Accusation of Deliberate Indifference, but Show a Concerted Effort to Address and Remedy the Issues Presented by the Defendant ....................................................................... 31

C.  The Government Has Not and Will Not Be Deliberately Indifferent to Any Specific Speculative Risks to the Defendant's Health and Safety ............................................. 32

1.  The Manner in Which the Defendant Has Been Treated in BOP Custody Shows that the BOP is Not Deliberately Indifferent to His Well-Being ......................... 33

a.  The Intake Guidelines for Vulnerable Inmates Contained in the Program Statement ....................................................................... 33

b.  The Manner in Which the MDC Identified and Addressed the Defendant's Needs Is Reflective of the Attention Paid by the BOP to its Inmates ............. 35

2.  The Defendant's Potential Vulnerabilities Do Not Render Him Unsuitable for Confinement ....................................................................... 40

3.  The Defendant's Argument About the Risks that He Faces in Prison Relies Excessively on the Hyperbolic Testimony of Nelson Aponte, Which Is Not Worthy of the Court's Reliance ............................................................. 43

a.  Aponte's Speculation Regarding the Defendant's Future in Federal Custody 44

b.  Aponte's Testimony Should Not Be Relied Upon by the Court ..................... 45

D.  The Defendant Asks the Court to Take an Action Without Precedent ....................... 51

IV. THE DEFENDANT'S DUE PROCESS AND EQUAL PROTECTION ARGUMENTS ARE PREMATURE AND WITHOUT MERIT .............................................................. 53

V.  THE DEFENDANT POSES SIGNIFICANT RISKS TO THE COMMUNITY ............. 54

CONCLUSION ....................................................................... 66

I. <u>FACTUAL BACKGROUND</u>

 A. <u>The Defendant's Criminal Conduct</u>

  1. <u>The Defendant's Molestation of Children on School Buses</u>

   In the spring of 2009, the defendant was arrested for molesting a young boy on a school bus.  (Pre-Sentence Report ("PSR") ¶ 70).  At the time of the offense, the defendant had been employed as a bus matron and had frequent contact with grade school age children. (<u>Id.</u>).  After the first victim spoke out about the defendant's conduct, the New York City Police Department ("NYPD") interviewed other children on the defendant's bus and found two other young boys who had been similarly molested by the defendant.  (<u>Id.</u>).  After being re-arrested on the additional charges, the defendant pled guilty in Queens County Supreme Court to three separate convictions: two felony convictions for sexual abuse in the first degree and one misdemeanor conviction for endangering the welfare of a minor.  (<u>Id.</u> ¶¶ 70-72).  The defendant was sentenced to three years of prison.  (<u>Id.</u>).

  2. <u>The Defendant's Molestation of Additional Children and Production of Child Pornography</u>

   After the defendant's 2009 arrest, the NYPD executed a search warrant on the telephone that the defendant had in his possession.  The telephone contained several sexually explicit photographs of at least one young boy, as well as several photographs of local day care centers.  (PSR Addendum ¶¶ 19-21 (June 8, 2015); GX 501, pgs. 203-208).  After being advised of his <u>Miranda</u> rights, the defendant told the NYPD (in a video-recorded statement) that he had obtained the pictures of child pornography on the internet.  The truth, however, was that the defendant had taken the photos himself.  (PSR ¶ 19).  The young boy in some of the photographs – "Victim #1" who supplied the victim impact statement noted in the PSR

(see below) – was a fourth child that the defendant had molested.[1]  The defendant met Victim #1 at his church and befriended him.  (Id. ¶¶ 20, 23).  After gaining his trust, the defendant starting showing Victim #1 images of child pornography on a church computer.  (Id.).  In the months that followed, the defendant molested Victim #1 (who was younger than ten years old at the time) in the back of his car and photographed the abuse.  (Id.).  Six years after the abuse, Victim #1 gave the following statement:

> Darnel [sic] Washington sexually abused me when I was younger.  He touched me in ways that I didn't feel comfortable.  If I would have been a little bit older, I would have been able to not let him touch me the way he did.  When I was with him by myself, I didn't like it.  What happened was not what was supposed to happen to me.
>
> When I was younger it affected me a lot because I thought about it a lot but never told anyone.  I sometimes had trouble sleeping because it was always on my mind.  I didn't like talking to people.  I felt ashamed and very uncomfortable.  I didn't tell my mom because I didn't feel right talking about it, and I felt like there was nothing I could do about it.
>
> Now that I am older, I don't think about it because I have gotten into activities that help me get my mind off of the sexual abuse.
>
> In my opinion, I think Darnel [sic] Washington should go away for a long time.  It wouldn't be right for him to come out and do the same thing to someone even younger than I was.

(Id.).[2]

---

[1] The photos found on the defendant's telephone appeared to be of two different individuals.  Victim #1 was sure that some of the photos were of him; he was unsure about the rest.  (PSR ¶ 20).  Accordingly, there may be photographs of a fifth victim on the telephone.

[2] The defendant was also the victim of sexual abuse when he was young.  As the government noted in its sentencing letter to the Court:

3. <u>The Defendant's Custody in State Prison</u>

The defendant spent approximately three years in New York State prison following his two felony convictions for sexual abuse in the first degree and one misdemeanor conviction for endangering the welfare of a minor.  (<u>Id.</u> ¶ 70-72).  The defendant reports that while he was in custody at the former Oneida State Correctional facility, he was assaulted and raped by another inmate while preparing to shower.  (<u>Id.</u> ¶ 96). The defendant also reports that while he was in custody at the Auburn Correctional Facility, he was sexually assaulted and raped while getting dressed after showering.  (<u>Id.</u> ¶ 96). According to the defendant, he reported the former incident but not the latter incident.  (<u>Id.</u> ¶ 96).

4. <u>The Defendant's Distribution, Receipt and Possession of Child Pornography</u>

After the defendant was released from prison in April 2012, he immediately began viewing and trading thousands of pictures and videos of child pornography.  In February 2013, special agents from the Federal Bureau of Investigation ("FBI") monitored

---

This is, without doubt, a very sad case.  The defendant has lived, by any measurement, a difficult life.  The documentary record suggests that the defendant was abused, sexually and otherwise, by his natural parents and his foster families.  Although he was fortunate to eventually be placed in the custody of a loving foster family, he suffered significantly prior to that placement, and he appears to still be dealing with the legacy effects of this mistreatment.  One cannot help but feel deep pity for the suffering that the defendant has endured.  The case is also sad, however, because of what the defendant has become . . . .

(13-CR-173, Dkt. 71 (June 10, 2015)).

the defendant as he traded pictures and videos of underage children engaging in sexually explicit activities, including rape and bondage.  (Id. ¶ 3).  Based on this conduct, the FBI obtained a search warrant for the physical location where the defendant had been distributing and receiving the child pornography.  (Id. ¶ 9).  The FBI executed the warrant on February 22, 2013, at a location in Queens where the defendant had been working.  (Id. ¶¶ 9, 12).  At the time the warrant was executed, the defendant was in the act of receiving and sharing child pornography with other computer users.  (See id. ¶ 13).

The defendant was placed under arrest.  The defendant was read his Miranda rights and he agreed to speak with Special Agent Thomas Thompson of the FBI.  During that interview, the defendant acknowledged, in sum and substance and in part, that he had been sharing 200 gigabytes of child pornography and that he was addicted to child pornography. (Id. ¶ 10, 14).  He also acknowledged (by a handwritten statement) that he had shown child pornography to "a victim in my 2009 case."  (See id. ¶ 15).

During the search of the defendant's workplace, the special agents found several items of interest.  They located a hard drive the defendant was using to store his child pornography, which contained more than 1000 videos and 7000 pictures.  (Id. ¶ 18).  They also located several documents relating to a fictitious bus company called "Mike's Transportation, Inc."  (Id. ¶ 17; GX 501 pgs. 50-62).  These documents included maps of proposed bus routes, as well an employment application for prospective employees of the bus company, one of which had been filled out by an applicant.  (Id.).  The questions on the application appeared to have been aimed at encouraging the applicant to share both his or her sexual interest in children and photographs of his or her naked body.

4

B.   The Defendant's Incarceration at the Metropolitan Detention Center

1.   The Defendant's Screening and Intake Upon Entry

After his arrest, the defendant was transferred to the Metropolitan Detention

Center ("MDC") in Brooklyn.  During the defendant's screening interview, he disclosed that

he had previously been sexually assaulted while in New York State prison and stated that he

did not know of any reason why he should not be placed in general population.  (DX T; Tr 1

at 157).  The defendant was then transferred to the MDC psychology wing for suicide watch

observation after he stated that he was feeling suicidal.  (DX T; Tr. 1 at 157).  The defendant

was kept on suicide watch for approximately five to seven days; he was released once the

facility determined that he was mentally stable.  (Tr. 1 at 157).

After being removed from suicide watch, the defendant was transferred to the

MDC's intake unit.  (Tr. 1 at 159).  From there, he was transferred to the K-81 unit, or

special programs unit, which is a unit for inmates that need additional psychological

attention.  (Tr. 1 at 159).

2.   The Defendant's Violations of Prison Regulations

On May 9, 2013, while in the K-81 unit, the defendant received a violation for

exposing himself to another inmate.  During a search of the defendant's cell in connection

with that incident, MDC officials with the Special Investigative Services ("SIS") unit located

a set of written documents in the defendant's handwriting.  (GX 404; Tr. 1 at 163-64).   On

their face, the documents describe a consensual sexual encounter between the narrator and an

eight year old boy.   The document reads, in part:

> I am in the water park.  I am wearing a pair of light blue
> speedos.  I see a lot of boys the age of 8 to 10 years old in
> various color speedos. . .  While waiting in line, [the boy] is

5

> behind me and then he hugs me from behind. . . . So while we are riding he asks me a question, "Are you gay?" So I answered his question honestly and told him I am bisexual but I am not fully sure if I was gay because I like boys and girls.  Then I asked him why he asked?  He said that he likes boys and men . . . . As I look at him I see he is looking down at something so I look to see what he is looking at and I see him holding the front of his speedo down so I can see his dick. . . . He starts to tell me that he did what he did in the lazy river to see how I would react to it and he told me he wants to fool around with me and he said he won't tell.

(Id.).  The story continues for several pages and describes the narrator and the boy engaging in oral, digital and anal sex, most of which is initiated by the child.  (Id.)

Because the defendant exposed himself to the other inmate, he was placed in disciplinary segregation and then transferred out of the K-81 unit.  (Tr. 1 at 160).  The defendant, however, was again placed in a general population unit geared toward vulnerable inmates – this time the 5-Unit (or D-Unit).  (Tr. 1 at 160).  D-Unit was later closed and reconstituted as G-42 Unit, which mirrored the unit that it replaced.  While in these latter units, the defendant was again accused of improper behavior – this time for asking another inmate in his unit about whether he shaves his testicles.  (Id. at 162).

3.    The Defendant's Safety During His Stay at the MDC

During the time that the defendant has been at the MDC, he has not complained of any violent conduct directed toward him (sexual or otherwise) by any other inmates.[3]  Accordingly, during the defendant's more than three years at the MDC, he has never been placed in protective custody, whether voluntarily or involuntarily.

---

[3] On Wednesday, March 30, 2016, two days before the filing of this brief, the defendant alleged that another inmate had made sexual advances toward him and a third inmate.  The defendant alleged that the other inmate said, "You have a fat ass and I like

6

C.     The Defendant's Guilty Plea

On November 11, 2014, the defendant appeared before the Honorable Ramon E. Reyes, Jr., and pled guilty to a two-count superseding information charging him with Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251, and Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2).  Judge Reyes questioned the defendant to establish that the defendant's plea was knowing, voluntary and intelligent.  Satisfied with the defendant's answers to the questions, Judge Reyes accepted the defendant's allocution, determined that there was a factual basis for the plea and recommended that this Court accept the defendant's plea.

D.     The June 11, 2015 Sentencing Hearing and Subsequent Evidentiary Hearings

On June 11, 2015, the parties appeared before this Court for sentencing.  Prior to the hearing, both the government and the defendant had retained experts (at the Court's request) to testify about the defendant's risk of recidivism.  Both experts were scheduled to testify on June 11, 2015, prior to the Court issuing its sentence.

During the sentencing hearing, the Court questioned the defendant regarding his November 11, 2014 plea.  The defendant stated that his plea was voluntary and that he wanted to go forward with sentencing.  The Court, however, <u>sua</u> <u>sponte</u> declined to go forward with the sentencing and did not accept the plea.  Although the experts on risk

---

that," which the defendant said made him uncomfortable.  The defendant added that he did not feel threatened by the statements.  The defendant reported this conduct to officials at the MDC, who in turn did a preliminary investigation into the conduct.  Based, in part, on an interview with the third inmate who also allegedly received advances, the MDC's preliminary conclusion is that the inmate did not harass or engage in a sexual act.  A more formal investigation into the incident is still ongoing.

assessment had not yet testified, the Court stated that it would not impose a sentence longer

than the minimum, noting "I do not understand why there should be a plea to a 15 year

minimum when he could be tried and receive the same sentence because it is quite clear I am

not going above the 15 year minimum."[4]  (Tr. at 4 (June 11, 2015)).  The Court then

requested that the parties return for another evidentiary hearing to address, among other

things, "the dangers presented to the defendant," "recommendations for treatment," and

whether a fifteen year prison sentence constitutes cruel and unusual punishment.  (Tr. at 5-6

---

[4] The Court has suggested on several occasions that it would not sentence the
defendant above the mandatory minimum sentence but that it would consider sentencing the
defendant well below the mandatory minimum.  In other words, in this particular case, the
statutory minimum is serving the exact opposite of its stated legislative purpose:  the Court is
using it as a ceiling, not a floor, in determining the punishment to be imposed.

