TM:EDP
F. #2013R00311

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

   - against -                                                                 Docket No. 13-CR-173 (JBW)

DARNELL WASHINGTON,

              Defendant.

– – – – – – – – – – – – – – – – – – –X

## SUPPLEMENTAL MEMORANDUM OF LAW IN RESPONSE TO THE COURT'S APRIL 8, 2016 REQUEST FOR ADDITIONAL BRIEFING

                                                                     ROBERT L. CAPERS
                                                                     UNITED STATES ATTORNEY
                                                                     Eastern District of New York
                                                                     271 Cadman Plaza East
                                                                     Brooklyn, New York 11201

Erik D. Paulsen
Assistant U.S. Attorney
    (Of Counsel)

This is not just a child pornography case—this is a sentencing of a convicted child molester who has already demonstrated a high risk of recidivism.[1]

On April 8, 2016, the Court issued an Order requesting that the parties submit supplemental briefing on the following two issues: first, "what resources will probably be available to this defendant after he is released from incarceration that will result in adequate protection to the public as well as support his own appropriate development" and second, "how will a term of incarceration of fifteen years or more, as compared to a sentence below the fifteen year minimum, affect defendant's reentry."[2] (Order at 3).

---

[1] Although the Court correctly notes that "[t]his is a child pornography case," (Order at 1 (April 8, 2016) ("Order")), the defendant's past conduct has not been limited to child pornography offenses. In this case, the defendant has been convicted of both possession of child pornography as well as the sexual exploitation of a child. Prior to these convictions, the defendant was convicted in New York State for several incidents of child molestation.

In United States v. R.V., this Court commented on the "continuum" of individuals who involve themselves with child pornography, drawing distinctions between those who merely "collect" child pornography and those who produce child pornography. No. 14-CR-0316, 2016 WL 270257, at *3, 23 (E.D.N.Y. Jan. 21, 2016). The defendant in this case is the latter kind of offender—a type of offender that this Court has stated "potentially constitutes a most serious and dangerous category of child pornography offender[]" and the "most likely to engage in the future, in the sexual exploitation of a minor." Id. at 3; see id. at 2 ("Child pornography offenders can be broadly divided into two main categories: those who produce child pornography and those who are viewers of child pornography. By definition, producers of child pornography are child molesters, frequently representing the worst and most dangerous type of offender."). Relatedly, in R.V., the Court presented a Venn diagram to clarify that all "child pornography offenders" are not, in fact, "sex offenders" or "pedophiles." Id. at 24. Again, while that observation may be true in general, it is not true as to this defendant: this defendant is a child pornography offender, a sex offender and a pedophile, and thus sits squarely in the area of maximum intersection within the Venn diagram presented by the Court.

[2] As was noted in the government's earlier brief, dated April 1, 2016, the Court is required by law to impose a mandatory minimum sentence which (depending on good-time credit) will result in the defendant being incarcerated for approximately nine and a half

1

I.     RESOURCES AVAILABLE TO THE DEFENDANT UPON RELEASE FOLLOWING A LAWFUL SENTENCE OF AT LEAST FIFTEEN YEARS

As was suggested by the Court in its Order, the government consulted with the United States Probation Department regarding (1) the measures that can be taken to protect the community following the defendant's release and (2) the resources that will be available to the defendant to support his development upon his release.[3]

A.     Measures to Protect the Community

The Probation Department ("Probation") will supervise the defendant following his release from prison. In general, probation utilizes a "containment" approach with the sex offenders under its supervision. Probation can undertake various measures aimed at protecting the community from the defendant, which may include the following (subject to the Court's approval):

- GPS Monitoring: Probation can use GPS devices to track the whereabouts of the defendant. Probation uses "passive" GPS monitoring—meaning that Probation will learn about the defendant's location at some point after the defendant's movements are made (that is, the GPS is not monitored contemporaneously). Probation can use the GPS to designate areas where the defendant may not travel, also known as "exclusion zones," if there are specific locations of concern to the Court (such as the house of a victim, for example). Such exclusion zones, however, cannot be used to designate general areas of temptation, such as all schools or playgrounds.

---

additional years. Any sentence imposed by the Court below this mandatory minimum sentence would be unlawful.

[3] The undersigned discussed these issues with Probation Department Supervisor Lawrence Andres, who was able to provide a summary of the resources available as of the present day. Although Mr. Andres does not expect that these resources will substantially change in the near future, it is impossible to predict what other resources or laws might be in effect at the time of the defendant's lawful release.