The government submits that the bare minimum sentence of fifteen years (180
months) incarceration should not be the ceiling of punishment in this case.  Instead, a
sentence within the Guidelines would satisfy the 3553(a) factors and would avoid disparities
with other sentences issued for comparable conduct in this district.  See e.g., United States v.
Joseph Burkett, 07-CR-857 (DRH): 420 months, life supervised release; United States v.
Thomas Carey, 09-CR-441 (DRH): 300 months, life supervised release; United States v.
Michael McGowan, 09-CR-653 (SJF): 1080 months, life supervised release; United States v.
Felix Cartagena, 10-CR-750 (CBA): 360 months, life supervised release; United States v.
Michael Ledee, 11-CR-175 (NGG): 325 months, life supervised release; United States v.
Taleek Brooks, 12-CR-166 (RRM): 600 months, life supervised release; United States v.
Solomon Eaton, 12-CR-352 (KAM): 255 months, life supervised release; United States v.
Bebars Baslan, 13-CR-220 (RJD): 432 months, life supervised release; United States v.
Alberto Yard, 13-CR-486 (KAM): 324 months, life supervised release.  In the plea
agreement, "the government agreed to take no position where within the Guidelines range
 . . . the sentence should fall."  The government submits that the sentences proposed by the
Court during the hearing, all of which would fall far below the Guidelines range of 292 to
360 months, would not only be unlawful but would also be substantively unreasonable.

(June 11, 2015)).[5]  The Court added that he would permit a full withdrawal of the

defendant's plea during the hearing.  (Tr. at 6 (June 11, 2015)).

On June 25, 2015, the Court issued an order directing that five issues be

addressed at the subsequent evidentiary hearing, as follows:

- First, "why did the defendant decide to plead when that would necessarily result in incarceration for at least fifteen years in lieu of exercising his constitutional right to a jury trial?  Counsel were aware that an adverse jury verdict would have resulted in the same sentence as would a plea."

- Second, based on the Court's observation of the defendant's "passivity and depression" during sentencing, whether the defendant is capable of waiving his right to trial.

- Third, whether "sentencing this defendant – who has been raped multiple times – to the statutory minimum sentence of fifteen years violates his right to cruel and unusual punishment?"

- Fourth, if an Eighth Amendment violation is found, "what types of appropriate alternatives to incarceration are available?"

- Fifth, "what are the attendant risks posed by the defendant if released into society?"

On November 23, 2015, the defendant appeared before this Court and renewed his desire to

plead guilty.  This time the Court accepted his plea of guilty.   That same day, the Court held

an evidentiary hearing on the third, fourth and fifth issues identified by the Court in its June

25, 2015 Order.  Hearings on these matters continued for three additional days: December

22, 2015, December 23, 2015 and February 3, 2016.[6]  Following completion of the hearings,

---

[5] This Court requested a similar inquiry in United States v. C.R., 09-CR-155, before refusing to apply a mandatory minimum sentence on Eighth Amendment grounds.  See United States v. [C.R.], 732 F.3d 204, 208 (2d Cir. 2013).

[6] The government has adopted the citation form used by defense counsel in footnote one of its brief:  "Tr. 1" refers to the November 23, 2015 hearing; "Tr. 2" refers to the

the Court requested post-hearing briefing from the parties and amici on the outstanding

issues identified by the Court.[7]

---

December 22, 2015 hearing; "Tr. 3" refers to the December 23, 2015 hearing; and "Tr. 4" refers to the February 3, 2016 hearing.



ANALYSIS

II.     THE COURT IS REQUIRED TO FOLLOW THE LAW AND IMPOSE A
        SENTENCE OF AT LEAST FIFTEEN YEARS INCARCERATION

On November 11, 2014, the defendant pled guilty to a two-count information charging him with Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251, and Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2).  The former of these two counts carries a fifteen year mandatory minimum sentence, while the latter carries a ten year mandatory minimum sentence.[8]

The Court is required by law to impose these two mandatory minimum sentences.  The defendant has cited no authority – nor can he cite any authority – that would sanction the Court's refusal to impose the minimum sentences required by Congress for these grave offenses.  The defendant's speculative concerns regarding his future conditions of confinement are not grounds for the Court to disobey the law and refuse to follow Congress's express instructions.

---

[8] Because the defendant had previously been convicted of molesting children on a New York City school bus, the mandatory minimum sentence applicable to his conviction for possession of child pornography was increased to 10 years.  The mandatory minimum sentence for his child exploitation conviction was unaffected.  Both mandatory minimum sentences fall well below his applicable Guidelines range of 292 to 365 months.

The defendant submits that the standard laid out by the Supreme Court in Farmer v. Brennan, 511 U.S. 825 (1994), authorizes this result.  The defendant is mistaken.  In Farmer, the Court laid out the standard that applies when an inmate brings a Bivens claim alleging an Eighth Amendment violation and asks for damages and/or injunctive relief.  As such, Farmer governs civil, not criminal, cases.  Nothing in Farmer or its progeny suggests that this standard can be applied prospectively to enable a Court to effectively commute an inmate's prison sentence – much less decline to impose a sentence specifically required by law.   This argument has absolutely no basis in precedent and invites the Court to act in an unlawful manner.  The government respectfully requests that the Court resist this invitation and impose a legally sufficient sentence.

III.   IMPOSITION OF A LAWFUL SENTENCE OF AT LEAST FIFTEEN YEARS OF INCARCERATION WOULD NOT CONSTITUTE CRUEL OR UNUSUAL PUNISHMENT

As set forth above, the defendant has identified no legal basis for the Court to decline to apply the statutorily-required sentence in this case.  However, even if the Court entertains the notion that the civil Bivens standard laid out in Farmer is somehow applicable to the Court's determination of the defendant's sentence, the defendant cannot meet that the Farmer standard.  For the reasons discussed below, the defendant has failed to show that the government has been or will be deliberately indifferent to an excessive risk of harm to the defendant.  Accordingly, even assuming arguendo that Farmer applies (it does not), the defendant cannot meet his burden to establish a basis for prospective relief.

A.    The Eighth Amendment and the Assessment of Prison Conditions in the
      Context of Civil Lawsuits

In the context of civil lawsuits, "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Helling v. McKinney, 509 U.S. 25, 31 (1993)).  In its prohibition of "cruel and unusual punishments," the Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement; among these duties, prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates." Id. (citing Hudson v. Palmer, 468 U.S. 517, 526-527 (1984)).  According to the Supreme Court, the Constitution does not mandate comfortable prisons but it also does not permit inhumane ones.  Id. (citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)).

In the civil context, the Supreme Court has held that a prison official violates the Eighth Amendment prohibition against cruel and unusual punishment when two requirements are met.  First, the alleged deprivation caused by the prison official must be, objectively, "sufficiently serious."  Id. at 834.  "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  Id. (citing Helling, 509 U.S. at 35).  Second, the alleged deprivation alleged must flow from a "sufficiently culpable state of mind," described as "deliberate indifference to inmate health and safety."  Id.  This requirement "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" Id. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)).

13

The Supreme Court has adopted a subjective test for deliberate indifference, noting that:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. at 837.  The Court noted that such a subjective approach comported with the text of the Eight Amendment in that the amendment "does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'"  Id.

In a civil case, the claimant does not need to wait for the threatened injury to occur to obtain relief.  In an action that seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, "the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct, their attitudes and conduct at the time suit is brought and persisting thereafter."  Id. at 845 (quotation marks omitted).  In other words, at the time of the allegation, the claimant must show that the prison officials were "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so . . . into the future."  Id. at 846. The Supreme Court noted, however, that a district court should approach issuance of injunctive orders with the usual caution, "warning" that courts should not become "enmeshed in the minutia of prison operations."  Id. at 847-48 (citing Bell v. Wolfish, 441 U.S. 520, 562 (1979)).

B.    <u>The Government Has Not Been and Will Not Be Deliberately Indifferent to the Issues of Sexual Assault and Restrictive Custody in its Prisons</u>

The defendant argues that the mandatory minimum sentence that applies to everyone else should not apply to him.  His argument is based on the utterly speculative assumption there are two and only two possible outcomes awaiting him in prison: perpetual confinement in protective custody or unavoidable rape.  Confronted with the "near certainty" or "virtual certainty" of such outcomes, the defendant argues that the Court must disregard the bare minimum statutory sentence that applies to everyone else and instead release him back to the community.

In support of his argument, the defendant has attempted to audit the efforts made by the government to address the issues of sexual assault in prisons and the use of protective custody.  In sum and substance, the defendant argues that the numerous efforts made by the government on these issues have not only been abject failures, but also that these efforts have been so misguided and mishandled—and offer so little chance of improvement in the future—that a jail sentence under present conditions would constitute a violation of the defendant's right to remain free of unconstitutionally cruel and unusual punishment.

This argument is unsupportable as a matter of fact and as a matter of law.

In order to find that the government will violate the defendant's Eighth Amendment right to be free of cruel and unusual punishment in the future, the defendant cannot merely criticize the current manner in which the government administers itself and suggest that things could or should be done better.  The defendant's arguments, at their core, rest on speculation and it is well-settled that speculation about future events cannot form the

basis for relief he requests.  To the contrary, in this context, courts typically exercise considerable restraint when assessing questions concerning prison conditions— "incorporate[ing] due regard for the unenviable task of keeping dangerous men in safe custody under humane conditions."  Farmer, 511 U.S. at 845.

The Supreme Court has commented on these considerations on a number of occasions.  In Rhodes v. Chapman, the Supreme Court conducted an Eighth Amendment analysis of an Ohio state prison's practice of "double-celling"—incarcerating two inmates together in a single cell as a response to issues of overcrowding.  452 U.S. 337 (1981).  The Court found no Eighth Amendment violation and noted the inherent difficulties in judicial assessment of such cases.  "We have sketched before the magnitude of the problems of prison administration," noted the Court.  Id. at 351 n.1.  "It suffices here to repeat:"

> The problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.  Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."

Id.  The Court further noted that "judicial recognition" of the difficulties of prison administration "reflects no more than a healthy sense of realism."  Id.  In light of these considerations, the Rhodes Court added that analysis of prison administration must "spring from constitutional requirements," not from a Court's "idea of how to best operate a prison." Id. at 351.  The Court further advised caution and restraint when addressing the constitutional parameters of cruel and unusual punishment in the prison context, noting that constitutional

solutions to such questions cannot be easily reversed nor "revised in light of further experience."  Id.

In light of these concerns, the Farmer standard is demanding and difficult to satisfy.  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that [the government] disregarded a known or obvious consequence of [its] action."  Connick v. Thompson, 563 U.S. 51, 61 (2011).  Commentators have noted the high bar that petitioners, such as prisoners, face in satisfying this standard.  See, e.g., Will A. Smith, Comment, Civil Liability for Sexual Assault in Prison: A Challenge to the "Deliberate Indifference" Standard, 34 Cumb. L. Rev. 289, 316 (2004) (noting the considerable difficulties in satisfying the Farmer standard of deliberate indifference); Shara Abraham, Male Rape in U.S. Prisons: Cruel and Unusual Punishment, 9 No. 1 Hum. Rts. Brief 5 ("[T]he 'deliberate indifference' standard poses a nearly insurmountable burden for Eighth Amendment claims. Under this legal standard, the court must rule in favor of the defendant unless the prisoner demonstrates the defendant had actual knowledge of a substantial risk to the plaintiff and the defendant disregarded that risk.  Proving subjective intent is a formidable requirement.").

In light of the current attention being given by the government to the issues raised by the defendant, substantial evidence would be necessary to meet this "demanding" standard.  The defendant comes before this Court at a moment in history when the important issues he raises—sexual assault in prisons and use of restrictive housing—have been placed front and center by the relevant arms of the government: the Congress, the Bureau of Prisons, the Department of Justice and even the President of the United States himself.  The attention paid by the legislative and executive branches has resulted in substantial changes to how the government administers and operates its prisons, changes which have already resulted in

17

tangible progress to prisoner outcomes and portend further progress still to come.  It is against this backdrop of legislative, administrative and executive attention that the defendant claims that the government has been so "deliberately indifferent" to the issues of sexual assault and restrictive housing that this Court should find that his incarceration would constitute cruel and unusual punishment.  Given this demonstrable attention to issues the defendant raises before the court, the defendant's claims are not just unsupported by law but are also totally belied by the evidence adduced at the hearing in this case.