- Computer and Internet Monitoring: Probation can install software on the defendant's computer to monitor his internet activities, subject to certain limitations. Probation would likely request that the defendant's use of a smartphone be prohibited, as Probation does not currently have the capability to monitor usage on such devices.

- Referral to Treatment Providers: Probation will refer the defendant to one of its contract treatment facilities. These treatment facilities will provide individual therapy as well as group sex offender treatment if appropriate. If the treatment facility finds that it is warranted, it will refer the defendant to outside specialists for attention to mental health issues or to address conditions that might require medication.[4]

- Residence Approval: Probation will likely request the standard release condition requiring the defendant to seek approval from Probation prior to making living arrangements. This would enable Probation to restrict the defendant from living in locations that, for example, allow inappropriate proximity to children.

- Sex Offender Registry: Probation will ensure that the defendant's information with the sex offender registry is kept up to date.

- Field Visits: Probation can visit the defendant on a regular basis to insure compliance with the forgoing.

B. Resources Available to the Defendant

As is noted above, upon the defendant's release from prison, the Probation Department would likely request that the Court refer the defendant to a treatment facility. This treatment facility would address the defendant's psychological needs in several ways, utilizing individual therapy, group therapy, mental health outreach and (if necessary)

---

[4] According to Probation Supervisor Andres, a defendant's success in treatment is largely dependent on the defendant's willingness to comply. Given the defendant's flagrant deception during his previous Court-ordered sex offender treatment, the government has doubts that the defendant will offer sincere efforts should such treatment be included as part of his release conditions.

medication. While this treatment is taking place, Probation would attempt to facilitate the defendant's reintegration into society, particularly in regard to housing and employment.

In light of the defendant's estrangement from his family, Probation would likely recommend that the Court add a special condition releasing the defendant to the care of a halfway house at the end of his mandatory minimum sentence. Such a placement would likely help the defendant acclimate back into society. The Court could, for example, order the defendant to stay at the halfway house for a period of six months, or allow the defendant to leave the halfway house once he found a suitable new residence (subject to approval by Probation). This latter approach would provide housing stability for the defendant while ensuring that his placement in the halfway house was not perceived as a punishment.

While addressing the defendant's housing needs and mental health requirements, Probation would also refer the defendant to one of the job training institutions that work with EDNY defendants, such as Workforce One and the Fortune Society. These institutions, among others, provide vocational training and reentry skills to individuals like the defendant. These institutions often work with EDNY sex offenders, a great many of whom have been able to find gainful employment following incarceration.

II. SCHOLARLY RESEARCH CONCERING THE RELATIONSHIP BETWEEN LENGTH OF SENTENCE AND THE RISK OF SEX OFFENSE RECIDIVISM AMONG CHILD MOLESTERS DOES NOT SUPPORT THE DEFENDANT'S MOTION FOR AN UNLAWFUL SENTENCE

The relationship between the length of a sex offender's sentence and his subsequent recidivism risk has not been the subject of considerable study. In a 2013 study entitled "Sex Offenders and Sex Crime Recidivism: Investigating the Role of Sentence Length and Time Served," authors Kristin Budd and Scott Desmond described "the literature

on sentence length, time served, and sex offender recidivism" as "sparse."  Budd and Desmond, <u>Sex Offenders and Sex Crime Recidivism: Investigating the Role of Sentence Length and Time Served</u>, International Journal of Offender Therapy and Comparative Criminology 58(12), at 1485 (2013) ("Budd and Desmond") (GX 802).  The authors noted that there have been "few studies that focus on sentence length or time served for sex offenders and the effect these criminal justice sanctions have on sex crime recidivism," and only one previous study that primarily focused on that relationship.  <u>Id.</u> at 1484.  The one previous study that primarily focused on this relationship – a study of 627 sex offenders in Canada – was referred to by defense counsel during his direct examination of Dr. Krueger.  Kevin L. Nunes, et al., <u>Incarceration and Recidivism Among Sexual Offenders</u>, 31 Law. Hum. Behav. 305 (2007) ("Nunes") (DX FF); (Tr. 2 at 36).

       The findings of the two studies cited above (Nunes, Budd and Desmond) are as follows:

- The Nunes study of 627 Canadian sex offenders found that a given inmate's prior length of sentence had little to no impact on that inmate's future rate of recidivism.  Nunes at 305-06, 314.  This was a study of specific deterrence, not general deterrence.  <u>Id.</u> at 315.  The authors stated that its findings would support use of alternatives to incarceration for "<u>sexual offenders who fall below some minimally acceptable risk level.</u>"  <u>Id.</u> at 314 (emphasis added).