The facts, as laid out in the testimony and documents admitted by the Court during this inquiry, establish that the government has not been deliberately indifferent to future risks posed to the defendant, whatever their likelihood or severity.  Moreover, the record shows that in recent years the federal government has made concerted efforts to address the incidence of sexual assault and the use of restrictive housing in its facilities, and that the government continues to prioritize these efforts moving forward.  The record further shows that by employing the standards that now govern each of its facilities, the government has successfully ensured the safety of this specific defendant for the entire time that he has been in federal custody.  Taken together, these facts show the exact opposite of deliberate indifference: they show that the government has been taking the safety and wellbeing of its inmates very seriously, including the safety and wellbeing of the defendant, and that it will continue to do so into the future.  In light of such facts, the Court should not, and cannot, find that the government has violated or will violate the Eighth Amendment rights of the defendant.

1.     The Government Has Made Considerable Efforts to Address the Issue
        of Sexual Assault in Prisons

The evidence shows that the government has made, and continues to make, a concerted effort to address the issue of sexual assault in prison settings.  In 2003, Congress passed the Prison Rape Elimination Act ("PREA") "to address the problem of rape in prison by creating a commission to study the issue and to develop national standards for the detection, prevention, reduction and punishment of prison rape."  Omaro v. Annucci, 68 F. Supp. 3d 359, 364 (W.D.N.Y. 2014).  The legislation established a National Prison Rape Elimination Commission ("NPREC") to "carry out a comprehensive legal and factual study of the penological [sic], physical, mental, medical, social, and economic impacts of prison rape in the United States and to recommend to the Attorney General national standards for enhancing the detection, prevention, reduction, and punishment of prison rape."  28 C.F.R. Part 115, National Standards to Prevent, Detect, and Respond to Prison Rape; U.S. Department of Justice Final Rule (May 2012) (citing 42 U.S.C. 15606(d)(1), (e)(1)) (alteration in original) (available at http://ojp.gov/programs/pdfs/prea_final_rule.pdf) (hereinafter, "PREA Final Rule").  The NPREC released its recommendations in June 2009, which were then considered and incorporated into the PREA Final Rule promulgated by the Attorney General in May 2012.  Id.  The regulations contained in the PREA Final Rule are binding upon the Federal Bureau of Prisons ("BOP").  (DX R at 2).

The overall objective of PREA is to foster an atmosphere of "zero tolerance toward sexual abuse, including sexual harassment."  (Tr. 1 at 142).  The standards included in the PREA Final Rule address this objective from a number of different angles, including the following:

- <u>Screening</u>:  Inmates must be screened upon entry into each BOP facility for risk of being sexually abused and that information must be used in informing housing, bed, work, education and program assignments. (Executive Summary, National Standards to Prevent, Detect, and Respond to Prison Rape; U.S. Department of Justice Final Rule (May 2012) (hereinafter "PREA Exec. Summary" or "GX 701") at 6).

- <u>Supervision and Monitoring</u>:  Each facility is required to develop staffing plans that provide sufficient staffing and (if necessary) video surveillance to protect inmates from sexual assault.  Supervisors must also conduct and document unannounced rounds to identify and deter staff sexual abuse and sexual harassment.  (<u>Id.</u> at 4).

- <u>Training</u>:  Each facility is required to train its staff on detecting, responding and preventing sexual abuse.  (<u>Id.</u> at 5-6).

- <u>Notification of Overall Policy to Inmates</u>:  Each inmate must be informed about the facility's zero-tolerance standard regarding sexual abuse and sexual harassment so that the inmate understands his/her rights.  (<u>Id.</u> at 6).

- <u>Inmate Reporting Options</u>:  Each inmate must be educated on how to report incidents of sexual abuse.  These avenues must include anonymous reporting options, as well as options to report to individuals outside of the agency structure.  The facilities must also permit third parties to report abuse on behalf of the inmate.  (<u>Id.</u> at 6).

- <u>Retaliation</u>:  Every facility must develop polices to prevent and detect any retaliation against individuals who make complaints or who assist in the investigation of complaints.  (<u>Id.</u> at 6).

- <u>Staff Discipline</u>:  Staff must be disciplined for violating agency policies regarding sexual abuse, with termination the presumptive discipline for actual engagement in abuse.  (<u>Id.</u> at 7).

- <u>Accountability by Leadership</u>:  Each facility is required to designate a PREA point person who has the time and authority to coordinate compliance efforts.  (<u>Id.</u> at 3).

- <u>Audits</u>:  Each facility must be audited by individuals external to the agency on a thrice-yearly basis.  (<u>Id.</u> at 8).

- <u>Special Considerations for Lesbian, Gay, Bisexual, Transgender, Intersex (LGBTI) and Gender Non-Conforming Inmates</u>.  Each facility must account for the "particular vulnerabilities" of inmates who are LGBTI and

address whether any incidents of abuse were motivated by LGBTI identification, status or perceived status.  (Id. at 8).

The Court heard testimony concerning how the PREA Final Rule has affected decision-making at BOP facilities.  Patricia Rodman, an associate warden with the MDC (now retired), testified about the "Sexually Abusive Behavior Prevention and Intervention" Program Statement ("Program Statement"), a BOP document that incorporates and elaborates upon the enacted PREA Final Rule.  The Program Statement provides binding guidelines for each BOP facility as they handle issues relating to sexual assault.  (DX R at 2).  Rodman testified that the Program Statement provides guidance to all BOP employees, from wardens down to officers, as they address issues relating to sexual assault.  Both Rodman and Brad Trate, the Correctional Services Administrator for the BOP, testified about their experiences working in the BOP following the passage of the PREA Final Rule, as well as their work as PREA compliance officers at their respective institutions.  As PREA compliance officers, both Rodman and Trate were responsible for ensuring that the guidelines contained in the Program Statement were being implemented at their respective facilities, and both testified about the ways in which they exercised that responsibility.  Defense expert Philip Wise, another ex-assistant warden, added that the BOP takes the Program Statement seriously and that BOP employees would treat the instructions contained therein as binding mandates.  (Tr. 1 at 48; 97).

As will be discussed in greater detail below, the requirements contained in the PREA Final Rule and the Program Statement have been in effect the entire time that the defendant has been in federal custody.  These requirements have governed BOP actions

toward the defendant and his fellow inmates, and have contributed to the defendant

successfully adjusting to his BOP facility for more than three years.

    2.    <u>The Government Has Made Considerable Efforts to Address the Use of Protective Custody in Prisons</u>

As is noted above, the Program Statement contains detailed guidance on

various measures aimed at preventing actual and potential sexual assault.  In addition, the

Program Statement contains guidance on what measures <u>should not</u> be taken in response to

threats of sexual assault—namely, excessive use of protective custody:

> Protective Custody.  (a) Inmates at high risk for sexual
> victimization shall not be placed in involuntary segregated
> housing unless an assessment of all available alternatives has
> been made, and a determination has been made that there is no
> available alternative means of separation from likely abusers.

(DX R at 33).   The Program Statement further provides restrictions to the amount of time

that a facility can seek to protect an inmate by keeping him in segregated housing (typically

known as the Special Housing Unit, or the SHU), as well as guidelines requiring that the

facility provide written justification when it uses protective custody in such a manner.

The government's attention to the issue of protective custody is a necessary

corollary to its attention to the issue of sexual assault.  The PREA Final Rule and the

Program Statement both make clear that the BOP should not solve the safety issues of its

inmates by housing them in the SHU.  In such a scenario, solving one problem (ensuring the

safety of the inmate) would create a different problem (preventing the inmate from adjusting

normally as a result of isolation).  Accordingly, as the government has tackled the problem of

sexual assault, it has also had to address the potential overuse of the SHU as a response to

sexual assault.

As was noted by Rodman and other witnesses, BOP facilities have not had to resort to involuntary detention of this sort on a frequent basis.  (Tr. 1 at 175).  Instead, the more common scenario that confronts the BOP relates to inmates who seek entry into the SHU on a voluntary basis.  (Tr. 1 at 176).  If an inmate makes such a request, the inmate is admitted into protective custody and the SIS staff conducts an investigation to determine if the threat the inmate fears is real.  (Tr. 1 at 176).   If the threat is verified—that is, if the BOP determines that the inmate has reason to fear risk of harm—the situation can be remedied in several different ways:  the cause of the threat (the aggressor) can be separated or transferred away from the inmate; the inmate could be transferred to a different facility; or the inmate could be transferred to a different housing unit within the same facility, away from the aggressor.  (Tr. 1 at 176-77).   If, on the other hand, the SIS staff determines that the threat is not real, the inmate is returned to general population.  (Tr. 4 at 23).  As Rodman testified, the inmate would not be left in protective custody permanently.  (Tr. 1 at 177).

Brad Trate testified in a similar manner.  Trate stated that, as a SHU officer, he was part of a review committee that continually assessed each and every individual in the SHU in an effort to determine a plan to manage that individual.  (Tr. 4 at 36).  Depending on the investigative findings and the judgment of the committee, the inmate might be moved to a different facility or returned to general population.  (Tr. 4 at 36-37).

As with the issue of sexual assault, the use and potential overuse of restrictive housing is a topic that the BOP had prioritized in recent years.  In January 2016, less than three months ago, the government completed a comprehensive analysis and audit of the BOP's use of restrictive housing.  The study, which was requested by President Obama, sought to understand the current use of restrictive housing and to develop strategies to reduce

23

its use through the nation.  U.S. Department of Justice Report and Recommendations

Concerning the Use of Restrictive Housing, Executive Summary, January 2016 ("SHU Exec.

Summary" or "GX 702") at 1.  Among other things, the study announced that the

government would take measures to ensure that the SHU is not used as a "default solution"

to problems within prison facilities and that its use would be circumscribed and moderated.

Id. at 1.  The report also encouraged modifications to the use of protective custody, including

the expansion of less restrictive forms of housing, such as Reintegration Housing Units

(RHUs).

> Although the SHU Executive Summary focused on areas of improvement, it

also noted that the BOP had already made significant progress in limiting the use of

restrictive housing.  The report noted, for example, that the BOP had reduced the number of

inmates in restrictive housing by more than 25% in the three years preceding the report—

roughly the entire length of time that the defendant has been in federal custody.  Id. at 2.

This analysis was consistent with earlier studies, such as the CNA Report referenced by the

defendant, which found that use of the SHU had dropped significantly over the same time

period.  (DX J at iii).  Defense witness Philip Wise stated that the drop in use of the SHU

during this time period was consistent with what he understood to be the BOP's intense focus

on the issue, noting that the use of the SHU is a "pretty large issue . . . a very big issue" with

the BOP.  (Tr. 1 at 87, 94).

> These findings were supported by the testimony of Brad Trate, the current

Correctional Services Administrator for the BOP.   In that position, Trate is responsible for

training wardens, lieutenants and captains; performing staffing analysis; and is responsible

for the correctional services of the BOP as a whole.  (Tr. 4 at 9-10).  Among other things,

Trate testified about the mechanisms that the BOP is currently using to limit the use of segregated housing.  As was noted in the SHU Executive Summary, in January 2013 the BOP rolled out a tracking system, the "SHU Application," which enables BOP staff to keep track individuals in segregated housing, including those in protective custody.  (SHU Exec. Summary at 8).  Trate testified that one of his responsibilities is to monitor the information aggregated by the SHU Application and to respond to that information on a daily basis.  (Tr. 4 at 10-11, 16).  Among other things, Trate monitors the overall number of inmates in segregated housing, including protective custody, and contacts regional officials and facility officials when the Application indicates that use of segregated housing at a specific facility has increased.  (Tr. 4 at 24-26).  Trate believes that his supervision and agitation over such issues has helped enforce the government's efforts to limit the use of segregated housing at BOP facilities.  (Tr. 4 at 25-26).

Trate was candid in his belief that such efforts could not completely eliminate the need for protective custody.  He noted, for example, that there are certain inmates who, for a variety of reasons, are unable to successfully acclimate at BOP facilities.  (Tr. 4 at 38-39).  In response to these individuals, the BOP is exploring the development of the aforementioned RHUs—Reintegration Housing Units—to assist inmates that struggle to acclimate normally.  (Tr. 4 at 37-38).  As was noted in the SHU Executive Summary report, the government is seeking to expand these units, which are currently few in number, so as to

"divert protective custody inmates to less restrictive forms of housing."  (SHU Exec.

Summary at 5).[9]

      3.      <u>The Government's Collection and Presentation of Statistics Support its
Position That It Has Not Been Deliberately Indifferent to the Issues
Concerning Sexual Assault and Restrictive Housing</u>

The BOP has made efforts to collect statistical data concerning the issues

addressed at the instant hearing, specifically the incidence of sexual assault in its facilities

and the use of restrictive housing.  This statistical data can serve several purposes, such as

flagging areas that need attention and improvement.