- The Budd and Desmond study consisted of an analysis of 8,461 offenders released in 1994 from 13 states.  Budd and Desmond at 1485.  The study measured recidivism in two different ways.  When recidivism was measured by future arrest for sex crime offenses, the study found that length of sentence was not related to risk of recidivism.  <u>Id.</u> at 1488.  When recidivism was measured by future conviction for sex crime offenses, however, the study found that longer sentences resulted in a slightly increased risk of recidivism for rapists and sexual assaulters while, conversely, "each additional month of incarceration was associated with a slight decrease in the odds of recidivism" for one specific group: child molesters.  <u>Id.</u> at 1493.

5

In summary, neither study found very strong relationships between length of sentence and future risk of re-offense, although the Budd and Desmond study did find that longer sentences had a deterrent effect on individuals like the defendant in this case: child molesters.

In addition to being "sparse," Budd and Desmond noted that the research in this field is subject to several additional limitations. Among other things, the studies that have been done suffer from the following issues: they generally treat sex offenders as a homogenous rather than heterogeneous population; they lack risk information about the offenders; they focus on offenders from nations with lower crime rates and lower incarceration rates than the United States; and they use data that predate newer statutory schemes, such as Megan's Law. Budd and Desmond at 1485, 1495.[5] For these reasons, the authors warn that the study's findings, like that of the earlier studies, "should be interpreted with caution." Id. at 1495.

The limitations of these studies are magnified by the more general problem with measuring recidivism in the context of sex offenses: namely, that sex offenses of all kinds are widely underreported. Studies based on confidential interviews with admitted hands-on sex offenders indicate that only a small proportion of sex offenses committed by sex offenders actually result in arrests or convictions. Roger Przybylski, Adult Sex Offender

---

[5] The authors note that length of sentence and future risk of offense might be expected to have a correlative relationship (as it does for rapists) if judges are giving higher sentences to the individuals they perceive as most dangerous. Budd and Desmond at 1494. Under such a hypothesis, it is not that high-risk rapists are more likely to recidivate because they received a longer sentence; but rather, the high-risk rapists received longer sentences because they were more likely to recidivate in the first place.

Recidivism, Sex Offender Management Assessment and Planning Initiative, Office of Justice Programs, Department of Justice, at 2 (available at http://www.smart.gov/SOMAPI/sec1/ch5_recidivism.html) (GX 801) (noting studies indicating that sex offenders were arrested for between 1 and 5 percent of the actual offenses they committed).  This concern is especially acute with child molesters: "While unreported crime affects all recidivism research, it is particularly problematic in recidivism studies of child-molesting offenders as several studies have demonstrated that the likelihood that a sexual assault will be reported to law enforcement decreases with the victim's age." Id. at 7; see id. at 8 ("[M]olesters of boys had the highest rates of sexual recidivism. . . . The highest rate of recidivism among child molesters in the study (77 percent) was found for child molesters with previous sexual offenses, those who were never married, and those who selected extrafamilial boy victims.").  Accordingly, "researchers widely agree that observed recidivism rates are underestimates of the true re-offense rates of sex offenders." Id. at 2.

       Despite these limitations, Budd and Desmond add one final statistical observation that should be of use to the current inquiry.  In the statistical analysis performed on the 8,461 sex offenders, the authors found evidence for the commonsense understanding that "propensity for criminality decreases with age:"

> With this sample of sex offenders, we find that age is associated with decreased likelihood of sex crime recidivism after release from prison. A sex offender's age at time of release from prison is significant for all the three categories of sex offenders in the expected direction.  For each additional year a sex offender ages in prison before release, the odds of recidivating with a new sex crime after release from prison decreases by approximately 2% for rapists, 3% for sexual assaulters, and 3% for child molesters, holding all other variables constant.

7

Id. at 1489 (emphasis added). Thus, even with the somewhat inconclusive relationship between length of sentence and specific deterrence, a longer sentence still serves to minimize the risk of re-offense in that a longer sentence results in the defendant growing older and less likely to act on improper impulses once he is released.[6]

Dated:    Brooklyn, New York
             April 25, 2016

                                        Respectfully submitted,

                                        ROBERT L. CAPERS
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

                          By:    /s/ Erik D. Paulsen
                                        Erik D. Paulsen
                                        Assistant United States Attorney
                                        (718) 254-6135

---

[6] These studies solely address the issue of specific deterrence. A longer sentence for the defendant can also be justified by the other purposes of punishment: general deterrence, retribution and (most pressing for this highly-dangerous defendant) incapacitation.