The statistics indicate that the use of restrictive housing, including protective

custody, has been in considerable decline.  As was described in the SHU Executive

Summary, during the time period between May 27, 2013 and November 23, 2015, the BOP

saw steep declines in the use of several types of segregated housing, including protective

custody:

---

[9] As was noted during the hearing, sex offenders are not currently eligible for
placement in the RHU.  (Tr. 4 at 129).

| SHU PLACEMENT OVER TIME (BUREAU-RUN FACILITIES) (Adapted from SHU Application "Dashboard") | | | | |
|---|---|---|---|---|
| **SHU Placement** | **05/27/13** | **11/23/15** | **Change (05/27/13 to 11/23/15)** | |
| | | | **Total** | **% Change** |
| Total in SHU | 10,086 | 8,625 | 1,461 ↓ | 14.48% ↓ |
| In SHU more than 90 days | 1,655 | 1,071 | 584 ↓ | 35.29% ↓ |
| In SHU more than 180 days | 778 | 338 | 440 ↓ | 56.56% ↓ |
| In SHU more than 364 days | 155 | 77 | 78 ↓ | 50.32% ↓ |
| Disciplinary Segregation (DS) Status | 2,041 | 1,417 | 624 ↓ | 30.57% ↓ |
| Administrative Detention (AD) Status | 8,045 | 7,208 | 837 ↓ | 10.40% ↓ |
| AD: Pending Investigation (BOP Violation) | 3,308 | 3,422 | 114 ↑ | 3.45% ↑ |
| AD: Pending Hearing (BOP Violation) | 937 | 782 | 155 ↓ | 16.54% ↓ |
| AD: Pending Investigation (Criminal Trial) | 110 | 115 | 5 ↑ | 4.54% ↑ |
| AD: Protective Custody (Inmate Requested) | 1,600 | 848 | 752 ↓ | 47.00% ↓ |
| AD: Protective Custody (Involuntary) | 254 | 73 | 181 ↓ | 71.26% ↓ |
| AD: Protective Custody (Any over 30 Days) | 1,358 | 436 | 922 ↓ | 67.89% ↓ |
| AD: Pending Transfer/Holdover | 676 | 1,180 | 504 ↑ | 74.56% ↑ |
| AD: Terminating DS, Ordered to AD | 465 | 231 | 234 ↓ | 50.32% ↓ |
| AD: Pending Classification | 573 | 342 | 231 ↓ | 40.31% ↓ |
| Separatee Assignment | 6,760 | 5,838 | 922 ↓ | 13.64% ↓ |
| Average Daily Bureau Population | 176,176 | 162,339 | 13,991 ↓ | 7.93% ↓ |

(DX CCC at 32; SHU Exec. Summary at 9).   These statistics are significant for a number of

distinct reasons.  First, the statistics indicate that the government's commitment to lowering

the use of restrictive housing is real, and that these efforts have made a considerable dent in

the use of protective custody.  Second, these statistics suggest that the use of protective

custody is far less common than the defendant and at least one of his experts suggests.  These

statistics, when cross-referenced with each inmate's type of crime, further indicate that

inmates charged with sex offenses are no more likely than other types of inmates to spend time in restrictive housing.  (Tr. 4 at 27-32).[10]

   As was addressed during the hearing before the Court, it is not possible to determine the exact number of individuals that are currently in protective custody.  As of November 23, 2015, there were fewer than 1000 inmates classified as being in protective custody out of a total BOP population of over 162,000 – less than 1%.  As Trate testified, however, that number is not quite complete, in large part because individuals who the BOP has chosen to transfer away from facilities for safety or other reasons would be included in a different category – "Pending Transfer/Holdover"— until their eventual reassignment.  (Tr. 4 at 23-24, 95-96).  Even assuming, however, that the entire category of "Pending Transfer/Holdover" inmates are protective custody cases seeking reassignment (which they surely are not), the aggregate number of protective custody cases would still be approximately 2000 inmates out of a total of 162,000 – well less than 2%.[11]

---

[10] As was noted during Trate's testimony, as of December 30, 2015, approximately 4.62% of total inmates were in restrictive housing and approximately 4.5% of inmates charged with sex offenses were in restrictive housing.  As the Court observed during the hearing, the difference between these numbers is "probably not statistically significant."  (Tr. 4 at 27-32).

[11] Defense counsel insisted in his cross-examination of Trate and in his brief that the BOP's sub-categories of inmates designated within restrictive housing are imprecise and subject to excessive discretion.  (Tr. 4 at 43-68).  Trate explained to defense counsel why this was not the case.  The motive behind this line of inquiry was clear:  if the sub-category tallies collected by the BOP are accurate (or even close to accurate), the defense's arguments regarding the overuse of protective custody are impossible to sustain.  Trate's testimony, however, offered no reason for the Court to believe that correctional supervisors who designate the inmates into these categories are either confused about the categories themselves or how to use them.  (Tr. 4 at 13-16, 43-68).

The lack of exact precision in the numbers, however, speaks to a larger point about what purpose these statistics should serve and how they should be employed. Take, for example, the other category of statistics at issue in this inquiry—the statistics regarding the incidence of sexual assault. The PREA Final Rule recognized that "one possible consequence of improved performance" in the reporting of prison abuse "is that evidence of more incidents will come to light." (PREA Exec. Summary at 2). In other words, the government's PREA-related efforts could have opposing effects on the statistics: the initiatives could both lower the incidence of abuse while simultaneously raising the number of acts of abuse that are reported.

Because of complications such as these, the goals that PREA established with regard to preventing sexual assault were process-based rather than outcome-based. (Id. at 2). This approach was grounded in the actuarial complications inherent in addressing both incidence and reporting simultaneously. For example, an increase in the number of reported incidents might reflect an increase in violent offenses, or an increase in inmate willingness to report violent offenses. Id. at 2. Similarly, an increase in the number of substantiated incidents of abuse could indicate that a facility is failing to protect its inmates, or it could indicate that the facility has become more effective in prosecuting allegations. Id. at 2. For these reasons, the government recognized that it could not merely look at statistics to recognize whether progress was being made.[12]

_____

[12] Observations about the statistical data, without proper context, could justify cynical arguments. For example, if the statistical rate of sexual abuse falls, the government can claim that its efforts to deter sexual abuse are working; if, however, the statistical rate of sexual abuse rises, the government can claim that its efforts to increase reporting of sexual abuse are working. In either case, the government could claim that its efforts have been a

The defendant points out in his brief that, by certain measures, the rate of sexual assault in prison has not dropped since the imposition of PREA.  This is true.  These statistics, however, are just a tool:  a diagnostic that enables the government to collect as much data as possible so as to better inform each subsequent intervention within the system.  Make no mistake: the government does believe that the current rate of sexual assault in BOP facilities reflects PREA's successes in encouraging increased reporting of incidents, and thus the steady rate of assault over time likely reflects an actual drop in violence.  Even the two ex-BOP officials offered by the defense as witnesses, Philip Wise and Nelson Aponte, agreed that PREA has encouraged better reporting of incidents of abuse.  (Tr. 1 at 101-02; Tr. 2 at 148).  But for the reasons noted above, these statistics cannot, on their face, indicate whether these efforts are fully succeeding.

The government submits that the Court should not unnecessarily focus on statistical rates laid out in the various reports cited in this case.  Even putting aside the interplay of those numbers with the increased rate of reporting (which, as noted above, clouds the usefulness of these numbers for points of comparison), whether the rate of sexual assault is 5% or 10% or 15% does not answer the question presented before the Court—that is, whether the government is being deliberately indifferent to the risks posed by sexual assault in prison.  The Court's focus should be on the efforts themselves—on the government's efforts to provide better regulations, processes and outcomes concerning

---

success.  Of course, a petitioner seeking to portray the government's efforts in a negative light could make the exact same arguments, only in the inverse.  Given that PREA simultaneously addresses both the incidence as well as the reporting of sexual abuse, these problems are temporarily unavoidable, as it is difficult to untangle the push and pull of the regulatory efforts.

prison abuse and the use of restricted housing.  The statistics are surely relevant, but for the particular inquiry the Court has undertaken, they are primarily relevant in that the efforts behind the collection of these statistics demonstrate clear evidence of the government's sincere efforts to tackle these problems and make them a priority.  The government's faithful collection, analysis and publication of these statistics is part and parcel of the overall efforts that show that the government has hardly been indifferent to these important issues.

    4.    <u>The Government's Efforts Described Above Not Only Rebut An Accusation of Deliberate Indifference, but Show a Concerted Effort to Address and Remedy the Issues Presented by the Defendant</u>

In his brief, the defendant has gone to considerable efforts to criticize and second guess the government's efforts described above.  According to the defendant, these efforts by the legislative and (in particular) the executive branches have been inadequate.  The defendant is surely wrong in regard to many of his allegations, but he may be right in regard to others: the government's efforts on these issues are clearly a work in progress and they have been, and will continue to be, subject to revision and improvement.  A debate over the specifics, however, is completely beside the point.   The issue before this Court is not whether government has made correct choices in each of its numerous efforts to address the problems of sexual assault and restrictive custody.  Rather, the issue before the Court is whether the applicable statutory mandatory minimum sentence is somehow rendered inapplicable as a result of a prospective risk of harm.  The answer to that question is clearly no.

The government agrees that the issues raised by the Court and the defendant in the instant proceeding are of grave significance, both to prisoners like the defendant and to the nation at large.  It is because of this grave significance that the government has focused

its legislative, executive and administrative attention to these problems and has sought to address them.  And while the stakeholders involved in the consideration of these problems—whether they be prison officials, Department of Justice lawyers, advocacy organizations or federal judges—may have different viewpoints as how these problems should be best tackled going forward, the government submits that there can be no reasonable assertion that the government has been indifferent, much less deliberately indifferent, to the problems themselves.  The record presented before the Court, both the documents and witness testimony, shows that these concerns have been a source of intense scrutiny, and will continue to be a source of intense scrutiny into the future.

    C.    <u>The Government Has Not and Will Not Be Deliberately Indifferent to Any Specific Speculative Risks to the Defendant's Health and Safety</u>

For the reasons noted above, the government submits that the record is clear that the government has been far from deliberately indifferent to the overarching concerns presented by the defendant, including the issues of sexual assault and the use of restrictive housing.  As a result, the defendant cannot show that the government has been or will be deliberately indifferent to him personally.  The record shows that the government is well capable of handling the defendant's specific needs.  This finding is amply supported by the fact that the government has successfully handled the defendant's specific needs for the past three years.

1.      <u>The Manner in Which the Defendant Has Been Treated in BOP
Custody Shows that the BOP is Not Deliberately Indifferent to His
Well-Being</u>

The binding regulations contained in the PREA Final Rule, which went into

effect in May 2012, have guided BOP during the entire time the defendant has been in

custody.  The defendant's time in federal prison is illustrative of the manner in which BOP

personnel do their jobs in a post-PREA regulatory environment, and offers a window into the

ways in which individuals like the defendant are handled at BOP facilities.  The government

submits that the manner in which the BOP has handled the defendant to date not only rebuts

the defendant's argument that the BOP will be deliberately indifferent to his needs, but it

suggests that the BOP will continue to handle the defendant in the capable and professional

manner it already has.

a.      <u>The Intake Guidelines for Vulnerable Inmates Contained in the
Program Statement</u>

The Court heard detailed testimony from Patricia Rodman regarding BOP

practices for identifying and protecting vulnerable inmates, including those detailed in the

Program Statement—the binding set of instructions governing BOP facilities.  (DX R).  As

was noted above, defense witness Philip Wise testified that the BOP takes the Program

Statement very seriously and that BOP employees treat its requirements as mandatory.  (Tr. 1

at 48, 97 (Wise noting that BOP facilities would not treat Program Statement requirements as

a "gentle suggestion[s]," but rather "as a mandate[s]" with "teeth")).

Among the most important provisions in the Program Statement relevant to

vulnerable inmates are the procedures concerning intake.  According to the Program

Statement, upon intake into a BOP facility, "[a]ll inmates shall be assessed during an intake

screening . . . for their risk of being sexually abused by other inmates or sexually abusive

toward other inmates."  (DX R at 29).  Included in this assessment is an inquiry into any past

incidents of sexual abuse:

> Inmates with a history of sexual victimization while in BOP
> custody.  When, during the intake screening process, staff
> identify inmates with a history of sexual victimization within
> BOP custody (e.g., from self-report or from review of available
> documents, such as judgment and commitment orders, criminal
> records, pre-sentence investigation reports, Inmate Central File
> data, etc.), they must refer the inmate to Psychology Services.  If
> not previously documented on BOP records, staff must notify
> the Chief of Correctional Services of the inmate's report of
> victimization to ensure that appropriate steps (investigation,
> documentation, CIMS concerns, etc.) have been taken.  The
> Chief of Correctional Services also updates any current
> SENTRY STG assignment pertaining to the alleged victim.
>
> Inmates with a history of sexual victimization while in a non-
> BOP setting.  If victimization occurred in a non-BOP setting,
> staff should document information, and appropriate
> psychological treatment and monitoring will be provided if
> needed.

(DX R at 29-30, Tr. 1 at 146-48).  This inquiry is done with an "objective screening

instrument" and the screener considers, at a minimum, the following criteria is assessing the

inmates risk of sexual victimization:

> (1) Whether the inmate has a mental, physical, or developmental
> disability;
>
> (2) The age of the inmate;
>
> (3) The physical build of the inmate;
>
> (4) Whether the inmate has previously been incarcerated;
>
> (5) Whether the inmate's criminal history is exclusively
> nonviolent;
>
> (6) Whether the inmate has prior convictions for sex offenses
> against an adult or child;

(7) Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;

(8) Whether the inmate has previously experienced sexual victimization;

(9) The inmate's own perception of vulnerability; and

(10) Whether the inmate is detained solely for civil immigration purposes.

(DX R at 31; Tr. 1 at 149).  At the same time as intake, the inmate receives a document that outlines the facility's sexual abuse behavior prevention and intervention program.  (GX 105; Tr. 1 at 152-53).  This document provides an overview to each inmate on how to report abuse, how to prevent abuse, what to do if threatened and how PREA works.  (Tr. 1 at 152-53).

The Program Statement states that the screening information is used to "inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive."  (DX R at 33; PREA Exec. Summary at 6).  According to Rodman, these inquiries are geared toward ensuring proper housing, placement and treatment for each inmate.  (Tr. 1 at 148, 150).

> b.   The Manner in Which the MDC Identified and Addressed the Defendant's Needs Is Reflective of the Attention Paid by the BOP to its Inmates

The requirements detailed in the Program Statement were put into effect for the intake and placement of the defendant within the MDC.  The defendant entered into federal custody on February 22, 2013, a bit more than three years ago.  (DX T).  Rodman testified about the manner in which the defendant was screened for entry into the MDC.  (Tr.

35

1 at 156-57).   The defendant entered the MDC at approximately 8:00 p.m. and was

interviewed by a BOP official shortly thereafter.  (DX T).  During that interview, the

screener asked the defendant a series of questions aimed to help the facility identify

information about the defendant that would aid in his placement.  (DX T).  In addition to

asking whether the defendant had ever been a member of a gang, had ever assisted law

enforcement, or had testified against anyone, the screener inquired of the defendant as to

whether he had ever been sexually assaulted.  (DX T).  The screener indicated that the

defendant answered this question in the affirmative, recording the following note: "Most

recent 2011 in NYS."   (DX T; Tr. 1 at 156).

As was noted by Rodman, the intake form used by the MDC during the

defendant's interview has since been modified.  The current version of the form also asks the

inmate whether he or she "wish[es] to self-identify your sexual orientation, gender identity,

any disabilities, and/or self-perception of vulnerability?"  (GX 103; Tr. 1 at 151, 156).   As

Rodman noted, this intake form is periodically updated and improved, and thus the defendant

would be asked this additional question (and any subsequently added questions) when the

defendant is placed in his next facility.  (See Tr. 1 at 156).

Although the defendant did not identify any reasons why he could not be

placed in general population during the intake process, the MDC did not, in fact, place him

general population.  (Tr. 1 at 157).  Instead, under the "OK for General Population" question,

the screener checked "No" and the defendant was transferred to the psychology department,

apparently because the defendant had expressed suicidal thoughts during the intake process. (DX T; Tr 1 at 157).[13]

       For approximately five to seven days, the defendant received a suicide risk assessment by the MDC Psychology Department.  (Tr. 1 at 157).  After the Psychology department completed its assessment, the defendant was placed in the "K-81 Unit," also known as the Special Programs Unit, which is monitored by the Psychology department. (Tr. 1 at 159).  As Rodman testified, the Special Programs Unit assists inmates that may need additional psychological attention.  (Tr. 1 at 159).

       The defendant remained in the Special Programs Unit for approximately two and a half months, until May 2013, when he was written up for exposing himself to another inmate (it was during the investigation into this offense that prison officials located the written document in the defendant's handwriting describing a consensual sexual encounter with an eight year old boy.  (GX 401, 404; Tr. 1 at 159-60).  After the defendant's disciplinary segregation, the defendant was again placed in a general population unit geared toward vulnerable inmates—the 5-Unit (or D-Unit).  (Tr. 1 at 160).  When D-Unit was later closed and reconstituted as G-42 Unit, the defendant was included among the G-42 Unit population, despite a second accusation of improper behavior against him.  (Tr. 1 at 161-63).

---

[13] The defendant makes much of the fact that the screener did not check "yes" on the "Psych Alert" question on the form, and further, that additional notes were not added to the form.  The record is clear, however, that the defendant was in fact transferred to the Psychology Department after this interview, which was appropriate under the circumstances. As the Court noted during the direct testimony of Philip Wise, "there is no evidence of mistreatment observed here."  (Tr. 1 at 53).

As of the date of this brief, the defendant has been successfully incarcerated at the MDC for nearly three years—a time period that covers between 20-25% of his mandatory minimum sentence (depending on the calculation of good time credit). (Tr. 1 at 161). BOP used the information it learned during intake and subsequent inquires to assist the defendant, despite his disclosed vulnerabilities. During those three years, the defendant has never been harmed or threatened with the kind of sexual or physical assault he alleges he suffered while in New York State custody. (Tr. 1 at 161). To date, the only substantiated PREA-related incidents which concerned the defendant were incidents in which the defendant was the person initiating and causing the improper conduct, and not vice versa. [14]

---

[14] The investigation into the complaint the defendant made on March 30, 2016 is still ongoing, as is noted in footnote three.

The manner in which the MDC responded to an earlier complaint that the defendant did make is illustrative of the way in which the BOP handles PREA-related complaints. (Tr. 1 at 167-69). In the fall of 2015, the MDC received an anonymous "drop note" stating that an inmate had been raped in the defendant's unit. Rodman, as the PREA compliance manger, was immediately notified of the allegation and an investigation was initiated. The MDC conducted "mass interviews" in the unit that included an interview of the defendant. During that interview, the defendant stated that he had written the note and clarified what he had seen (or in this case, smelled):

> While on G-42 I witnessed inmate [redacted] departing inmate [redacted]'s cell. When I approached both them I could smell what I believed to be the scent of two males having engaged in anal sex. I'm a bi-sexual male and I have knowledge of what male on male sex smells like. I felt that I needed to report this incident because I was sexually assaulted while in the state jail and do not want to see this happen to another inmate.

(GX 405). After the MDC spoke to the defendant, they interviewed the inmates identified by the defendant, medically assessed them and referred them to Psychology Services. Both denied that any sexual contact had happened.

The defendant has argued, however, that his success at the MDC is irrelevant, as he will spend the rest of his time at a medium or high security prison, rather than a detention center like the MDC.  While it is clear that medium and high security facilities are not the same as a detention centers,[15] the government submits that the defendant's time in MDC still offers a useful window into the issues before the Court, for a number of reasons.

First, the most obvious point:  the BOP has kept the defendant safe from assault, sexual or otherwise, for over three years without resorting to protective custody. Detention centers, like all prisons, face difficulties in ensuring the safety of its inmates.  On cross examination of Rodman, defense counsel made this argument repeatedly, pointing out that the MDC has had issues with sexual assault and sexual abuse, even in the units specially geared for vulnerable prisoners.  (Tr. 1 at 181-187, 190-91).  While such incidents are of course regrettable, they prove nothing more than the fact that all prisons face periodic problems concerning sexual assault between inmates and/or staff, concomitant to the "unenviable task of keeping dangerous men in safe custody under humane conditions." Farmer, 511 U.S. at 845; (Tr. 1 at 192-193 (Rodman noting that sexual assaults will never be

---

This incident shows the diligence with which BOP facilities address potentially PREA-related incidents.  It also shows that the defendant is personally aware of the role that he can play in addressing such incidents—even suspected incidents—and that he may do so in an anonymous fashion.

[15] Although detention centers like the MDC house defendants destined for all levels of security, defendants who are awaiting sentencing have incentives to be on their "best behavior."  Still, as the Court is aware, such incentives do not deter all unlawful behavior within detention centers.  Moreover, to the extent that the defense believes that all behavior by inmates prior to sentence is suspect because of the "good behavior motive," the defendant cannot ask the Court to credit his own pre-sentencing statements regarding his regret for the crimes he committed, or his sincere wish for therapy, as unbiased by similar motives.  (Tr. 3 at 244-49).

entirely eliminated from the prison context); Tr. 1 at 82 (Wise noting that assaults cannot be completely eliminated)).  And despite the potential for such problems, even at places like the MDC, the defendant has served three years successfully without significant incidents.[16]

Second, the guidelines and regulations that the MDC has followed during the defendant's period of incarceration are the exact same regulations that cover all BOP facilities.  Pursuant to those guidelines (which have been improved since the defendant's arrival), the MDC inquired about the defendant's history of sexual assault and identified the issue within hours of his arrival.  Based on the correctional assessment made by the MDC staff, the defendant was placed in units that the facility believed best fit his particular needs and vulnerabilities.  These placements, it should be noted, all predated the instant inquiry by the Court, and thus preceded any indication that the MDC's conduct toward the defendant would be put under particular scrutiny by the Court.  In other words, the MDC's application of PREA and other standards vis-a-vis the defendant reflects business as usual—the way in which the BOP has sought to accomplish the aspiration of "zero tolerance" toward sexual assault codified in the PREA final rule.

2.      The Defendant's Potential Vulnerabilities Do Not Render Him Unsuitable for Confinement

Although the defendant has successfully been housed at the MDC for over three years and counting, the defendant argues that he cannot be placed in another facility because of the virtual certainty that he will either be raped or kept in perpetual restrictive

---

[16] It goes without saying that had the defendant been the victim of violence at the MDC, the government expects that the defendant would have presented evidence regarding such violence in support of his argument to the Court.

custody at his next facility.  The gravamen of this argument is that the defendant's personal issues are, in combination, so unique that he offers challenges that the BOP cannot possibly handle.  This argument, again, is belied by the record.

As was noted above, the BOP has successfully managed the defendant for over three years without complaints of violence or resorting to restrictive custody.  During that time period, the BOP made efforts to perceive his individual needs, address those needs, and then place him in units appropriate to those needs.  Far from being deliberately indifferent to the defendant's particular risks, the MDC addressed those risks and used sound correctional judgment to mitigate those risks.

While, as was noted, the MDC offers types of confinement that will differ from those offered at the defendant's final destination (wherever that may be), BOP facilities are by no means monolithic.  BOP facilities often contain sub-units that allow correctional officers to target the specific needs of the inmates, such as housing units with additional psychological counseling or units with closer supervision.  (Tr. 4 at 33-34).  As Brad Trate testified, facilities can adjust various aspects of an inmate's experience to assist him in acclimating, such as adjusting choice of cellmate, job assignment or living situation.  (Tr. 4 at 34).  In such scenarios, the facility uses the screening process to find the inmate "an appropriate place where they can live, eat [and] recreate with minimal interruption to daily life."  (Tr. 4 at 34).

And the defendant is not, of course, the only inmate within the BOP system that offers unique needs and challenges.  The defendant is correct to point out that the statistics collected by the DOJ and BOP indicate that certain inmates are more at risk than others.  For example, according to studies done by the Department of Justice, the rates of

41

assault of gay inmates are higher than those of heterosexual inmates.  (Tr. 1 at 40-41).

Among other things, PREA has mandated the collection of such data so that the government

can assess such risks and determine which populations require intervention.  These statistics,

as the defendant points out, clearly indicate that sexual assault persists as a problem in the

prison context to a certain degree.

       The BOP officials on the ground, of course, are not indifferent to these facts or

statistics.  Trate testified as much on direct examination.  Trate himself worked in various

positions within the BOP, including positions ranging from correctional officer to associate

warden.  He was asked about his experience with individuals convicted of child molestation

crimes, individuals with mental health issues and individuals who had been assaulted in

prison before.  (Tr. 4 at 33-35, 38-39).  Trate stated that he has dealt with inmates who

offered such risk factors, and he was candid that some of the individuals he had dealt with

struggled to adjust successfully in BOP facilities.  (Tr. 4 at 38-40, 104, 113).  Philip Wise

stated something similar, noting that the defendant's profile (being LGBTI, a sex-offender,

and a prior victim of assault suffering from some mental health issues) may affect his ability

to adjust.[17]  Trate also testified, however, that the overwhelming majority of inmates he has

dealt with, including individuals with the kinds of risk factors shared by the defendant (such

---

[17] Defense counsel referenced the increased risk of assault for inmates deemed
underweight.  (Tr. 4 at 110).  According to the defendant's most recent measurement (noted
in the BOP document attached in GX 703), the defendant measures at 5' 5" and 170 pounds,
with a body mass index of 28.3.  This evidence indicates that the defendant not, in fact,
underweight according to the standard body mass calculation indices.  See
http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/ (noting that a B.M.I. of 25-29.1
generally corresponds to being overweight).

as sex offenders), were able to adjust normally. (Tr. 4 at 32-35, 102-03, 113-14).[18]  Rodman

echoed Trate's opinion, noting that in her lengthy experience, the BOP had successfully

handled lots of inmates with vulnerabilities similar to the defendant, including inmates with

more significant adjustment issues—such as transgender inmates.  (Tr. 1 at 155, 178).[19]

3.    The Defendant's Argument About the Risks that He Faces in Prison
Relies Excessively on the Hyperbolic Testimony of Nelson Aponte,
Which Is Not Worthy of the Court's Reliance

The Court received testimony from several individuals knowledgeable about

prison administration.  Philip Wise, Nelson Aponte, Patricia Rodman and Brad Trate all had

long careers with the BOP: each reached the position of associate warden, with Trate moving

on to become the Correctional Services Administrator.  Although each witness had extensive

experience in the BOP, their respective experiences with regard to PREA and PREA

implementation was not equivalent.  The government experts, Trate and Rodman, both

served as PREA compliance coordinators for BOP facilities after the PREA Final Rule went

into effect.  Aponte, on the other hand, retired from the BOP nine years ago, while Wise

retired fifteen years ago.  Neither Aponte nor Wise worked at a BOP-run facility post-PREA,

although Aponte worked at a U.S. Marshal's Service contract facility for a few months

following the passage of the PREA Final Rule.

---

[18] Trate's impressions regarding sex offenders are corroborated by the fact that sex offenders are no more likely that other defendants to be placed in the SHU.

[19] Rodman mentioned her experience with transgender inmates and noted that the Program Statement contains specific provisions to address the programming difficulties with transgender inmates.  (DX R at 33; Tr. 1 at 155).  Wise also handled transgender inmates at the facilities he administered.  (Tr. 1 at 33).  Rodman observed that, in her experience, the BOP has been able to address the difficulties inherent in handling transgender inmates in a way that permitted the inmates to serve their sentences successfully.  (Tr. 1 at 155).

The defendant's argument that he will not be able to successfully adjust to a BOP facility is grounded heavily in the testimony of Aponte.   For the reasons noted below, the government submits that the Court should discount Mr. Aponte's testimony on these matters.

        a.    <u>Aponte's Speculation Regarding the Defendant's Future in Federal Custody</u>

According to Nelson Aponte, if the defendant spends any time in BOP custody, he will, in essence, be thrown to the wolves.  Mr. Aponte's testified that the defendant "is going to have a hard time adjusting" in custody.  (Tr. 2 at 134).  Mr. Aponte based his opinion on the following information:

- The defendant is an "admitted homosexual."  (Tr. 2 at 135).  Aponte noted that some inmates "don't like gay people," and if they are "approached by a gay man in prison, then they're obligated to do something" so that they (the other inmates) are not perceived as gay.  (Tr. 2 at 137).  This is because, as Aponte tells it, "nobody likes an admitted gay."  (Tr. 2 at 139).  Relatedly, once word is out about the defendant's sexuality, "the predators start coming around . . . and they're going to do their thing"—an outcome that Aponte described as both a possibility and a probability.  (Tr. 2 at 140).  Aponte further added that these predators will make him "somebody's girlfriend . . ., somebody's property, [or a] group of guys' property" unless he seeks protection.  (Tr. 2 at 141).

- The defendant has "some mental issues." (Tr. 2 at 135).

- The defendant previously exposed himself to another inmate.  (Tr. 2 at 135).

- Nobody likes pedophiles.  (Tr. 2 at 137).

Although Aponte noted each of these issues, his particular focus—to which he returned to again and again—was on the fact that the defendant is an "admitted gay."  Because of his sexual orientation, Aponte stated that the defendant is going to have to fight or "check in" to the SHU to survive.  (Tr. 2 at 141).  He suggested that recourse to the SHU for protection

was not unusual in his experience, adding that about half of the people in SHU during his time at BOP would be protective cases.  (Tr. 2 at 151).

According to Aponte, individuals like the defendant will not be effectively protected by prison staff.  He stated that the staff of the BOP will "turn a blind eye" to the abuse of the defendant and allow it to happen.  (Tr. 2 at 141).  Some staff will try to help, but some will not care "if he gets raped every night."  (Tr. 2 at 142).  Further, if good staff try to report the bad staff, the good staff will be alienated by their peers and will not be protected themselves during their next call for help.  (Tr. 2 at 143-45).   Aponte further added that, in his experience, staff would arrange for new inmates, if they were a "known homosexual," to "get married" with a "bad ass inmate" already at the prison.  (Tr. 2 at 160).   Aponte stated that all of these things happened on his watch, while he had supervisory authority.[20]

> b.      Aponte's Testimony Should Not Be Relied Upon by the Court

For a number of reasons, the government submits that Aponte's testimony should be discounted and/or disregarded by the Court.

As an initial matter, Aponte has not worked in a BOP facility since 2007, nearly five years prior to the PREA Final Rule taking effect.  Aponte continued to work for a prison doing contract work for the government until early 2013, shortly after the Final Rule became binding, and since then worked for a time at a state facility in Louisiana before retiring from prison employment.  While the BOP has implemented PREA-style regulations

---

[20] Trate testified that he had worked at one of the same facilities as Aponte, the U.S. Penitentiary at Lewisberg.  Trate acknowledged that he was aware of some misconduct by prison guards but stated that Aponte's description of the conduct of prison guards did not match his experience.  (Tr. 4 at 41).  Trate described Aponte's testimony as "appalling" and stated that "it pissed me off."  (Tr. 4 at 41).

since as early as 2003, Aponte has not experienced BOP administration under the PREA

Final Rule.  The specific question posed before this Court is what will happen to the

defendant in BOP custody in the future.  Aponte, based on the date of his retirement and his

stale knowledge on the subject, has little to offer to an inquiry which, by its nature, seeks to

predict outcomes in 2016 and beyond.

Substantively, the government respectfully submits that the bulk of Aponte's

testimony is not worthy of the Court's reliance.  Aponte describes a world in which gay men

and sex offenders are utterly incapable of surviving in prison.  Aponte testified that it is more

likely than not that the defendant will be either sexually abused or forced into the SHU.  (Tr.

2 at 165).  While the statistics and witness testimony do indeed suggest that gay men and sex

offenders have greater difficulty adjusting at BOP facilities, no statistical source offered to

the Court during this inquiry comes close to corroborating Aponte's extreme predictions.[21]

---

[21] Arguably, the testimony of Jason Lydon, the national director of Black and Pink,
supports the overly bleak narrative provided by Aponte.  The government submits, however,
that Lydon's testimony adds little of value to the inquiry before the court.

Lydon testified that in September/November 2014, Black and Pink, an organization
that identifies itself as committed to the abolition of the prison industrial complex, mailed a
long, 133-question survey to its readership of approximately 7000 inmates in state and
federal custody.   From those 7,000 surveys, the organization received approximately 1,118
responses, only 79 of which were from federal prisoners

There are several problems with this evidence.  First, this was not a poll of a
representative sample of LGBTQ inmates in state and federal custody.  Rather, this was a
poll of a small subset of individuals who subscribe to the organization's magazine and
presumably sympathized with its views about the "prison industrial complex."  Black and
Pink acknowledges as much in its report:  "[I]t is important to point out that this report is not
based on random selection of LGBTQ prisoners across the country.  This is a selection of
LGBTQ prisoners who have intentionally reached out for access to resources and who are
willing to put themselves at risk to receive a newspaper that is known as an LGBTQ
publication.  As such, this report cannot claim to [be] representative of LGBTQ

When confronted about the grave discrepancy between his predictions and the statistics collected by the prisons themselves, all he could say was that the statistics were "a little bit wrong" or "probably a little higher." (Tr. 2 at 168).

The gulf between Aponte's testimony and the statistics collected by the government is perhaps most telling in Aponte's description of the use of restrictive housing. According to Aponte, in his experience about 50% the SHU was filled with inmate protection cases. (Tr. 2 at 151). This number is in stark contrast to the statistics today. As of the end of 2015, the number of protection cases is closer to 1-2% of the BOP population as a whole.[22] The government submits that this discrepancy is explainable by one of two

experiences." (DX D, pg. 16). The poll, at best, presents the feedback of 79 individuals (out of approximately 200,000 federal prisoners) who were already interested in the magazine's overall message and took the time to reply. The risk of self-selection bias and unrepresentative sample sizes are clearly evident here.

Second, there are obvious hearsay issues with considering evidence of this sort. Although the Court may consider hearsay as part of its inquiry, there are no indicia of reliability in the responses made by the inmates that would warrant relying on these statements. The inmates who responded may have responded accurately, of course, but they also may have responded inaccurately because of perception failures, bias, mental illness, exaggeration or deception, among numerous other reasons. The Court is not in a position to know what weight should be placed on these responses.

Third, and finally, the information presented by Lydon on its face does not significantly aid the Court's inquiry into the conditions that the defendant will face at a federal facility moving forward. The Black and Pink report notes that the average respondent to its survey had spent ten years in prison in state or federal prison. Thus, on average, eight of the ten years each spent in prison (on average) would have been served prior to the passage of PREA. Given the forward-looking nature of the Court's inquiry, this evidence is insufficiently relevant.

[22] As is noted above, the actual number of protective custody cases as of November 23, 2015 is less than a thousand, or less than 1% of BOP population. However, because the true number is obscured by "Transfer/Holdover" category, the government is erring on the side of caution and noting a larger (though itself exaggerated) number.

47

reasons: either the BOP that Aponte described no longer exists, or the BOP that Aponte described never existed.  In either case, his testimony has little benefit to the speculative, forward-looking inquiry the Court has undertaken.

Significantly, none of the other three BOP witnesses who testified before the Court—all of whom had positions in BOP comparable to Aponte—described a situation nearly so exaggerated as Aponte.  Philip Wise, a defense's other expert witness, testified that the defendant would face difficulties because of his profile—namely, being gay, being a sex-offender and his having mental health issues.  (Tr. 1 at 35-42).  Wise depicted these as serious concerns, pointing in particular to the discrepancy in rates of inmate assault for heterosexual inmates versus  homosexual inmates.  (Tr. 1 at 40-41).  Were Wise capable of corroborating Aponte's utterly Hobbsian version of BOP life, however, surely Wise would have echoed such testimony.  But no such testimony was elicited.  Instead, Wise testified to what the Court was already largely aware from the documentary record generated by the government itself:  that certain classes of inmates (such as gay men) are more vulnerable than others, and that efforts like PREA have not (and likely will not) entirely eliminated the threat of sexual abuse.  (Tr. 1 at 180, 192-93 (Rodman notes that there are thousands of assaults in BOP facilities every year; Rodman suggests that sexual assault against inmates cannot be eliminated entirely).  For all of these reasons, the government submits that Aponte's hyperbolic version of prison life is a noticeable outlier to the other evidence presented before the Court.

Finally, the government submits that Aponte was neither candid nor honest with the Court in his testimony about his post-BOP employment.  Aponte testified that he left the BOP in 2007, shortly after he alleged that the BOP had discriminated against him by

failing to promote him to warden.  (Tr. 2 at 171-72).[23]  At his subsequent job with the

Northeast Ohio Correctional Center, Aponte was demoted for allegedly falsifying

documents.  (Tr. 2 at 174).  Aponte claims that he refused the demotion and resigned instead.

(Tr. 2 at 174).  Despite the fact that this happened just a few years ago, far more recently than

any of the events that he testified to in great detail during direct examination, Aponte stated

the following:

> Q: So they wrote you up for allegedly falsifying documents?
>
> A: Falsifying documents, and the same thing that they have
> been written up for by the government and contract, CCA.
>
> Q: So your supervisor there wrote you up for falsifying
> documents and they looked to demote you, and you said you
> didn't want the demotion; is that a fair assessment?
>
> A: No. You know what? Yeah, that was it. I didn't want
> the demotion. I didn't think it was right, so I resigned.
>
> Q: Did you resign before that, I guess, their accusations,
> they had adjudicated them in any kind of way?
>
> A: No, I resigned after they adjudicated and said, hey, we
> found you guilty and I said okay. I went through the appeal
> process and I left shortly thereafter.
>
> Q: Do you know what sort of documents did they accuse you of
> falsifying?
>
> A: I don't remember.

---

[23] This testimony also gives rise to a concern that Aponte may be harboring a bias
against his former employer.  As was elicited on cross examination, just prior to his
retirement, Aponte alleged that the BOP had discriminated against him for failing to promote
him to warden.  (Tr. 2 at 171-72).  Aponte stated that he was frustrated with the BOP for the
lack of promotion and accordingly he filed a formal complaint.  (Tr. 2 at 169).  According to
Aponte, the EEOC "didn't believe I had a case" and Aponte did not pursue the matter.  (Tr. 2
at 173).

Q: Your employer accused of you falsifying documents in the workplace and you don't remember what it was?

A: It's a long time ago, Counsel. I'm 62 years old.

Q: You are testifying about things that happened during your 25-year career, but this was not that long ago.

A: The types of incidents are not significant to me. Talk to me about those 16 homicides that I had. I could probably give you the names of every one.

Q: I don't think that's a responsive answer.

A: I know.

Q: Look. Your work, your employer accuses you of doing something very wrong, accusing you of lying. They then write you up. They seem to have some sort of process. They find that you did it and they look to demote you and you end up quitting because of it. That's not something that, like, sticks in your memory a little bit?

A: I gave you the best I can remember.

Q: That's the most you remember of it?

A: Yeah. I didn't think it was significant. And again, have you looked at the new CCA? The government got them for falsifying, their—their timesheets, okay, Indiana, all the issues they have had at their prisons. So it's kind of funny to me afterwards, after this incident I had with them I had with CCA that this is the same company that wrote me up, but yet now they have been charged with almost the same.

Q: So maybe you both falsified documents.

A: Maybe we did.

(Tr. 2 at 174-76). The government submits that these answers under oath were not remotely candid or credible, and further indicate that the Court should not rely upon Aponte's testimony. It is not reasonable to trust the accuracy of Aponte's rather incredible (and

frankly, uncorroborated) testimony about, for example, protective custody statistics from a decade ago, when, under oath, he claims to not recall any facts at all regarding his employer's accusation that he falsified documents—an accusation against him personally that occurred just a few years ago and resulted in his losing his job. That lack of candor, combined with the aforementioned concerns about the relevancy and actual content of his testimony, should lead the court to discount Aponte as a fact witness in this inquiry. The Court has been offered no shortage of credible fact and documentary sources on which to rely: Aponte should not be one of them.

    D.    <u>The Defendant Asks the Court to Take an Action Without Precedent</u>

The record before this Court simply does not support the extraordinary measures that the defendant asks this Court to take. The defendant has failed to show that the defendant will face a "near certainty" of abuse in prison. Def. Br. at 65. Moreover, the defendant has failed to show that the government has been, or will be, anything close to deliberately indifferent to the risk of abuse posed to the defendant and other similarly-situated inmates. To the contrary, the record before the Court shows that the government (including the BOP) has made considerable efforts to address the important issues raised by this inquiry, both in general and toward the defendant specifically. These facts conclusively rebut the factual basis underlying this motion, and this Court has been directed to no legal authority that would authorize or justify the unlawful remedy suggested by the defendant.[24]

---

[24] In <u>Lobozzo v. Colorado Department of Corrections</u>, the Tenth Circuit rejected a claim which touched on arguments similar to those made by the defendant. 429 Fed. App'x 707 (July 8, 2011). Lobozzo, a Section 1983 plaintiff, had been sexually involved with a guard at the La Vista Correctional Facility in Colorado. When the sexual contact was uncovered, the guard was suspended, Lobozzo was placed in segregated housing and then

In <u>Rhodes v. Chapman</u>, the Supreme Court commented on the "magnitude of the problems" in prison administration, and noted that the solutions to these problems "require expertise, comprehensive planning, and the commitment of resources, <u>all of which are peculiarly within the province of the legislative and executive branches of government</u>." 452 U.S. at 351 n.1 (emphasis added).   For these reasons, the Supreme Court stated that

---

transferred to another facility.  Among other things, Lobozzo argued her sexual contact with the guard amounted to an Eighth Amendment violation because the prison was generally aware, via PREA and other similar data collection initiatives, of the rate of sexual contact between inmates and guards.

The Tenth Circuit soundly rejected Lobozzo's specific factual allegations, noting that because there was "no evidence" that prison officials had "failed to take seriously their responsibility for the safety of inmates," the standard for deliberate indifference has not been met.  <u>Id.</u> at 712-13.  The Court then addressed more generally Lobozzo's use of PREA statistical data to substantiate her claim:

> Prisoners are sometimes victims of sexual abuse at the hands of staff and other inmates alike—a tragic fact demanding the attention of prison administrators. . . . [T]here is no reason to assume the mere number of incidents [of sexual assault against inmates] is sufficient evidence of an unreasonable response to a substantial risk in an isolated case.  To so hold would subject every institutional administrator to constitutional liability even if all possible actions were taken to correct an inherently dangerous situation.  This would contradict the standard clearly iterated by the Supreme Court [in <u>Farmer</u>] . . . .  —The evidence must be robust and focused, not scattered and speculative.

<u>Id.</u> at 712-13.  In <u>Lobozzo</u>, of course, there had been actual sexual conduct between the inmate and a guard—not the mere speculation that conduct might conceivably occur.  Still, the court noted that the focus of the deliberate indifference inquiry had to be on actions taken by prison officials, not the statistical incidence of harm.  The court's analysis echoed the "reasonableness" invocation established in <u>Farmer</u>:  Prison officials have not been deliberately indifferent to an inmate's right to be free of cruel and unusual punishment "if they responded reasonably to the risk, even if the harm ultimately was not averted."  <u>Farmer</u>, 511 F.3d at 844-45.  The touchstone, as always, is whether the government sought to "ensure reasonable safety."  <u>Id.</u>

solutions to problems within prisons are not "readily susceptible to judicial decree," and that recognition of this fact "reflects no more than a healthy sense of realism." Id.   The defendant invites this Court to speculate and impose an unlawful sentence on the basis of speculation and conjecture.  The court must decline this invitation and impose the statutorily-required mandatory minimum sentence.

IV.   THE DEFENDANT'S DUE PROCESS AND EQUAL PROTECTION ARGUMENTS ARE PREMATURE AND WITHOUT MERIT

In the Court's June 26, 2015 Order, the Court asked the parties to conduct an evidentiary hearing on, among other things, whether the imposition of the mandatory minimum sentence of fifteen years would constitute cruel and unusual punishment in violation of the Eighth Amendment.  The parties presented numerous witnesses and documents relevant to this specific inquiry.

In his post-hearing briefing, the defendant raises two additional legal theories, neither of which were discussed by the Court or counsel prior to the evidentiary hearings.  Neither claim has merit.

First, the defendant asserts that the government has violated or will violate the defendant's liberty interest in not being detained in restrictive housing without due process of law.  This claim is belied by the record.  The defendant has not been held in any kind of restrictive housing, whether involuntary or voluntary, and thus logically could not have been denied due process of law.  The defendant's speculative argument, on the other hand, is that the defendant should be excused from his lawful jail sentence because he might eventually be placed in restrictive housing, at which point the government might not afford him review procedures concerning his housing placement, at which point the government might violate a

53

cognizable liberty interest—one that the defendant himself acknowledges has not yet been judicially recognized.[25]  This argument is premature and devoid of merit.

The defendant's second argument, that he has been or will be denied the equal protection of the laws, is similarly premature and non-cognizable.  The thrust of the defendant's argument is that he will be placed in restrictive custody as a result of his sexual orientation.  As is noted above, the defendant has never been placed in protective custody during his three years of incarceration; the defendant's allegation of harm is thus speculative and unfounded.  Moreover, this argument asks the Court to go to further extremes than even his other arguments: in essence, it asks the Court to find that gay men cannot be incarcerated because they might be more likely to find themselves in restrictive housing (even voluntary protective custody).  The Court has not been (and cannot be) directed to any authority that would support such an unprecedented finding.

## V.  THE DEFENDANT POSES SIGNIFICANT RISKS TO THE COMMUNITY

Over and apart from the unlawfulness of the Court imposing a sentence below the required mandatory minimum, the Court has requested that the parties address two additional issues.  First, the Court asked the parties to address the risks posed by the defendant if he was released to society; and second, the Court asked the parties to address

---

[25] This argument also does not square with the rest of the defendant's arguments or the law.  As the defendant makes abundantly clear throughout his brief, he is primarily concerned with being compelled to seek voluntary segregation for harms that the BOP will refuse to appreciate.  The defendant notes in his brief, however, that the Second Circuit has not actually recognized a due process violation in connection with voluntary, rather than involuntary, protective custody.  (Def. Br. at 68).  In other words, the defendant alleges that the government "might" disregard a due process right that does not actually exist.

treatment options that may be available to the defendant following his period of incarceration.[26]

On two recent occasions, this Court engaged in detailed inquiries as to whether a mandatory minimum sentence should have been applied to an offender charged with a sex-related offense. In the cases of both Peter Polouizzi and C.R., the Court declined to impose statutory minimum sentences on Sixth and Eighth Amendment grounds, respectively.[27] In both cases, the Court made findings as to the risks posed by each defendant. In United States v. Polouizzi, the Court found that the defendant had never acted out against a child or anyone else, and that the evidence demonstrated that the defendant offered no appreciable risk to any child or adult. 760 F. Supp. 2d 284, 285 (E.D.N.Y. 2011). In United States v. C.R., this Court found that the evidence established "that there was no threat of [the defendant] producing child pornography, viewing child pornography or acting out in a physical way

---

[26] As is noted above, the government's expert was not permitted to examine the defendant. Dr. Berrill noted, in general, the kinds of treatment options that should be made available following the defendant's release from prison: he stated that the treatment should include an individual component, a group component, medication, GPS tracking, vocational training, polygraphs and curfews, among other modes of intervention. (Tr. 2 at 120-22). This analysis, however, was provided on a cold record, without any personal interaction with the defendant. It was also provided with the understanding that the defendant has lied in a material way to nearly every doctor that he has seen during the pendency of this case. The record is abundantly clear that the defendant needs treatment—that much is clear. The government takes the position, however, that such treatment must be provided in addition to a lawful sentence, not in lieu of a lawful sentence.

[27] In each case, the Second Circuit reversed and remanded so that the Court could impose a lawful sentence.

against any child or other person."  972 F. Supp. 2d 457, 458 (E.D.N.Y. 2013).[28]  In both

cases, the Court counseled for a lenient sentence based, in part, on its assessment of the risks

posed by the defendants upon their release.[29]

The risk assessment of the defendant Darnell Washington is very, very

different.

The risk factors offered by the defendant in the instant case could not be more

clear.  The defendant stands before this Court having molested at least four separate children.

The record shows that the defendant sought out situations where he would be given

supervisory roles over children and he took advantage of that authority.  He is, by his own

account, "addicted" to child pornography and he has used child pornography to victimize the

children he molested.[30]  Unlike Polouizzi and C.R., individuals this Court felt were not likely

to pose risks to other children, this defendant has already acted on his desire to molest

children and has done so repeatedly.  The risks offered by this defendant are not speculative;

they are nearly certain.  The Court has recently recognized the risks posed by individuals like

the defendant.  Just two months ago, in United States v. R.V., this Court stated that "Child

---

[28] The Court made this finding as to C.R. despite evidence that C.R. had molested his younger sister on three occasions when he was younger.  United States v. [C.R.], 731 F.3d 204, 207 (2d Cir. 2013).

[29] In a much more recent case, United States v. R.V., the Court imposed a sentence of time served for a defendant charged with five counts of possession of child pornography. No. 14-CR-0316, 2016 WL 270257 (E.D.N.Y. Jan. 21, 2016).  In that case as well, the Court found that the defendant "poses no further danger to his or other children."  Id. at *4.

[30] The defendant's interest in child pornography was not limited to mere photos of underage nudity; instead, he was drawn to images of bondage and violence, including infants and toddlers being raped.  He also produced sexual images involving one or more children he personally molested.

56

pornography offenders can be broadly divided into two main categories: those who produce child pornography and those who are viewers of child pornography. By definition, producers of child pornography are child molesters, frequently representing the worst and most dangerous type of offender." United States v. R.V., No. 14-CR-0316, 2016 WL 270257, at *2 (E.D.N.Y. Jan. 21, 2016). The defendant, of course, is in the former of those two categories—a child molester and "the worst and most dangerous type of offender." Id.

The other evidence offered in this case only underscores these risks. At the time of the defendant's arrest in 2009, for example, his telephone contained child pornography that he himself had created. Interspersed among the photos he took of the children he had molested were several pictures of day care centers. (GX 501, pgs. 203-208). While the government does not know why the defendant was photographing day care centers at the same time he was molesting children on school buses and molesting children in youth groups, one cannot help but make the disturbing natural inference that the defendant was scouting out additional victims.

The Court requested that the parties seek experts to perform a psychological analysis of the defendant's risk of recidivism. Although both parties hired such experts, the defendant (upon the advice of counsel) refused to be analyzed by the government's expert, Dr. Naftali Berrill. (Tr. 2 at 102). Accordingly, the analysis provided to the Court on this issue was, by the defendant's decision, incomplete. Despite the defendant's refusal to talk to anyone but experts he himself employed, the picture of the defendant that emerges from the defendant's life history demonstrates the defendant's extraordinary risks of future dangerousness. Among other factors, Dr. Berrill pointed out the following risk factors:

- The defendant's past behavior—molesting young boys and photographing the molestation—indicates that he has a proclivity to commit such offenses.  (Tr. 2 at 106-07).

- The defendant's three years in prison did not substantially deter him from re-engaging with child pornography; to the contrary, he re-engaged with child pornography almost immediately.  (Tr. 2 at 107).  And prior to that re-engagement, the defendant used child pornography to "groom" his victims—he showed it to acclimate his victims to sexual contact between children and adults.  (Tr. 2 at 108-09).

- The defendant stated that he is addicted to child pornography, which suggests that he has lost control over his desires and is powerless to stop it. This suggests that he has abdicated responsibility for his choices.  (Tr. 2 at 111-12).

- The defendant sought out positions where he would be near children, such as working as a bus matron.  (Tr. 2 at 109-10).[31]

- Although apparently emotionally scarred by the abuse he himself suffered as a child, the defendant has continued to repeat upon others that same abuse, suggesting either a lack of empathy or an inability to understand the perspective of the children he molested.  (Tr. 2 at 112-14).

This final risk factor—that the defendant's perceptions of his encounters with children are deeply askew—gravely underscores his risk.  In May 2013, officials from the MDC seized a document written in the defendant's handwriting from his jail cell.  The document described an interaction, likely a fantasy, in which the narrator meets an eight year old boy at a waterpark and engages in oral, digital and anal sex with the child.  Significantly, as was noted by Dr. Berrill, in the story the child is the aggressor—the child is the individual

---

[31] Dr. Kreuger initially noted that he would not consider the defendant's behavior in seeking jobs where he is put in charge of children to be an additional risk factor.  (Tr. 2 at 80).  He also stated, however, that pedophiles who seek out children (as opposed to molesting children they already have access to) are, in fact, more dangerous.  (Tr. 2 at 91). The government is at a loss attempting to square these two opinions; only the latter opinion appears to make sense.

seducing the adult, permitting the adult to "abrogate responsibility for the act."  (Tr. 3 at 241).   In this fantasy, the defendant portrays the child as "someone who has the agency to initiate a full-blown sexual encounter," not as a victim, but as a sexual actor who wants to be penetrated by the adult.  (Tr. 2 at 114; Tr. 3 at 238).[32]  This is yet another indication of risk: the defendant, someone who has already molested several young boys, appears to believe that his victims, at some base level, wanted what he did to them.

The psychological analysis performed by Dr. Kreuger (and commented on by Dr. Berrill) did nothing to dispel the inference that the defendant offers extraordinary risks of re-offending.  To the contrary, Dr. Kreuger's analysis of the defendant indicates just how dangerous the defendant is.

Among other things, Dr. Kreuger analyzed the defendant using the Hare Psychopathy Scale, a test which measures a defendant's anti-social personality characteristics, such as "a penchant for lying, a penchant for breaking rules and regulations, limited empathy, tendency to rationalize one's bad acts . . . [and a tendency ] to indulge oneself in order to gratify ones needs at the risk or the cost of other people."  (Tr. 2 at 118; see Tr. 3 at 250).   According to Dr. Kreuger, a high psychopathy score would describe someone "skilled in the art of manipulation and deceit," an individual "who can't be trusted,

---

[32] Defense counsel has suggested that the defendant's first person narrative of having anal sex with a sexually-aggressive eight year old boy at a water park may be, in actuality, a description of the abuse the defendant himself suffered.  (Tr. 3 at 238-241).  Putting aside the total lack of support in the record for such an assertion, the facts as known to the Court do not support this inference.  The document is written from the perspective of an adult, not a child; there is no evidence that defendant was ever molested by a stranger, let alone one he met at an amusement park; and the defendant was placed in a loving foster home when he was six years old, while the victim in his story was eight years old.

who has little regard for authority and who has a substantial risk of re-offense."  (Tr. 2 at 69).

Dr. Kreuger added that someone who scored high on the Hare Psychopathy test would likely

show "limited empathy for victims" and a "general willingness to violate societal norms."

(Tr. 2 at 70).

The defendant received a "significantly elevated" score on the Hare

Psychopathy Test—a "significant score" in Dr. Kreuger's opinion.  (Tr. 2 at 15, 47).  Dr.

Kreuger noted that someone with high levels of psychopathy is no different than a sociopath.

(Tr. 2 at 86).  Dr. Berrill added that not every pedophile shows psychopathic tendencies, but

the defendant is one who certainly does.  (Tr. 2 at 119).

Notably, the Court did not need Dr. Kreuger's psychopathy findings to

conclude that the defendant is deceptive.  Put bluntly, the defendant has deceived each of the

doctors who analyzed him, (Tr. 2 at 46-47, 75, 115-16; Tr. 3 at 265), as follows:

- The defendant deceived the physicians who treated him following his release from state custody, distributing and sharing thousands upon thousands of videos of child pornography at the same time he was undergoing court-ordered treatment following his state sentence for molesting children.

- The defendant deceived Dr. Rosenfeld, the doctor hired by the government to administer an IQ assessment.  During this test, the defendant malingered to such a degree that Dr. Rosenfeld could not opine about the defendant's mental capabilities other than to note that the defendant's efforts were insincere.  (GX 501 pgs. 113-18).

- The defendant lied to Dr. Prentky about his past conduct.  At the time Dr. Prentky analyzed the defendant, the government had not yet learned that the defendant had molested additional children and had photographed his victims.  In his analysis, Dr. Prentky noted that the defendant could have been concealing further conduct, but "I observed no signs of dissimulation during my interview.  Stated otherwise, [the defendant] is not a man who is dexterous in the art of deceit."  (Tr. 2 at 68-69).

- The defendant even lied to Dr. Kreuger, his own expert. Dr. Kreuger performed an Abel and Becker test on the defendant, which seeks to measure the types of individuals (by gender and age) that a given person is attracted to. (Tr. 2 at 81). During that test, the defendant indicated that he was only interested in adult females, contradicting a similar test previously administered by Dr. Prentky. (Tr. 2 at 82). Dr. Kreuger testified, rather sensibly, that he did not actually believe the defendant was being truthful during this interview. (Tr. 2 at 82).

All of this behavior should give the Court significant pause when assessing the defendant's sincerity and willingness to undergo therapy following his incarceration. Dr. Kreuger suggested as much during his testimony: he noted that the defendant's rampant deception during his previous post-incarceration treatment plan—the defendant was compulsively distributing and downloading child pornography while undergoing Court-ordered treatment—should bear on the Court's assessment of the defendant's amenability to further treatment. (Tr. 2 at 75). Put simply, the defendant's own expert suggests that the Court "would have to be very careful when taking [the defendant] at his word." (Tr. 2 at 120; Tr. 3 at 264).[33]

The defendant's tendency toward deceit and manipulation is not merely reflected in his anti-social personality diagnosis and his behavior toward his doctors; it was also reflected in his behavior prior to his arrest. At the time of the defendant's arrest, the FBI seized several documents in the defendant's possession indicating that the defendant had fabricated a fictitious bus company. (PSR ¶ 17; GX 501 pgs. 50-62). The documents

---

[33] Despite noting repeatedly that the defendant's anti-social, psychopathic tendencies manifest themselves in a "disregard for the truth" and a "disregard for rules and regulations," (Tr. 2 at 119), and that the defendant had flagrantly deceived the previous set of doctors who administered his prior outpatient treatment program, Dr. Kreuger has chosen to credit the defendant's self-serving claim that he is interested in treatment. (Tr. 2 at 32-33).

collected by the FBI included maps charting potential school bus routes, false letterhead and fictitious employment applications.  The employment application in question solicited the applicant's personal information, including social security number, and asked a number of disturbing questions about the applicant's interest in sex with children, among other sexual topics.  The application also requested nude photos of the applicants.  The evidence recovered by the FBI indicated that defendant distributed the employment application to at least one individual, based on the fact that at least one man (a resident of a men's shelter) filled out the application and returned it to the defendant.

Although the evidence is unclear whether the defendant had the intention to actually form a bus company (a disturbing thought, given that the defendant had molested children while working as a bus matron), these documents certainly indicate that the defendant spent part of the nine months between his two periods of incarceration tricking others into sharing nude photos and their sexual thoughts about children.  At worst this is evidence of the defendant's looking to reenact the scene of his prior hands-on offenses against children; at best this is further evidence supporting Dr. Kreuger's "strong sense" that the defendant is "manipulative . . . and deceptive." (Tr. 2 at 94).

Finally, in addition to the findings relating to the defendant's degree of psychopathy, Dr. Kreuger administered several other analyses showing the risks posed by the defendant.   To sample but a few:

- Dr. Kreuger administered the Static-99 actuarial test on the defendant and found that it indicated a high risk of reoffending.  (Tr. 2 at 16; Tr. 2 at 105).

- Dr. Kreuger administered the SVR-20 test on the defendant and found that it indicated a high risk of reoffending.  (Tr. 2 at 16)

- Dr. Kreuger administered the SONAR (Sex Offender Needs Assessment Rating scale) test on the defendant and found that it indicated a moderate high risk of reoffending.  (Tr. 2 at 16)

- Dr. Kreuger administered the Coleman Compulsive Sexual Behavior Inventory and found that during times when the defendant was looking at child pornography, the defendant's sexual drives were "compulsive, very sort of out of control."  (Tr. 2 at 83).

Overall, Dr. Kreuger found that the defendant had a "high" or "moderate to high" risk of engaging in what the Court described as "light touching" and "heavy touching."  (Tr. 2 at 17-26, 64; Tr. 2 at 115).  Dr. Kreuger further added that pedophiles like the defendant who seek out children (as opposed to molesting children they already have access to) are more dangerous that other pedophiles and have a higher risk of recidivism.  (See Tr. 2 at 91).

In total, both the government and the defense experts joined in the above findings (although only Dr. Kreuger had the opportunity to speak with the defendant).  Both Dr. Kreuger and Dr. Berrill agreed that the defendant scored poorly on the psychopathy tests; that the defendant was prone to deception and deceit; that the defendant had lied to his previous doctors, including those administering court-ordered treatment; and that the defendant had a high risk of reoffending, both in regard to child pornography offenses and molestation offenses.  After all of this, however, Dr. Kreuger opined that the "least risky" step that could be taken by the Court is to give the defendant no further incarceration and release him into the community for treatment.  (Tr. 2 at 64-65; Tr. 2 at 70 ("The overall analysis is that he's a high risk.  I think the plan I have set forth addresses that high risk")).

Given his findings, Dr. Kreuger's conclusion that releasing the defendant now is the "least risky" outcome is not supported by the evidence.[34]  The defendant has molested at least four children; he is prone to deception, deceit and refusal to follow social norms; he scores as a high risk on every known psychological instrument; he has sought out children in the past; and he flagrantly deceived the last doctors who attempted to provide him with outpatient treatment.[35]  While the defendant may benefit from treatment, Dr. Kreuger's opinion is not just incoherent—it is irresponsible and dangerous.  Dr. Berrill, to the contrary, did not opine on how many years in prison the defendant should serve—he noted that he was retained to perform a psychological risk assessment of the defendant for the benefit of the Court, not to express an opinion of what the defendant's sentence should be.  (Tr. 2 at 116-17).[36]  Dr. Berrill did express, however, one piece of common sense lacking in Dr. Kreuger's

---

[34] The Court saw evidence presented by the defendant that incarceration has no substantial effect on recidivism after release.  (Tr. 2 at 36 ("THE COURT: Well, I'm going to assume that's what the study says, that it's neutral.  Incarceration is neutral as a risk factor.")  Thus, if the defendant's risk of re-offense is not increased by a longer period of incarceration, it is certainly less risky to the community if the defendant is released after a longer period of incarceration and thus is kept apart from children for a longer period of time.

[35] The only points in the defendant's favor are that he did not actually batter the victims he molested, and that during the nine months between his two prison sentences, there is no known evidence that indicates that he molested any additional victims.  (Tr. 3 at 220, 231).

[36] The government concurs with Dr. Berrill's approach to this inquiry:  the doctors were retained to assess the defendant's risk of recidivism, not to determine what sentence would be sufficient, but not more than necessary, given the defendant's crime and personal characteristics.  The assessment of final sentence is a determination that should be left to the Court

advice: "I can tell you this.  Certainly the longer the defendant is in prison, the less likely it is that any child will be victimized by him."  (Tr 2. at 117).

In Polouizzi, C.R., R.V. and other similar cases, this Court made a point of assessing whether a defendant charged with sex offenses would pose a risk of re-offense upon their release.  The Court clearly weighed these risk factors out of an appropriate concern for the community at large, and the record shows that the Court's final decisions with regard to those defendants were motivated, in part, by the Court satisfying itself that none of those defendants would commit hands-on offenses against children upon release.  Given the record presented before the Court in the instant case, however, the government fails to see how the Court could reach an equivalent level of comfort with this defendant.  Every factor, detailed above, points to the defendant's extraordinary risk of re-offense.

In its recent decision in the R.V. case, this Court distinguished between producers of child pornography and the viewers of child pornography, describing the former as "child molesters, frequently representing the worst and most dangerous type of offender." R.V., 2016 WL 270257, at *2.  This defendant, Darnell Washington, is a repeat child molester.  This defendant, Darnell Washington, is that most dangerous type of offender.  Put more clearly, if this defendant, on these facts, does not offer a unacceptable level of danger of re-offense warranting (at the very least) the statutory mandatory minimum sentence required by law, the government fails to see what defendant would.

<u>CONCLUSION</u>

For the reasons outlined above, the Court is required by law to reject

defendant's arguments and to impose a lawful sentence.

Dated:      Brooklyn, New York
            April 1, 2016

                                    Respectfully submitted,


                                    ROBERT L. CAPERS
                                    UNITED STATES ATTORNEY
                                    Eastern District of New York
                                    Attorney for Plaintiff
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201


                        By:    /s/ Erik D. Paulsen
                               Erik D. Paulsen
                               Assistant United States Attorney
                               (718) 254-6135